# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SMALL PROPERTY OWNERS OF NEW YORK, INC.; RPN MANAGEMENT CO., INC.; PKM HOME LLC; and 135 W 78TH, LLC,<br><br>     Plaintiffs,<br><br>**-against-**<br><br>THE CITY OF NEW YORK; THE NEW YORK CITY RENT GUIDELINES BOARD; RUTHANNE VISNAUSKAS, in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal; THE STATE OF NEW YORK; DOUG APPLE, in his official capacity as chair and member of the New York City Rent Guidelines Board; ARPIT GUPTA, ALEX SCHWARTZ, REED JORDAN, ALEXANDER ARMLOVICH, ROBERT EHRLICH, CHRISTINA SMYTH, GENESIS AQUINO, and ADÁN SOLTREN, in their official capacities as members of the New York City Rent Guidelines Board,<br><br>     Defendants. | **Complaint for a Civil Case**<br><br>Case No.<br><br>_____<br><br>Jury Trial: ☐ Yes ☑ No |

## INTRODUCTION

1. This case is a constitutional challenge to the provisions of New York's Rent Stabilization Law that limit the rent that can be charged for vacant apartments. Rent control laws in most jurisdictions allow rent to reset to market levels upon vacancy. Likewise, in New York, building owners can charge market rent for vacant apartments in buildings constructed *after* 1974.

1

But the Rent Stabilization Law strictly limits the rent that can be charged for vacant apartments in pre-1974 buildings. Moreover, the rents set by the Rent Stabilization Law for vacant apartments are fundamentally arbitrary: Each apartment's regulated rent reflects its history of prior tenant turnover over the past five decades, a metric that bears no relationship to an incoming, unrelated tenant. As a result, essentially identical vacant apartments are subject to wildly disparate rental caps, for no material reason.

2.    These selective and arbitrary rent caps on vacant units are not helping any tenant. To the contrary, they are keeping units off the market. Owners must incur expenses to put apartments on the market. Amongst other things, apartments typically require repairs and renovations after long-term tenancies before they can be rented again. Indeed, regulations mandate updates. But, after over fifty years of rent stabilization, the regulated rents on some apartments have become so low (in some cases, just hundreds of dollars per month) that it makes no economic sense to incur the expense associated with putting units on the market. As a result, tens of thousands of apartments sit vacant in New York City amidst a housing shortage. These apartments have been regulated off the market.

3.    The ongoing enforcement of these rental caps on vacant units is unconstitutional. It violates the Takings Clause because it directly takes from the value of the apartment's leasehold, resulting either in a complete taking (by making it economically impossible to rent the leasehold) or a partial taking of the leasehold's value. The arbitrary nature of the caps also violates the Due Process Clause, because materially identical vacant apartments are subject to wildly disparate rental caps based on a random walk through a half-century of regulatory history involving unrelated tenants who no longer occupy the apartments. And it also violates the Equal Protection Clause

because the owners of some vacant apartments are free to rent at market rates, while others are subject to crushing limitations, despite the lack of any rational basis for that discrimination. Amongst other irrationalities, it makes no sense to limit the rent of a vacant apartment in 2025 based on whether the building was constructed before or after 1974.

4.      Because this case focuses only on vacant apartments, it does not challenge the proposition that the government can limit increases in rent to protect existing tenants from being forced out of their apartments. But, when government sets the rent for vacant apartments, there is no tenant to protect. And when New York sets the rent so low that vacant apartments cannot ever be rented, it effectively takes those apartments off the market. New York does not remotely help tenants—and instead makes all New Yorkers worse off by limiting housing supply. Plaintiffs want to put tenants into their vacant apartments, and they are unable to do so only because of New York's irrational and unconstitutional Rent Stabilization Law.

## JURISDICTION AND VENUE

5.      This case is a federal constitutional challenge to New York's restriction on the rent that can be charged for vacant apartments in buildings that were constructed before 1974.

6.      This case is brought pursuant to the Fourteenth Amendment, which incorporates the Fifth Amendment's Takings Clause; the Declaratory Judgments Act; the Civil Rights Act of 1871; and *Ex parte Young*, 209 U.S. 123 (1908).

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

8.      Venue lies in this Court pursuant to 28 U.S.C. § 1391 because multiple apartments at issue in this case are located in the Southern District.

## PARTIES

### *Plaintiffs*

9.      Plaintiff Small Property Owners of New York, Inc. ("SPONY") is an all-volunteer nonprofit trade association that represents the interests of small-scale property owners in New York City. It was founded over 40 years ago by a group of property owners who came together at a meeting of New York City's Rent Guidelines Board, united by the difficulties they were having navigating New York's rent stabilization laws. The association represents the interests of small property owners throughout New York, and its membership includes small property owners with apartments that cannot be rented because the Rent Stabilization Law arbitrarily caps their rent at amounts that make it economically infeasible to put them on the market. As a result, the leaseholds for those apartments cannot be rented and have lost their economic value.

10.      Plaintiff RPN Management Co., Inc. is a corporation that is owned and managed by brothers Pashko and Tony Lulgjuraj (as well as other family members with passive ownership stakes). Through this corporate entity, Pashko and Tony operate a building in upper Manhattan— at 81 Cabrini Boulevard—that contains two two-bedroom apartments that sit vacant because the Rent Stabilization Law has capped their rents at arbitrary amounts (approximately $710 and $860). Those amounts render Pashko and Tony's units economically unviable, as they do not justify the cost of legally mandated repairs and renovations that would be required to bring the units back on the market, and they are not sufficient to allow Pashko and Tony to profitably rent the units. As a result, the leaseholds for those apartments cannot be rented and have lost their economic value.

11.      Plaintiff PKM HOME LLC is a limited liability company that is owned and managed by Bipin Mathew and his wife. Through this corporate entity, Bipin owns and operates a building in Queens—at 1819 Cornelia Street—that contains a two-bedroom unit that sits vacant because the

Rent Stabilization Law has capped its legal rent at an arbitrary amount (around $1,300). That regulated rent renders Bipin's unit economically unviable, as it does not justify the cost of legally-mandated repairs and renovations that would be required to bring it back onto the market, and it is not sufficient to allow Bipin to profitably rent the unit. As a result, the leasehold for that apartment cannot be rented and has lost its economic value.

12.     Plaintiff 135 W 78TH, LLC is a limited liability company that is owned and managed by Ilan Rabinovitch. Through this corporate entity, Ilan owns and operates a building on Manhattan's Upper West Side—at 135 W. 78th Street—that contains a one-bedroom apartment that sits vacant because the Rent Stabilization Law has capped its rent at an arbitrary amount (approximately $1,200). That amount renders Ilan's unit economically unviable, as it does not justify the cost of legally-mandated repairs and renovations that would be required to bring the unit back onto the market, and it is not sufficient to allow Ilan to profitably rent the unit. As a result, the leasehold for that apartment cannot be rented and has lost its economic value.

### Defendants

13.     Defendant City of New York is the governmental entity with responsibility, pursuant to state law, to determine the existence of a housing emergency warranting continued application of the Rent Stabilization Law. The City of New York most recently made an emergency finding for the City's apartment rental market on March 19, 2024.

14.     Defendant New York City Rent Guidelines Board is the New York City governmental agency that determines allowable annual rental increases, including vacancy increases, for stabilized apartments. The Rent Guidelines Board is therefore charged with enforcing the provisions of state law that limit vacancy increases for vacant apartments.

15.     Defendant RuthAnne Visnauskas is the Commissioner of the New York State Division of Housing and Community Renewal, which enforces violations of the Rent Stabilization Law. Ms. Visnauskas is sued in her official capacity.

16.     Defendant State of New York is the governmental entity that, through the governor, ultimately controls the Division of Housing and Community Renewal.

17.     Defendant Doug Apple is the chair, as well as a member, of the New York City Rent Guidelines Board. Mr. Apple is sued in his official capacity.

18.     Defendants Arpit Gupta, Alex Schwartz, Reed Jordan, Alexander Armlovich, Robert Ehrlich, Christina Smyth, Genesis Aquino, and Adán Soltren are members of the New York City Rent Guidelines Board. They are sued in their official capacities.

## FACTUAL ALLEGATIONS

### *Thousands of Apartments Sit Vacant Because of Rent Stabilization*

19.     New York City instituted "emergency" rent stabilization in 1969.

20.     In 1974, the New York state legislature passed the Emergency Tenant Protection Act, which superseded the City's previous rent stabilization law. The Act (as amended, and in conjunction with regulations promulgated pursuant to the Act) provides the current framework for rent stabilization in New York City.

21.     The provisions of the Emergency Tenant Protection Act of 1974, as subsequently amended and currently in force, together with the relevant implementing regulations, are hereinafter referred to as the Rent Stabilization Law.

22.     As currently amended, the Rent Stabilization Law generally applies to apartments in buildings that (1) were constructed before 1974 and (2) contained 6 or more units as of 1974.

Application of the Rent Stabilized Law is not means-tested and therefore does not depend on the tenant's income or ability to pay.

23.     The state legislature designed the Rent Stabilization Law to address temporary emergencies. On its own terms, it applies within New York City only upon the City Council's declaration of a housing "emergency," and, barring subsequent emergency findings, expires after three years.

24.     The Rent Stabilization Law allows New York City to declare a three-year housing emergency "on the basis of the supply of housing accommodations within [the City], the condition of such accommodations and the need for regulating and controlling residential rents within [the City]." N.Y. Unconsol. Law § 8623(a).

25.     The New York City Council has repeatedly declared a housing "emergency" to keep the Rent Stabilization Law in force every three years since the Rent Stabilization Law first came into effect—*i.e.*, every three years for over 50 years.

26.     New York City most recently declared a housing emergency on March 19, 2024, continuing the law in effect for another three years.

27.     The Rent Stabilization Law has been amended repeatedly over time, with the most recent amendment effective October 17, 2024.

28.     Even though the Rent Stabilization Law has been repeatedly amended since 1974, and even though the Rent Stabilization Law currently applies based on an emergency finding made in March 2024, the Rent Stabilization Law generally only applies to apartments in buildings constructed before 1974.

29.    Defendant New York City Rent Guidelines Board is the entity that determines allowable increases in the rent for rent-stabilized apartments. *See* N.Y.C. Admin. Code § 26-510; N.Y. Unconsol. Law § 8624.

30.    The Rent Guidelines Board consists of nine members, all of whom are appointed by the New York City mayor.

31.    Defendant Doug Apple is the chair, and a member, of the Rent Guidelines Board.

32.    The other eight members of the Rent Guidelines Board are Defendants Arpit Gupta, Alex Schwartz, Reed Jordan, Alexander Armlovich, Robert Ehrlich, Christina Smyth, Genesis Aquino, and Adán Soltren.

33.    The Rent Stabilization Law distinguishes between a "vacancy lease," which is the "first lease or rental agreement for a housing accommodation that is entered into between an owner and a tenant," and a "renewal lease," which is a subsequent renewal for an existing tenant. *See* 9 N.Y.C.R.R. §§ 2520.6(g), (h).

34.    The Rent Stabilization Law's provisions limiting rent increases for renewal leases of occupied apartments are codified at 9 N.Y.C.R.R. § 2523.5(a).

35.    For years, increases allowed by the Rent Guidelines Board for renewal leases have consistently been below natural increases in market rents.

36.    For years, increases allowed by the Rent Guidelines Board for renewal leases have consistently been below increases in expenses faced by New York City building owners.

37.    The Rent Stabilization Law's provisions limiting the rent that can be set for a vacancy lease—*i.e.*, the initial lease of a vacant apartment—are codified at N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. § 2522.5(a); and 9 N.Y.C.R.R. § 2522.8.

8

38.    Since 1969, the Rent Stabilization Law's provisions for vacancy leases have been repeatedly revised. From 1971 to 1974, rent was allowed to reset to market upon vacancy. Since 1974, the law has periodically allowed for "vacancy increases," meaning that owners were allowed to increase rents upon vacancy by a set percentage over and above the usual increases allowed by the Rent Guidelines Board. Vacancy increases have gone up and down over time, but at times went as high as 20% of the unit's regulated rent.

39.    When they were allowed, vacancy increases made it possible for the rents on stabilized apartments to at least partly catch up with market rents when tenants turned over. As such, vacancy increases helped to keep legal rents from drifting too far out of alignment with underlying economic realities.

40.    However, vacancy increases could only have that beneficial effect if apartments had turnover at a time when meaningful vacancy increases were allowed. Therefore, apartments that have had less turnover over the last fifty years (or had turnover at times when vacancy increases were less meaningful) have lower regulated rents than apartments that had more turnover (or turnover at times when vacancy increases were more meaningful).

41.    Currently, the Rent Stabilization Law prohibits vacancy increases. *See* N.Y. Unconsol. Law § 8624(e) ("Rent guidelines boards shall no longer promulgate adjustments for vacancy leases."). Therefore, when renting a vacant stabilized apartment, owners must charge the new incoming tenant the same rent they charged the last tenant—adjusted only by whatever percentage increase the Rent Guidelines Board allows for occupied apartments. *See* 9 N.Y.C.R.R. § 2522.8 (maximum rent for vacancy lease is calculated by adding current year's renewal percentage increase to previous rent).

42.     The New York Division of Housing and Community Renewal enforces violations of the Rent Stabilization Law. *See* N.Y. Unconsol. Law § 8632.

43.     Those violations include when an owner collects rent "above the rent authorized" by the Rent Stabilization Law for a specific stabilized apartment, including for vacancy leases. N.Y.C. Admin. Code § 26-516(a).

44.     The Commissioner of the New York Division of Housing Community Renewal, *i.e.*, Defendant RuthAnne Visnauskas in her official capacity, imposes civil penalties on owners for violating the Rent Stabilization Law.

45.     An owner would subject himself to severe civil penalties if he rented out a vacant apartment for an amount above the authorized rent for the apartment.

46.     When units become vacant, they typically require repairs before they can be put back on the market. For example, they may require extensive lead abatement; structural repair such as replacement or leveling of floors, windows, or doorframes; redoing of electrical wiring or gas pipes; or modernization of bathrooms, kitchens, and replacement of appliances.

47.     Repairs to vacant apartments are required by state and municipal laws and regulations, and owners would open themselves up to liability if they rented vacant units without making necessary repairs.

48.     The cost of necessary repairs, including permitting, demolition, removal, materials, and labor, can easily exceed $100,000 for a single vacant apartment.

49.     The Rent Stabilization Law's provisions regarding recovery of the cost of repairs or improvements to vacant units (*i.e.*, increases for Individual Apartment Improvements) have also been amended over time. Before 2011, owners could obtain a permanent increase in rent for a

stabilized apartment, in an amount equaling 1/40th the cost of an Individual Apartment Improvement. In other words, owners could increase the rent in an amount that would allow them to recover the full cost of the work on the apartment in just a little more than three years.

50.    Today, the increase allowed for Individual Apartment Improvements to vacant apartments is far lower. If an increase is allowed at all, the very maximum increase is limited to 1/144th of the actual cost of the improvement, up to $50,000. In other words, owners may increase the monthly rent by a maximum of $347.22 (1/144 of $50,000) to reflect repairs to a vacant apartment. This increase is designed to allow the apartment owner to recover the cost of the work on the apartment (but only up to $50,000) over a period of fifteen years.

51.    That $50,000 maximum (or $347.22 monthly increase) applies only to vacant apartments that (i) were registered as "vacant" no later than December 31, 2024, or (ii) became recently vacant following a period of continuous occupancy for more than twenty-five years.

52.    For vacant apartments that do not fall into those categories, the Individual Apartment Improvement rental increase is 1/168th the cost of the improvement, up to a maximum of $30,000. Therefore, owners who are ineligible for the $50,000 increase may increase the monthly rent up to $178.57 (1/168 of $30,000) to reflect repairs to a vacant apartment. This increase is designed to allow the apartment owner to recover the cost of the work on the apartment (up to $30,000) over a period of fifteen years.

53.    If an owner makes multiple repairs to an apartment over a fifteen-year period, the law limits the owner to a maximum $347.22 (or $178.57) monthly increase during that time. Thus, the law provides no way to recover the cost of subsequent repairs after that first $347.22 (or $178.57) monthly increase is obtained.

54.     If a repair to a vacant unit costs more than $50,000 (or $30,000), the law provides no mechanism for the owner to recover that cost over that fifteen-year period.

55.     If an owner borrows money to finance $50,000 (or $30,000) worth of repairs for an apartment, the law provides no mechanism for the owner to recover the interest that would be charged on that loan over a fifteen-year period.

56.     The provision for Individual Apartment Improvement increases also does not provide any mechanism to recover the cost of applying for the increase, which can be significant.

57.     Because getting a vacant apartment ready to go on the market almost always costs more than $50,000 (or $30,000), the upshot is that the law mandates repairs to vacant rent stabilized apartments before they can be put back on the market but does not allow owners to increase rent to cover the cost of those necessary repairs.

58.     Every stabilized apartment's regulated rent is a combination of (1) the rent that was charged for the apartment at the time that the Rent Stabilization Law was first imposed, (2) annual percentage increases that have been allowed over time by the Rent Guidelines Board, (3) the apartment's history of improvements and whatever provision for recovery of costs happened to be in force at the time those improvements were made, and (4) the apartment's history of vacancies and the rent increases that were legally allowed under whatever version of the Rent Stabilization Law happened to be in place at the time of vacancy.

59.     Notably, the rent that an owner may charge for a vacant stabilized apartment does not depend on any characteristic of either the apartment or the incoming tenant. It does not turn on apartment square footage, location, or condition. It also does not turn on the tenant's income or

ability to pay. There is no requirement that a tenant be low income (by any definition) in order to occupy a rent-stabilized apartment at the stabilized rent.

60. Functionally identical vacant apartments in the same building, with the same floorplans, can have wildly disparate stabilized rents depending on their previous rental histories.

61. Based on their particular histories, some vacant apartments have high regulated rents—in some instances, rents that are even higher than the market rent.

62. When the stabilized rent on an apartment is higher than market, the owner typically rents the apartment at a rent below the legal rent—what New York City calls a "preferential rent." About a quarter of rent stabilized apartments in New York City rent for preferential rents.

63. On the other hand, again based on their particular histories, some vacant apartments have very low regulated rents—in some instances, rents that are far below market rent.

64. For example, some two-bedrooms in the building at 81 Cabrini have legally regulated rents of more than $5,000 per month (and rent for less than that amount), while other two-bedrooms in the same building have legally regulated rents in the hundreds of dollars per month (and sit vacant because they cannot economically be rented).

65. New York's treatment of vacant apartments makes its rent stabilization law an anomaly. Most other jurisdictions that limit the rent that can be charged for apartments or other residences allow rent to reset to market upon vacancy.

66. For instance, California state law has long required municipalities to allow rents to increase to market rate upon vacancy. *See* Cal. Civ. Code §§ 1947.12(b) ("For a new tenancy in which no tenant from the prior tenancy remains in lawful possession of the residential real property, the owner may establish the initial rental rate[.]"), 1954.53(a) ("Notwithstanding any other

provision of law, an owner of residential real property may establish the initial rental rate for a dwelling or unit[.]").

67.     In New York City, a separate legal regime (the "Good Cause Eviction Law") also limits the amount that owners can raise the rent on tenants in apartments that are not subject to rent stabilization. The Good Cause Eviction Law limits rent increases to either 10% or 5% plus the annual change in the Consumer Price Index. Importantly, however, when apartments subject to the Good Cause Eviction Law become vacant they can be rented out at market rates.

68.     In large part because the rent on stabilized apartments does not reset upon vacancy, buildings with large numbers of stabilized units are in financial distress across the City as expenses are growing faster than income.

69.     The rent for some rent-stabilized apartments in New York City is set so low that owners cannot profitably put those apartments on the market.

70.     An owner necessarily incurs costs by renting an apartment. If there are issues with an apartment, the owner must fix them. The owner will also have to pay for regular wear and tear caused by a tenant.

71.     An owner also accepts substantial risk by renting an apartment. That includes risk of a legal dispute, which can require paying for a lawyer; risk that a tenant might use an apartment for an illegal purpose; risk of nonpayment and nonrecovery of rents owed; and risk of damage to the apartment or common areas of the building by the tenant.

72.     The rent on some apartments is set so low that it does not make sense for owners to incur these costs and liabilities.

73.    The stabilized rent for some vacant apartments is set so low that it does not make sense for owners to incur the expense of repairing the apartment to bring it up to code and get it ready for the market (regardless of any Individual Apartment Improvement increase).

74.    In 2024, a survey of owners in New York City found that over 26,000 rent stabilized apartments were vacant and unavailable for rent after long-term occupancies.

75.    The true number of vacant rent stabilized apartments in New York City may be even higher than 26,000.

76.    Tens of thousands of rent stabilized apartments currently sit vacant in New York City because the rent on those apartments has been set so low that they cannot be profitably rented.

### *New York Sets Rent at the Unit Level, But Determines Hardship at the Building Level*

77.    In an attempt to ameliorate the economic impact of its Rent Stabilization Law, New York allows owners of stabilized apartment buildings to file hardship petitions where they may request that they be allowed to increase a building's stabilized rents.

78.    On information and belief, New York has not granted any hardship relief in years, but has repeatedly denied applications on technical grounds—*e.g.*, because the agency deemed the applications untimely by a matter of days or months.

79.    The standards for hardship relief are set out by law. New York officials have no authority to grant hardship relief if not authorized under those standards.

80.    New York has two formulae to calculate whether a building qualifies for hardship relief. One formula ("comparative hardship") compares the building's current profit margins over the last three years with the building's non-inflation-adjusted profit margins between 1968–70 (or another three-year period, in limited circumstances). If the profit margin from the earlier period

exceeded that of the last three years, the owner may obtain a rental increase reflecting the difference.

81.    The second hardship-relief formula ("alternative hardship") asks whether the building's gross revenue from the last year exceeded expenses by five percent. If not, the owner may obtain a rental increase reflecting the difference.

82.    When determining whether a building qualifies for hardship relief, New York imputes income for vacant units (and owner-occupied units) equal to the amount of maximum legal rent for the vacant unit.

83.    Both of these formulae determine hardship at the building level. The comparative hardship formula looks to profits for the building as a whole. Similarly, the alternative hardship formula compares gross revenue to expenses for the building as a whole.

84.    If hardship relief is granted, it is likewise granted at the building level. New York's Division of Housing and Community Renewal determines the percentage by which rents should be allowed to rise for the building as a whole under either the comparative or alternative formula.

85.    On the other hand, as explained above, the Rent Stabilization Law sets rents for regulated apartments at the unit level. Some apartments in a building may have rents that are very low, and others may have rents that are quite high.

86.    Therefore, hardship relief exacerbates the disparities between apartments' stabilized rents. If hardship relief is granted, an apartment with a high regulated rent would see its rent increase more (in absolute terms) than an apartment with a low regulated rent.

87.    For example, officials might determine based on the alternative hardship formula that rents for the building should be allowed to rise by 5%. That would mean that an apartment with

a regulated rent of $500 could see its rent go up by $25, whereas an apartment with a regulated rent of $4,000 could see its rent go up by $200. The difference in rent between the two apartments would be even larger after hardship relief was granted than before, both in absolute and in percentage terms.

88.     Because hardship relief is designed so that the rent goes up more for apartments that already have high rents, owners cannot necessarily realize the full amount of hardship relief. Apartments with high stabilized rents are frequently rented for less than the legal cap (at so-called preferential rents), meaning that the hardship relief is only theoretical and will not translate into any additional rent for those units. Meanwhile, apartments with irrationally low rents may remain economically unviable even after hardship relief is granted, meaning that increases for those units would also only be theoretical—and would not translate into any additional rent.

89.     Even if an owner's hardship application is granted, the owner may realize hardship relief only through gradual rental increases not exceeding 6% in any year. Therefore, if the amount of hardship relief exceeds 6%, it might be many years before an owner's allowed rental income reflects the full extent of the granted hardship relief.

90.     For example, if an apartment's rent is set at $600, then a successful hardship application would allow the rent on the apartment to increase by no more than $36 each year until the total increase is realized—no matter how high that total increase may be.

91.     This means that even after New York determines that a building is not profitable and grants hardship relief, New York does not immediately allow rents in the building to rise to a profitable level if the necessary increase in rent to make the building profitable is more than 6%.

92.    Even if the rent on a particular unit is set so low that the unit cannot be rented, the apartment may be located in a building that does not qualify for hardship relief.

93.    Owners, however, do not make the decision whether to rent a particular apartment based on the profitability of the building as a whole. Even if a building as a whole generates revenue for an owner, the owner will not rent an apartment if the rent generated by the apartment does not justify the associated costs.

94.    As a result, apartments with low regulated rents sit vacant and unoccupied even if they are located in buildings that do not qualify for hardship relief.

95.    In addition, because realization of any hardship relief is capped at 6% per year, even if hardship relief is granted it typically would not increase the rent on involuntarily vacant apartments to a point where they can profitably be leased.

96.    As a result, apartments with low regulated rents sit vacant and unoccupied, regardless of whether they are located in a building that qualifies for hardship relief.

97.    In other words, because hardship relief is calculated at the building level, whereas rents are set at the unit level, the hardship relief process does not meaningfully address the problem of vacant units with unprofitably low legal regulated rents.

### *Each Apartment Leasehold Is a Separate Property Interest*

98.    Each apartment unit in an apartment building corresponds to a leasehold interest that is a separate property interest distinct from the building as a whole.

99.    Each apartment unit is physically separate from the building as a whole: Apartment units have locked external doors, such that access to the building hallways does not provide access to the separate apartment units.

100.    Apartment units have distinct boundaries, marked by their outer walls, such that it is possible to demarcate the physical space that corresponds to a particular apartment unit. As a result, it is possible (and customary) to draw up architectural plans to show the floorplan of a particular apartment unit, and it is possible (and customary) to state the square footage of a particular apartment unit.

101.    It is customary for the owner of an apartment building to separately lease out each apartment unit in the building.

102.    Typically, each apartment unit is leased to a separate tenant. Even in the unusual situation where a single tenant leases multiple apartment units, the tenant would sign a separate lease for each apartment unit. And, regardless, under the Rent Stabilization Law a tenant must use the apartment as their primary residence, so it typically would not be feasible for a tenant to rent multiple rent-stabilized apartments.

103.    New York law recognizes the property interest that is leased out by apartment owners to apartment tenants as a separate property interest, called a leasehold.

104.    New York law recognizes that an apartment's leasehold is a separate property interest requiring just compensation if taken through eminent domain.

105.    New York law recognizes that government may take a portion of an apartment's leasehold via eminent domain, without taking the entire leasehold (and without taking the underlying real property).

106.    New York's Rent Stabilization Law likewise recognizes each apartment's leasehold as a separate property interest, as the Rent Stabilization Law separately regulates the rent that can be charged for each leasehold.

107.    Moreover, the Rent Stabilization Law sets the rent that can be charged for each apartment's leasehold based on that apartment's particular rental history.

108.    Limiting the rent that can be charged for one vacant apartment in a building does not provide any benefit that would somehow enhance the value of other apartments in the building.

109.    Limiting the rent that can be charged for one vacant apartment in a building does not prevent any sort of a nuisance that would otherwise diminish the value of other apartments in the building.

110.    If anything, limiting the rent that can be charged for one vacant apartment works to the detriment of other apartments in the building—as it limits the owner's ability to charge a fair market rent that would allow the owner to cover the building's common expenses. If the rent on one apartment in the building is set so low that the apartment cannot be rented, then the owner cannot use rent revenue from that apartment to pay for things like repairs to exterior walls, hallways, or heating systems.

111.    The value of an apartment to the owner lies in the leasehold interest, as an apartment produces revenue through the rent that is charged for the leasehold.

112.    When the law restricts the rent that can be charged for a leasehold interest, the law confiscates the rent that could otherwise be charged for that leasehold.

113.    When an apartment sits vacant because it cannot be profitably rented, the value of the leasehold interest has been totally destroyed.

***Plaintiffs Own Apartment Units That Sit Vacant Because of Rent Stabilization***

<u>Small Property Owners of New York</u>

114.    Small Property Owners of New York, Inc. ("SPONY") is a nonprofit, all-volunteer trade association that focuses on the interests of small-scale property owners across the state of New York.

115.    SPONY was founded over forty years ago, not too long after the Rent Stabilization Law came into effect.

116.    SPONY's core purpose is to educate, and to advocate on behalf of, small-scale owners of rental properties in New York.

117.    Any owner of rental properties may become a SPONY member, so long as he or she owns an interest in fewer than 200 housing units total (across buildings).

118.    There is no initial fee requirement upon becoming a SPONY member, but members are required to pay annual dues of $95.

119.    Although membership is open to owners statewide, the majority of SPONY's membership owns properties located within New York City.

120.    SPONY's membership includes more than 300 natural persons who, in the aggregate, own more than 5,000 housing units.

121.    SPONY's members include Plaintiffs Bipin Mathew and Ilan Rabinovitch.

122.    SPONY's leadership consists of a 15-member Board of Directors, which in turn selects a 4-member Executive Committee each year.

123.    SPONY's Board of Directors serve staggered 3-year terms, so that five Board seats are subject to election each year.

124.    SPONY's membership directly votes for the five open Board seats in annual elections.

125.    The Rent Stabilization Law, and in particular its capping of rents allowable for vacancy leases, severely impacts small-scale property owners, including SPONY's members.

126.    SPONY's members, being small-scale property owners, are less able to absorb rising building costs when compared with larger owners. For example, they lack the ability to spread costs among many buildings or tenants; they enjoy less access to capital that could allow renovations of units; and they are less able to endure long periods of monetary losses.

127.    In particular, the inability to reset stabilized vacant units' rent to market rates makes it particularly difficult for SPONY's members to survive as building owners.

128.    Indeed, many of SPONY's members own vacant apartments that are subject to the Rent Stabilization Law's rental caps.

129.    Many of SPONY's members own apartments that are sitting vacant because the Rent Stabilization Law's rental caps make them economically unviable, particularly in light of expensive, legally mandated renovation work that often exceeds $100,000.

130.    Some of those apartments have been sitting vacant for more than a decade.

131.    Some SPONY members have vacant units whose monthly rents are capped as low as $200 or $300.

132.    Many of SPONY's members are barely able to make ends meet on their buildings, in part or entirely because of the Rent Stabilization Law's caps on legal rents for vacant apartments.

133.    Some of SPONY's members are in imminent danger of losing ownership of their buildings, in part or entirely because of the Rent Stabilization Law's caps on legal rents for vacant apartments.

134.    Many of SPONY's members would renovate and rent out currently vacant stabilized apartments, if they were allowed to do so above their stabilized caps (*i.e.*, at market rent).

135.    These members, however, would subject themselves to substantial civil penalties if they did so.

136.    There are no SPONY members whose interests would be harmed by a judicial ruling allowing them to rent their stabilized vacant units at market rates.

### Pashko and Tony Lulgjuraj

137.    Pashko and Tony Lulgjuraj operate a building at 81 Cabrini Boulevard through Plaintiff RPN Management Co., Inc. ("RPN"). The Cabrini Boulevard building is owned by Plaintiff RPN, and Pashko and Tony are the primary shareholders (with their other family members) and managers of Plaintiff RPN.

138.    Pashko and Tony have owned the Cabrini Boulevard building through Plaintiff RPN since 1991. They currently own a few buildings (two in Manhattan and one comparably sized building in the Bronx), but this was the first apartment building that they purchased.

139.    Pashko previously worked as a union doorman, and Tony worked as a building superintendent nearby, for decades.

140.    Pashko and Tony bought their building with their father, who also previously worked as a building superintendent. However, their father has passed away.

141.    Pashko and Tony's family is Albanian. Pashko and Tony came to the United States from Montenegro (then-Yugoslavia) as children, and they are both naturalized citizens.

142.    The Cabrini Boulevard building is a thirty-unit building in the far upper reaches of Manhattan, in Washington Heights near the George Washington Bridge. It is situated in a residential neighborhood just a few blocks from Fort Washington Park and about ten blocks south of Fort Tryon Park (where the Cloisters are located).

143.    Currently, two units in the Cabrini Boulevard building sit vacant because the regulated rent is so low that it does not make sense to put the units on the market.

144.    The first vacant unit, #35, became vacant in summer of 2019 (very shortly after the Rent Stabilization Law was amended to eliminate vacancy increases).

145.    Unit 35 is a two-bedroom apartment. It is a separate and contained physical space within the Cabrini Boulevard building, with its own locked door separating it from the rest of the building.

146.    The legal regulated rent on unit 35 is set at approximately $710 per month.

147.    The market rent for unit 35 would be approximately $2,600 per month.

148.    The apartment directly below unit 35—with an identical floor plan—is rent-stabilized at $2,735.02, which at the time it was last rented was above market rates. That apartment is currently being rented at $2,595 per month.

149.    The second vacant unit, #41, became vacant in early 2022.

150.    Unit 41 is also a two-bedroom apartment. Its floor plan is slightly larger than the floor plan of unit 35. It is a separate and contained physical space within the Cabrini Boulevard building, with its own locked door separating it from the rest of the building.

151.    The legal regulated rent on unit 41 is set at approximately $860 per month.

152.    The market rent for unit 41 would be approximately $3,000 per month.

153.    The apartment directly above unit 41—with an identical floor plan—has a legal regulated rent of over $5,000. Because $5,000 is more than the market rate, that apartment is currently being rented at the market rate of approximately $3,000 per month.

154.    The identical unit on the second floor is currently being rented at a stabilized rate of approximately $2,500 per month.

155.    The identical unit on the first floor has a legal regulated rent of over $6,000. Because $6,000 is more than the market rate, that apartment is currently being rented at the market rate of approximately $3,000 per month.

156.    Units 35 and 41 sit vacant because it does not make business sense to rent them at the regulated rents.

157.    It does not make sense for Pashko and Tony to incur the expensive costs of bringing units 35 or 41 up to code, given the caps on their legal rents.

158.    In addition, it does not make sense for Pashko and Tony to rent out these units at their legal rents, given the costs and liabilities that come from renting any apartment.

159.    The legally mandated repairs, for either unit, would include: raising and leveling the floors, replacing or repairing the joists, effectively replacing the bathroom and kitchen, performing mandatory lead abatement, and undertaking other legally required renovation. Preparing the units for market would also require paying associated costs for permitting, demolition and removal, materials, and labor. These updates are far afield from putting in marble countertops; they are the repairs that are legally required and appropriate to make the unit rentable.

160.    These repairs would be expensive, and even using conservative estimates, the cost would far exceed $100,000 for each unit.

161.    Under the Rent Stabilization Law's allowance for Individual Apartment Improvement increases, Pashko and Tony would be able to obtain at most a rental increase reflecting only $50,000 of improvements (*i.e.*, a monthly rental increase of $347.22) for each unit, and even that limited amount would be recouped over a period of fifteen years.

162.    Thus, to put units 35 or 41 on the market, Pashko and Tony would be required to incur costs to fix up the apartments that they would be legally unable to recover.

163.    It does not make sense for Pashko and Tony to make these expensive repairs just to rent units 35 and 41 at their regulated rents, even if they obtained the maximum allowable Individual Apartment Improvement increase.

164.    The Cabrini Boulevard building does not qualify for rental increases based on either hardship relief criteria.

165.    The building does not satisfy the "comparative hardship" criteria because its net income for the last three years exceeded its (non-inflation-adjusted) income for the period of 1968–70, as well as the first three years that Pashko and Tony (via RPN) owned it.

166.    The building does not satisfy the "alternative hardship" criteria because its expense-to-income ratio for the last year (whether the fiscal year, the calendar year, or the last twelve months) did not exceed 0.95.

167.    The building does not qualify for alternative hardship, in part, because of the rent that Pashko and Tony are able to collect from other (non-vacant) apartments. But the fact that

Pashko and Tony are able to collect rent from some apartments does not change the calculation of whether it makes sense to rent the vacant apartments.

168.     Even if the Cabrini Boulevard building did qualify for hardship relief, Pashko and Tony could realize that relief only through maximum annual rental increases of 6%.

169.     That means that, in any case, any hardship relief could result in the rent on unit 35 being increased by an absolute maximum of only approximately $40 each year, until the total hardship increase was realized.

170.     Likewise, any hardship relief could result in the rent on unit 41 being increased by an absolute maximum of only approximately $50 each year, until the total hardship increase was realized.

171.     Meanwhile, because owners must realize hardship percentage increases across units, the variance in maximum rents between units 35 and 41, as well as the building's other stabilized units, would increase due to the building-wide hardship increases.

172.     For instance, if hardship relief was granted for the building, the rent on unit 41 would rise approximately $50 each year, whereas the legal rent on the identical apartment with a legal rent over $6,000 would rise by over $360. The disparity between the legal rents for the two apartments would be even larger than before hardship relief was granted.

173.     Even if hardship relief were granted (in any amount), the 6% limitation ensures that the rent caps on units 35 and 41 would still be too low to justify the costs and liabilities incurred by putting those apartments on the market anytime in the foreseeable future.

174.    Even if hardship relief were granted (in any amount), the 6% limitation ensures that the rent caps on units 35 and 41 would still be too low to justify the expense of renovations legally required to put those apartments on the market anytime in the foreseeable future.

175.    That would remain the case even if Pashko and Tony also obtained the maximum Individual Apartment Improvement increase.

176.    On the other hand, if Pashko and Tony could rent units 35 and 41 at their market rents, then Pashko and Tony could recover the cost of renovations and make a reasonable profit sufficient to justify the costs and liabilities that are incurred by renting an apartment.

177.    If Pashko and Tony could increase the rent charged for units 35 and 41 to market rent, they would renovate and rent out those apartments.

178.    Pashko and Tony are in the business of renting out apartments. If Pashko and Tony could earn a reasonable profit by renting out units 35 and 41, Pashko and Tony would do so.

179.    Pashko and Tony are not renting out units 35 and 41 because New York's Rent Stabilization Law makes it economically infeasible to do so.

180.    Because the Rent Stabilization Law has set rent caps on units 35 and 41 so low that they cannot be profitably rented, the leaseholds for those apartments cannot be rented and have lost their economic value.

Bipin Mathew

181.    Bipin Mathew operates a building located at 1819 Cornelia Street. The building is owned by Plaintiff PKM HOME LLC, which is in turn owned by Bipin and his wife.

182.    Bipin acquired the building in 2016, then transferred it to PKM HOME LLC in July 2025.

183.    Bipin's building is a six-unit building located in Queens.

184.    Currently, one unit in Bipin's building, unit #3L, sits vacant because the regulated rent is so low that it does not make sense to put it on the market.

185.    Unit 3L became vacant in 2024.

186.    Unit 3L is a two-bedroom apartment. It is a separate and contained physical space within Bipin's building, with its own locked door separating it from the rest of the building.

187.    The legal regulated rent on unit 3L is set at approximately $1,315 per month.

188.    Based upon comparable rentals in the area, the market rent for unit 3L would be around $2,500 per month.

189.    Unit 3L sits vacant because it does not make business sense to rent it at the regulated rents.

190.    It does not make sense for Bipin to incur the expensive costs of bringing unit 3L up to code, given the cap on its legal rent.

191.    In addition, it does not make sense for Bipin to rent out 3L at its rental cap, given the costs and liabilities that come from renting any apartment.

192.    The necessary updates for unit 3L would include performing mandatory lead abatement, renovating bathrooms, and redoing the electrical wiring as well as the associated costs for permitting, demolition and removal, materials and labor.

193.    These repairs would be expensive, and the cost would exceed $100,000.

194.    Bipin did not register unit 3L as vacant by December 31, 2024; and the previous tenant did not occupy it for twenty-five years or more.

195.    Therefore, Bipin would not be eligible for the maximum $50,000 allowance for Individual Apartment Improvement increase (*i.e.*, a rental increase of $347.22) for unit 3L. Instead, he would be limited to recovering a maximum of $30,000 (*i.e.*, a rental increase of $178.57) over a period of fifteen years.

196.    Thus, to put unit 3L on the market, Bipin would be required to incur costs to fix up the apartment that he would be legally unable to recover.

197.    It does not make sense for Bipin to make these expensive repairs just to rent unit 3L at its regulated rent.

198.    Bipin's building does not qualify for rental increases based on either hardship relief criteria.

199.    Bipin's building does not satisfy the "comparative hardship" criteria because its net income for the last three years exceeded its (non-inflation-adjusted) income for the period of 1968–70, as well as the first three years that he (or his LLC) owned it.

200.    Bipin's building does not satisfy the "alternative hardship" criteria because its expense-to-income ratio for the last year (whether the fiscal year, the calendar year, or the last twelve months) did not exceed 0.95.

201.    Even if Bipin's building did qualify for hardship relief, Bipin could realize that relief only through maximum annual rental increases of 6%.

202.    That means that, in any case, any hardship relief could result in the rent on unit 3L being increased by an absolute maximum of only $76.16 each year, until the total hardship increase was realized.

203.    Meanwhile, because owners must realize hardship percentage increases across units, the variance in maximum rents between unit 3L and the building's other stabilized units would increase due to the building-wide hardship increases.

204.    Even if hardship relief were granted (in any amount), the 6% limitation ensures that the rent cap on unit 3L would still be too low to justify the costs and liabilities incurred by putting it on the market anytime in the foreseeable future.

205.    Even if hardship relief were granted (in any amount), the 6% limitation ensures that the rent cap on unit 3L would still be too low to justify the expense of repairs legally required to put it on the market anytime in the foreseeable future.

206.    That would remain the case even if Bipin obtained the maximum Individual Apartment Improvement increase.

207.    On the other hand, if Bipin could rent unit 3L at market rent, then he could recover the cost of repairs and make a reasonable profit sufficient to justify the costs and liabilities that are incurred by renting an apartment.

208.    If Bipin could increase the rent charged for unit 3L to market rent, he would repair and rent it out.

209.    Bipin would like to rent out unit 3L. If he could earn a reasonable profit by renting it out, he would do so.

210.    Bipin is not renting out unit 3L because New York's Rent Stabilization Law makes it economically infeasible to do so.

211.    Because the Rent Stabilization Law has capped the rent for unit 3L so low that it cannot be profitably rented, the leasehold for unit 3L cannot be rented and has lost its economic value.

Ilan Rabinovitch

212.    Ilan Rabinovitch operates a building at 135 W. 78th Street, through Plaintiff 135 W 78TH, LLC ("135 W 78TH"). The building is owned by Plaintiff 135 W 78TH, which in turn is solely owned by Ilan.

213.    Ilan first acquired his building in 2020 in his own name, before transferring it to his LLC in 2022. He lives in one unit with his wife, and he rents out the other units.

214.    Ilan's primary occupation is software development (including open-source nonprofits). He does not own rental properties in New York, beyond the building located at 135 W. 78th Street.

215.    Ilan's building is a four-unit building in Manhattan's Upper West Side. It is subject to the Rent Stabilization Law because, as of 1974, it contained six units.

216.    Currently, one unit in Ilan's building, unit #3A, sits vacant because the regulated rent is so low that it does not make sense to put it on the market.

217.    Unit 3A became vacant in October 2024.

218.    Unit 3A is a one-bedroom apartment. It is a separate and contained physical space within Ilan's building, with its own locked door separating it from the rest of the building.

219.    The legal regulated rent on unit 3A is set at approximately $1,200 per month.

220.    Based on comparable rentals in the area, the market rent for unit 3A is between $4,500 and $5,100 per month even with the minimum updates required to make it a legal and habitable rental.

221.    The apartment directly above unit 3A—which is a two-bedroom apartment—has been destabilized (under regulations that have been since repealed) and is therefore subject to market rates. That apartment is currently being rented for $6,000 per month.

222.    Unit 3A sits vacant because it does not make economic sense to rent it at the regulated rent.

223.    It does not make sense for Ilan to incur the expensive costs of bringing unit 3A up to code, given the cap on its legal rent.

224.    In addition, it does not make sense for Ilan to rent out unit 3A at its legal rent, given the costs and liabilities that come from renting any apartment.

225.    The necessary repairs would include: redoing gas and electrical lines, performing mandatory lead abatement, and undertaking other legally required renovations just to bring it to a legal and habitable rental. Ilan would also have to pay permitting fees, demolition and removal, as well as the costs of materials and labor. None of this includes the updates that *could* be done to maximize the value of this apartment, which is less than one block from the Natural History Museum and two blocks from Central Park.

226.    These necessary repairs would be expensive, and the cost would exceed $100,000.

227.    Ilan did not register unit 3A as vacant by December 31, 2024, and the previous tenant did not occupy it for twenty-five years or more.

228.    Therefore, Ilan would not be eligible for the maximum $50,000 allowance for Individual Apartment Improvement increase (*i.e.*, a rental increase of $347.22) for unit 3A. Instead, he would be limited to recovering a maximum of $30,000 (*i.e.*, a rental increase of $178.57) over a period of fifteen years.

229.    To put unit 3A on the market, Ilan would be required to incur costs to fix up the apartment that he would be legally unable to recover.

230.    It does not make sense for Ilan to make these expensive repairs just to rent unit 3A at its regulated rent, even if he obtained the maximum Individual Apartment Improvement.

231.    Ilan's building does qualify for rental increases based on the "alternative hardship" relief criteria.

232.    Ilan's building satisfies the "alternative hardship" criteria because its expense-to-income ratio for the calendar year ending December 2024 exceeded 0.95. The same was true for the years ending December 2022 and December 2023.

233.    Ilan previously submitted two hardship applications based on the building's numbers for the years 2022 and 2023. Both of those hardship applications were denied on technical grounds unrelated to their substance.

234.    First, Ilan's hardship application based on calendar year 2022 was rejected because the Division of Housing and Community Renewal deemed the filing untimely.

235.    The Division of Housing and Community Renewal has rejected multiple applications from other property owners because the applications were deemed untimely.

236.    Second, Ilan's hardship application based on calendar year 2023 was rejected based on a series of technicalities. Initially, the Rent Administrator denied the application on the ground

that an owner must have owned a building for three years to be eligible for relief, and Ilan's LLC

had not yet owned the building for that long. That was error: Ilan owned the building directly before

he transferred it to his LLC, and the combined ownership period during which Ilan owned the

building either directly or through an LLC exceeded three years. On administrative appeal, the

Deputy Commissioner agreed that combined ownership could satisfy the three-year ownership

period. However, the Deputy Commissioner nevertheless rejected the appeal on the ground that

Ilan supposedly did not provide any evidence on appeal of when he himself first acquired the

building (although Ilan had provided that proof in the initial hardship application).

237.    In March 2025, Ilan submitted a third hardship application, based on the building's

numbers for calendar year 2024.

238.    As of November 2025, the Division of Housing and Community Renewal is still

processing Ilan's third hardship application.

239.    Even if Ilan's latest hardship application is successful, he could realize any hardship

relief only through maximum annual rental increases of 6%.

240.    That means that, in any case, any hardship relief could result in the monthly rent on

unit 3A being increased by an absolute maximum of only $78 each year, until the total hardship

increase was realized.

241.    Even if Ilan's requested hardship relief were granted in full, it would take up to

sixteen years of annual six-percent increases before his building realizes that relief.

242.    During that sixteen-year period, the expenses for Ilan's building would likely

increase—meaning that, even after realizing his requested hardship relief in full, the building's

expense-to-income ratio would likely still be greater than 0.95.

243.    Even if hardship relief were granted (in any amount), the 6% limitation ensures that the rent cap on unit 3A would still be too low to justify the costs and liabilities incurred by putting that apartment on the market anytime in the foreseeable future.

244.    Even if hardship relief were granted (in any amount), the 6% limitation ensures that the rent cap on unit 3A would still be too low to justify the expense of repairs legally required to put it on the market anytime in the foreseeable future.

245.    That would remain the case even if Ilan obtained the maximum Individual Apartment Improvement increase.

246.    On the other hand, if Ilan could rent unit 3A at its market rent, then Ilan could recover the cost of repairs and make a reasonable profit sufficient to justify the costs and liabilities that are incurred by renting an apartment.

247.    If Ilan could increase the rent charged for unit 3A to market rent, he would repair and rent it out.

248.    Ilan wishes to rent out all the apartments in his building (other than the one occupied by his family). If he could earn a reasonable profit by renting out unit 3A, he would do so.

249.    Ilan is not renting out unit 3A because New York's Rent Stabilization Law makes it economically infeasible to do so.

250.    Because the Rent Stabilization Law has capped the rent for unit 3A so low that it cannot be profitably rented, the leasehold for that apartment cannot be rented and has lost its economic value.

## INJURY TO PLAINTIFFS

251.    Plaintiffs (or their members) own and operate vacant apartments that are subject to maximum allowable rents set by New York's Rent Stabilization Law.

252.    However, Plaintiffs (or their members) are unable to earn a reasonable profit on those vacant apartments, because the maximum allowable rents are set too low.

253.    Plaintiffs (or their members) would rent out those vacant apartments above their maximum allowable rents, to willing tenants.

254.    However, if Plaintiffs (or their members) rented out their vacant apartments above their maximum allowable rents, they would expose themselves to significant civil penalties pursuant to New York's Rent Stabilization Law.

255.    Therefore, Plaintiffs (or their members) are experiencing injury in the form of a practical inability to make productive use of property that they own, and which is nevertheless subject to property taxation.

256.    Likewise, Plaintiffs (or their members) have experienced injury in the form of lost rents on their vacant apartments.

257.    Likewise, Plaintiffs (or their members) are experiencing ongoing injury in the form of lost use of their property, resulting from continued enforcement of New York's Rent Stabilization Law.

## CLAIMS FOR RELIEF

### <u>Count 1</u>
**Fourteenth Amendment, Incorporated Takings Clause (Facial and As Applied)
42 U.S.C. § 1983, Under *Ex parte Young*, and Directly Under the
Incorporated Takings Clause**

258.    Plaintiffs repeat and reallege every allegation above (at paragraphs 1–257) as if fully set forth herein.

259.    As a matter of local, state, and federal law each apartment in a building corresponds to a separate property interest referred to as the leasehold interest.

260.    The leasehold interest is effectively the common law right to exclude, since, by selling the leasehold to a tenant, the owner sells the tenant the right to exclude.

261.    When an apartment is vacant, the leasehold interest is held by the building owner.

262.    For an apartment building owner, the value of the leasehold interest for a vacant apartment is the rent that can be charged to a tenant for the leasehold.

263.    By setting the rent that can be charged for some vacant apartments at levels so low that those apartments cannot be rented for a reasonable profit, New York's Rent Stabilization Law entirely confiscates the value of the leasehold interest for those apartments under *Lucas v. South Carolina Coastal Commission*, 505 U.S. 1003 (1992).

264.    Therefore, enforcement of New York's Rent Stabilization Law results in a *per se* taking of the leasehold interest for Plaintiffs' vacant apartment units that cannot be profitably rented because of rent stabilization. Specifically:

      a.      81 Cabrini Boulevard, Units 35 and 41.

      b.      1819 Cornelia Street, Unit 3L.

      c.      135 W. 78th Street, Unit 3A.

265.    In addition, even if the leasehold retains residual value (*i.e.*, even if renting the stabilized, vacant unit is still in some sense economically feasible), the provisions of the Rent Stabilization Law that limit the rent that can be charged for vacant apartments directly and impermissibly confiscate a portion of the value of the leasehold corresponding to the difference between the legal regulated rent and the market rent.

266.    The right to make productive use of property is an essential and inherent aspect of property ownership that is protected by the Fifth and Fourteenth Amendments to the U.S. Constitution. That includes the right to set the rent for the leasehold interest and to sell the leasehold interest to willing tenants.

267.    The United States Supreme Court, as well as the common law generally, has long recognized the principle that people have a right to fix the price at which they convey their property, or allow the use of it. That principle was established by the time of the founding and was reaffirmed by the adoption of the Fourteenth Amendment.

268.    While the law has traditionally recognized exceptions to that principle—such as for property enjoyed pursuant to a governmentally granted privilege, as that enjoyed by public utilities—no such exception applies here.

269.    Therefore, enforcement of the provisions of New York's Rent Stabilization Law restricting the rent that can be charged for vacant apartments, N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. § 2522.5(a); and *id.* § 2522.8, on their face and as applied, results in a *per se* taking of a portion of the leasehold, irrespective of whether that leasehold retains residual value.

270. The Rent Stabilization Law's regulation of vacant apartments cannot be justified as a regulation of an existing landlord-tenant relationship, as there is no such existing relationship for vacant apartments.

271. The Rent Stabilization Law's regulation of vacant apartments also cannot be justified as a regulation of landlord-tenant relationships generally, as the Rent Stabilization Law sets allowable rent for vacant apartments according to the unit's particular rental history, rather than setting a general restriction that operates equally on all apartments.

272. In other words, New York's Rent Stabilization Law selectively and directly burdens specific property interests (*i.e.*, specific apartment leaseholds), rather than broadly regulating an activity (such as the landlord-tenant relationship itself). And, in doing so, the Rent Stabilization Law confiscates a portion of the value of the burdened property interest.

273. By limiting the rent that can be charged for vacant apartments, the Rent Stabilization Law also imposes a condition on owners' use of their property that lacks any nexus to the government's purported interest. No owner, by renting his or her apartment unit at market rates, would be harming the City's interest in ensuring its residents have access to housing, such that the City would be better off without the unit being on the market at all.

274. Even if it were not a *per se* taking, the Rent Stabilization Law's restriction on the rent that can be charged for vacant apartments results in a regulatory taking of the leasehold interest (or a portion thereof) under *Penn Central Transportation Co. v. New York City*, 439 U.S. 883 (1978). The economic impact is to confiscate value from the leasehold; that confiscation interferes with the owner's investment-backed expectations, as the purpose of owning or purchasing an apartment building is to rent the leasehold; and the regulation of the rent charged for one apartment does not

in any way protect or enhance the value of neighboring apartments (and in fact has the opposite effect). This is true both on the face of the restrictions and as they are applied to Plaintiffs.

275.    Plaintiffs are owed just compensation for the taking of the leasehold interest in their vacant apartments.

276.    Unless this Court provides declaratory and injunctive relief, Defendants' ongoing enforcement of rental caps on vacant apartments will continue to injure Plaintiffs and other apartment owners in New York. Moreover, it will continue to keep vacant apartments off the market, reducing options for willing tenants.

### **Count 2**
### **Fourteenth Amendment, Due Process Clause (Facial and As Applied)**
### **42 U.S.C. § 1983 and Under *Ex parte Young***

277.    Plaintiffs repeat and reallege every allegation above (at paragraphs 1–257) as if fully set forth herein.

278.    The U.S. Supreme Court has long recognized that the Due Process Clause to the Fourteenth Amendment protects owners' right to convey their property, including its leasehold value, at a price of their choosing.

279.    While the law has traditionally recognized exceptions to that principle—such as for owners who enjoy exclusive governmental privileges, as that enjoyed by public utilities—none of those exceptions applies here.

280.    In addition, the Due Process Clause prohibits any price control that is arbitrary.

281.    New York's Rent Stabilization Law sets the rent for individual vacant apartments in a manner that is fundamentally arbitrary. That is, some apartments may be rented above market; some may be rented near market; and some may be rented at levels well below market.

282.    The differences in the rent that can be charged for vacant apartments under New York's Rent Stabilization Law are not the result of the different characteristics of the apartments or the buildings in which those apartments are located. Nor are they a product of any characteristic of the incoming tenant, such as the tenant's ability to pay.

283.    Instead, the rent that can be charged for a vacant apartment is a product of that apartment's rental history over the years since 1969, when New York City first instituted rent stabilization.

284.    Moreover, the rent that can be charged for a vacant apartment depends on whether its building was constructed before 1974. That is, owners of buildings constructed during or after 1974 typically can set the rent for vacant apartments at any amount.

285.    It is fundamentally irrational to limit the rent that can be charged for a vacant apartment based on past events involving past tenants who are no longer living in the apartment.

286.    It is likewise fundamentally irrational to limit the rent that can be charged for a vacant apartment based on whether its building was constructed before or after 1974.

287.    Because they set rents in a manner that is contrary to historically recognized limits on the government's authority to control prices, and in a manner that is fundamentally arbitrary, the provisions of New York's Rent Stabilization Law that limit rents for vacant apartments, N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. § 2522.5(a); *id.* § 2522.8, violate the Due Process Clause on their face and as applied to Plaintiffs' vacant apartment units.

288.    Unless this Court provides declaratory and injunctive relief, this violation of the Due Process Clause will continue to injure Plaintiffs and other apartment owners in New York.

Moreover, it will continue to keep vacant apartments off the market, reducing options for willing tenants.

### Count 3
### Equal Protection Clause (Facial and As Applied)
### 42 U.S.C. § 1983 and Under *Ex parte Young*

289.    Plaintiffs repeat and reallege every allegation above (at paragraphs 1–257) as if fully set forth herein.

290.    New York's Rent Stabilization Law arbitrarily discriminates between owners of vacant apartment units in buildings built before 1974 (who are not allowed to set market rents) and owners of vacant apartment units in buildings built after 1974 (who are allowed to set market rents).

291.    The New York state legislature has repeatedly amended the Rent Stabilization Law since 1974. Nevertheless, even as amended, its three-year emergency provisions apply only to buildings constructed before 1974—regardless of when the City declares an emergency.

292.    There is no difference between vacant units in pre- and post-1974 buildings that would justify this discriminatory treatment of the owners.

293.    The New York City Council, by issuing a resolution declaring a housing emergency every three years for the last fifty-six years, has perpetually invoked the Rent Stabilization Law since it was first implemented.

294.    The New York City Council most recently declared a housing emergency justifying three more years of the Rent Stabilization Law in March 2024.

295.    If restricting the allowable rent for a vacancy lease is justified today (or anytime in the future) as an "emergency" measure, there is no rational reason why the emergency restriction should be limited to pre-1974 buildings.

296.    Moreover, the irrational manner in which New York sets rents for individual apartments results in irrational discrimination between owners, as some apartments have high rents and some apartments have low rents for no rational reason.

297.    In other words, New York is irrationally discriminating among owners of materially identical vacant apartments, setting disparate rental caps based on each apartment's previous tenant turnover.

298.    There is no rational, legitimate reason to set disparate maximum rents among vacant apartments based on the apartment's history of tenant turnover.

299.    Unless this Court provides declaratory and injunctive relief, this violation of equal protection will continue to injure Plaintiffs and other apartment owners in New York. Moreover, it will continue to keep vacant apartments off the market, reducing options for willing tenants.

### Count 4
### Fourteenth Amendment, Privileges or Immunities Clause (Facial and As Applied)
### 42 U.S.C. § 1983 and Under *Ex parte Young*

300.    Plaintiffs repeat and reallege every allegation above (at paragraphs 1–257) as if fully set forth herein.

301.    Plaintiffs recognize that any claim challenging the regulation of their vacant apartments under the Fourteenth Amendment's Privileges or Immunities Clause is currently barred by the Supreme Court's decision in *The Slaughterhouse Cases*, 83 U.S. 36 (1873).

302.    For preservation purposes, however, Plaintiffs allege that the Privileges or Immunities Clause protects their right to take, hold, and dispose of property, either real or personal, and that this protection includes the right to set the rent on the leasehold interest in their vacant apartments so that those apartments can be rented to willing tenants.

303.    While the law has traditionally recognized exceptions to that principle—such as for owners who enjoy exclusive governmental privileges, as that enjoyed by public utilities—none of those exceptions applies here.

304.    Further, the Privileges or Immunities Clause bars the government from arbitrarily restricting Plaintiffs' ability to set the price on the leasehold interest of their vacant apartments.

305.    The manner in which New York sets the rent for vacant rent-stabilized apartments is fundamentally arbitrary. Some apartments may be rented above market, some may be rented near market, and some may be rented at levels well below market—and the difference between these apartments is based on irrelevant events involving past tenants who no longer live in the apartments. Moreover, the fact that these restrictions only apply to apartments in buildings constructed before 1974 is also fundamentally arbitrary.

306.    Because they set rents in a manner that is contrary to historically recognized limits on the government's authority to control prices, and in a manner that is fundamentally arbitrary, the provisions of New York's Rent Stabilization Law that limit rents for vacant apartments, N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. § 2522.5(a); *id.* § 2522.8, violate the Privileges or Immunities Clause on their face and as applied to Plaintiffs' vacant apartments.

307.    Unless this Court provides declaratory and injunctive relief, this violation of the Privileges or Immunities Clause will continue to injure Plaintiffs and other apartment owners in New York. Moreover, it will continue to keep vacant apartments off the market, reducing options for willing tenants.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

A.  A declaration that, on their face and as applied to Plaintiffs, the provisions of New York's Rent Stabilization Law that restrict allowable rent for vacant apartments, N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. § 2522.5(a); and *id.* § 2522.8, violate the Fourteenth Amendment to the U.S. Constitution;

B.  A permanent injunction prohibiting the enforcement of New York's Rent Stabilization Law, insofar as it restricts allowable rent for vacant apartments;

C.  An award of damages reflecting lost net rental income resulting from the Rent Stabilization Law's restriction on allowable rent for vacant apartments;

D.  Nominal damages in the amount of $1 for each constitutional violation;

E.  An award of attorney fees and costs under 42 U.S.C. § 1988;

F.  Any other legal or equitable relief that the Court deems just and proper.

Respectfully submitted this 12th day of November, 2025.

/s/ William Aronin
_____

William Aronin
SDNY Bar No. WA0685
INSTITUTE FOR JUSTICE
901 N. GLEBE ROAD, SUITE 900
ARLINGTON, VA 22203
TEL: (703) 682-9320
waronin@ij.com

Robert Johnson*
OH Bar No. 0098498; DC Bar No. 1013390
INSTITUTE FOR JUSTICE
16781 CHAGRIN BLVD., SUITE 256
SHAKER HEIGHTS, OH 44120
TEL: (703) 682-9320
rjohnson@ij.com

Suranjan Sen^
NY Reg. No. 5905575; TN Bar No. 038830
McCarley Maddock*
SC Bar No. 106372
INSTITUTE FOR JUSTICE
901 N. GLEBE ROAD, SUITE 900
ARLINGTON, VA 22203
TEL: (703) 682-9320
ssen@ij.org; mmaddock@ij.com

*Attorneys for Plaintiffs*

 *Motions for Admission *Pro Hac Vice* to be filed

^Application for Admission to SDNY to be filed