Index No. 25 CV 09425

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SMALL PROPERTY OWNERS OF NEW
YORK, INC., et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

Defendants.

**CITY DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS THE
COMPLAINT**

*STEVEN BANKS*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Counsel:  Rachel Moston and Leah Reiss*
*Tel:  (212) 356-2190*
*Matter No.  2025-086835*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. III

PRELIMINARY STATEMENT ......................................................................... 1

STATUTORY AND REGULATORY BACKGROUND............................................. 4

      A.  Overview of Rent Stabilization in NYC........................................ 4

      B.  History of Rent Regulation in NYC ............................................. 6

      C.  The RSL's Regulation of Rent Increases....................................... 8

ARGUMENT..................................................................................................... 9

    POINT I

      CITY DEFENDANTS HAVE NOT CAUSED PLAINTIFFS' ALLEGED INJURIES ................................................... 10

    POINT II

      PLAINTIFFS FAIL TO STATE A TAKINGS CLAIM BECAUSE THE PROPER UNIT TO CONSIDER IS THE WHOLE BUILDING................................................................. 12

    POINT III

      PLAINTIFFS FAIL TO STATE A *PER SE* REGULATORY TAKINGS CLAIM .................................................. 15

      A.  Plaintiffs Do Not Plausibly Allege a Facial *Per Se* Taking........................................................................................ 16

      B.  Plaintiffs' As-Applied *Per Se* Taking Claim Fails ..................... 18

    POINT IV

      PLAINTIFFS FAIL TO STATE A NON-CATEGORICAL REGULATORY TAKING CLAIM ........................................................ 21

      A.  Plaintiffs Do Not State a Facial Regulatory Taking ..................... 21

      B.  Plaintiffs Do Not State an As-Applied Challenge Under *Penn Central* ........................................................................ 24

**Page**

i.    Plaintiffs' Claims Are Not Ripe ....................................................... 24

ii.   Plaintiffs Fail to State a Claim........................................................... 24

POINT V

PLAINTIFFS FAIL TO STATE SUBSTANTIVE DUE
PROCESS AND EQUAL PROTECTION CLAIMS .......................................... 29

A.   Plaintiffs' Substantive Due Process Claim Fails ........................................... 29

i.    The RSL Serves Rational Government Interests .............................. 30

ii.   The RSL Satisfies Rational Basis Review........................................ 31

B.   Plaintiffs' Equal Protection Claim Fails ....................................................... 33

CONCLUSION........................................................................................................... 35

WORD COUNT CERTIFICATION ........................................................................ 36

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                                **Pages**

*335-7 LLC v. City of New York*,
    No. 21-823, 2023 U.S. App. LEXIS 4940 (2d. Cir. 2023) .....................................4, 14, 19, 24

*74 Pinehurst LLC v. New York, et al.*,
    59 F.4th 557 (2d Cir. 2023) ................................................................................... *passim*

*All Aire Conditioning, Inc. v. City of New York*,
    979 F. Supp. 1010 (S.D.N.Y. 1997)......................................................................................29

*Allen v. Cuomo*,
    100 F.3d 253 (2d Cir. 1996)..................................................................................................27

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................................9

*Baur v. Veneman*,
    352 F.3d 625, 632 (2d Cir. 2003)..........................................................................................11

*Beatie v. City of New York*,
    123 F.3d 707 (2d Cir. 1997)..................................................................................................29

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007)................................................................................................................9

*Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*,
    2024 U.S. App. LEXIS 5905 (2d Cir. 2024) .................................................................. *passim*

*Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York*,
    Nos. 19-cv-11285, 20-cv-634, 2021 U.S. Dist. LEXIS 174535
    (S.D.N.Y. 2021) ...............................................................................................................10, 11

*Bryant v. Steele*,
    25 F. Supp. 3d 233 (E.D.N.Y. 2014) ......................................................................................9

*Buffalo Teachers Fed'n v. Tobe*,
    464 F.3d 362 (2d Cir. 2006)..................................................................................................16

*Cmty. Hous. Improvement Program v. City of New York, et al.*,
    492 F. Supp. 3d 33 (E.D.N.Y. 2020) .....................................................................................30

*Cmty. Hous. Improvement Program v. City of New York, et al.*,
    59 F.4th 540 (2d Cir. 2023) ................................................................................... *passim*

iii

**Cases**                                                                                                                                      **Pages**

*Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust*
   *for S. California*,
     508 U.S. 602 (1993)...............................................................................................20, 25

*Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*,
   87 N.Y.2d 325 (1995) .................................................................................................5

*Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*,
   83 F.3d 45 (2d Cir. 1996)........................................................................................20, 26

*Greystone Hotel Co. v. City of New York*,
   1999 U.S. App. LEXIS 14960 (2d Cir. 1999) ...........................................................14

*Harmon v. Markus*,
   412 F. App'x 420 (2d Cir. 2002) ..............................................................................28

*Heldman v. Sobol*,
   962 F.2d 148, 156 (2d Cir. 1992)..............................................................................10

*Kaluczky v. City of White Plains*,
   57 F.3d 202 (2d Cir. 1995).........................................................................................29

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
   480 U.S. 470 (1987)..............................................................................................12, 15

*KSLM-Columbus Apts., Inc. v. New York State Div. of Hous. & Cmty. Renewal*,
   6 A.D.3d 28 (1st Dep't 2004) ......................................................................................6

*La Guardia v. Cavanaugh*,
   53 N.Y.2d 67 (1981) .....................................................................................................6

*Lingle v. Chevron U.S.A. Inc.*,
   544 U.S. 528 (2005).......................................................................................12, 16, 18

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982)...................................................................................................16

*Lucas v. South Carolina Coastal Council*,
   505 U.S. 1003 (1992)......................................................................................12, 16–19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).....................................................................................................11

*Morrison v. Nat'l Austl. Bank Ltd.*,
   547 F.3d 167 (2d Cir. 2008)........................................................................................9

**Cases**                                                                                                           **Pages**

*Murr v. Wisconsin,*
    582 U.S. 383 (2017)..............................................................................................................13, 14

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001)....................................................................................................................16

*Park Ave. Tower Associates v. New York,*
    746 F.2d 135 (2d Cir. 1984)........................................................................................15, 20, 25, 26

*Penn Cent. Transp. Co. v. New York City,*
    438 U.S. 104 (1978)............................................................................................................. *passim*

*Pennell v. City of San Jose,*
    485 U.S. 1 (1988)........................................................................................................................18

*Rent Stabilization Ass'n v. Dinkins,*
    5 F.3d 591 (2d Cir. 1993)..................................................................................................16, 18, 21

*Rent Stabilization Ass'n v. Higgins,*
    83 N.Y.2d 156 (1993) .............................................................................................................10, 29

*Sonterra Capital Master Fund, Ltd. v. UBS AG,*
    954 F.3d 529 (2d Cir. 2020)........................................................................................................10

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002)..............................................................................................................15, 19

*United States v. Salerno,*
    481 U.S. 745 (1987)....................................................................................................................17

*W. 95 Hous. Corp. v. N.Y. City Dep't of Hous. Pres. & Dev.,*
    2001 U.S. Dist. LEXIS 7784,
    *aff'd*, 31 F. App'x 19 (2d Cir. 2002)..........................................................................................30, 33

**Cases**                                                                       **Pages**

*Ximines v. George Wingate High Sch.*,
   516 F.3d 156 (2d Cir. 2008)................................................................................11

**Statutes**

9 N.Y.C.R.R. §§ 2520.1...............................................................................................4

9 N.Y.C.R.R. § 2522.5.................................................................................................2

9 N.Y.C.R.R. § 2522.5(a) ...........................................................................................2

9 N.Y.C.R.R. § 2522.8.........................................................................................17, 31

E.T.P.A. § 3................................................................................................................10

Fed. R. Civ. P. 12(b)(1)............................................................................................1, 9

Fed. R. Civ. P. 12(b)(6)............................................................................................1, 9

Fed. R. Civ. P. 25(d) ...................................................................................................1

N.Y.C. Admin. Code § 26-501 ..........................................................................5, 6, 23

N.Y.C. Admin. Code § 26-504 .....................................................................................5

N.Y.C. Admin. Code § 26-510(a)................................................................................10

N.Y.C. Admin. Code § 26-510(b).................................................................................8

N.Y.C. Admin. Code § 26-511(c)(6)(a).........................................................................8

N.Y.C. Admin. Code § 26-511(c)(6)(b) ........................................................................9

N.Y.C. Admin. Code § 26-511(c)(13) ...........................................................................9

N.Y.C. Charter § 396 .................................................................................................11

N.Y. Private Hous. Fin. Law § 452(8).........................................................................5

N.Y. Real Prop. Tax Law § 421-a(2)(f)........................................................................5

N.Y. Unconsol. Law Ch. 249-B, §§ 1–14....................................................................6

N.Y. Unconsol. Law Ch. 249-B, § 3............................................................................8

vii

**Statutes**                                                                                                                    **Pages**

N.Y. Unconsol. Law §§ 8601–8617 ............................................................................................4

N.Y. Unconsol. Law § 8624(e)...........................................................................................2, 17, 31

Defendants, the City of New York ("City"), the New York City Rent Guidelines Board ("RGB"), Doug Apple, in his official capacity as chair and member of the RGB, Arpit Gupta, Alex Schwartz, Reed Jordan, Alexander Armlovich, Robert Ehrlich, Christina Smyth, Genesis Aquino, and Adán Soltren, in their official capacities as members of the RGB, (collectively, "City Defendants") by their attorney, Steven Banks, Corporation Counsel of the City of New York, submit this memorandum of law in support of their Motion to Dismiss the Complaint ("Compl.") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").[1]

## PRELIMINARY STATEMENT

For more than half a century, New York State's Rent Stabilization Law ("RSL") has provided a fair and stable rental market in New York City. Rent stabilization generally applies to buildings constructed before 1974 with at least six units and to newer buildings that have opted to stabilize in exchange for public subsidies. The RSL, amended regularly in response to changing conditions, regulates rent increases and limits when tenancies may be terminated or not renewed. Today, it protects two and a half million City residents.

The RSL provides the largest source of below-market housing in the City, and offers critical tenant protections that enable residents to remain in their homes and communities. For decades, the RSL has provided housing security to some of the most vulnerable tenants by giving them rights aimed at preventing their dislocation, eviction, harassment, and homelessness. A critical feature of the RSL, one that has been consistent since 1974 and has withstood numerous legal challenges, is that landlords may not increase the rent on a stabilized apartment

---

[1] The current members of the RBG – Chantella Mitchell (Chair and member), Arpit Gupta, Lauren Melodia, Brandon Mancilla, Sina Sinai, Maksim Wynn, Christina Smyth, Sagar Sharma, and Adán Soltren – are automatically substituted for the former RGB Chair and members named in the instant action pursuant to FRCP 25(d).

to market rate when the current tenant vacates. This protection reduces incentives for owners to harass tenants out of their apartments in order to access higher rents, and helps keep rent stabilized apartments affordable to lower-income New Yorkers. Plaintiffs seek to eliminate this crucial aspect of rent stabilization.

Plaintiffs are a nonprofit trade association that allegedly represents the interests of small-scale property owners in New York City, as well as three corporate entities that currently own several New York City residential buildings containing rent-stabilized units. Compl. ¶¶ 9-12. Plaintiffs challenge the provisions of the RSL, as amended by the State Legislature in 2019, that restrict the rent that can be charged for vacant apartments – namely, N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. § 2522.5(a); and *id.* § 2522.5. Compl. ¶¶ 1, 269, Wherefore Clause. Plaintiffs claim these provisions, both on their face and as applied, constitute a *per se* regulatory taking, a regulatory taking under *Penn Central*, a substantive due process violation, and an equal protection violation.[2] Although not specifically alleged in their Complaint, Plaintiffs claim the "primary remedy [they] seek is the right to set the *initial* rent for their vacant units at market rates" and thereafter abide by the RSL's restrictions for "subsequent increases … (at least until the apartments became vacant again)." *See* Plaintiffs' Pre-Motion Conference Letter at 1, dated January 29, 2026 ("Pls. Letter"), ECF Doc. No. 61.

As detailed below, Plaintiffs' claims against City Defendants must be dismissed as a matter of law. *First*, Plaintiffs lack standing to sue City Defendants because the City does not enforce the RSL, and Plaintiffs have not alleged that the City's actions have caused their alleged injuries. *Second*, Plaintiffs' case is premised on an inherently flawed understanding of the relevant unit of property – the denominator – for a regulatory takings analysis. Plaintiffs fail

---

[2] Plaintiffs further purport to raise a challenge under the Privileges and Immunities Clause, though as Plaintiffs admit, such claim is barred. Compl. ¶ 301-07.

to plausibly allege the denominator is each individual rent-stabilized apartment, rather than the building as a whole.

*Third*, Plaintiffs' facial and as-applied *per se* regulatory takings claims must be dismissed.  Plaintiffs have failed to satisfy their exacting burden of pleading a facial challenge by alleging that the challenged provisions of the RSL unconstitutionally deprive all owners of buildings containing rent-stabilized units of all economically beneficial use of their buildings (let alone their units).  Plaintiffs' as-applied *per se* regulatory takings claim must be dismissed because the challenge is premature; two Plaintiffs have not yet sought an administrative hardship exemption to increase the rents they are allowed to collect, and the third Plaintiff has an application pending.  In any event, Plaintiffs have failed to plausibly allege that the challenged provisions deprive them of all economically beneficial use of their properties.

*Fourth*, Plaintiffs' facial and as-applied claims under *Penn Central* fare no better.  Plaintiffs fail to allege that *every* landlord has suffered an adverse economic impact from the RSL's provisions regarding vacancy increases.  Plaintiffs' as-applied claim is premature and must be dismissed because the Complaint does not allege that the challenged provisions of the RSL have interfered with their investment-backed expectations.  Finally, Plaintiffs' substantive due process and equal protection claims fail because the provisions of the RSL that maintain stabilized rents for units at vacancy are rationally related to a legitimate government interest.

At bottom, the RSL has been the subject of decades of litigation.  Property owners have attacked the RSL on a host of grounds, claiming (as Plaintiffs do here) it violates the U.S. Constitution's Takings, Due Process, and Equal Protection Clauses.  Each of these challenges failed.  *Cmty. Hous. Improvement Program v. City of New York, et al. ["CHIP"]*, 59 F.4th 540, 547 (2d Cir. 2023).  Most recently, the Second Circuit dismissed constitutional challenges to the

RSL, as amended by the State Legislature in 2019, which is the version of the RSL Plaintiffs challenge now, six years later. *Id.*; *74 Pinehurst LLC v. New York, et al. ["74 Pinehurst"]*, 59 F.4th 557 (2d Cir. 2023); *335-7 LLC v. City of New York ["335-7"]*, No. 21-823, 2023 U.S. App. LEXIS 4940, at *10-22 (2d. Cir. 2023); *Bldg. & Realty Inst. of Westchester & Putnam Cntys., v. New York ["BRI"]*, 2024 U.S. App. LEXIS 5905 (2d Cir. 2024). Although Plaintiffs portray this action as narrower in scope than these dismissed RSL cases, Plaintiffs are wrong. Plaintiffs challenge the elimination of the vacancy bonus, which was not only a claim raised – and dismissed – in some of the prior lawsuits, but also a central feature of the RSL since 1974. Accordingly, the Complaint must be dismissed in its entirety.

## STATUTORY AND REGULATORY BACKGROUND

### A.  Overview of Rent Stabilization in NYC

The City's market for rental housing is exceedingly tight. "In an entirely unregulated [rental] market, rent levels are governed solely by the law of supply and demand," which can be unforgiving. *CHIP*, 59 F.4th at 544. Such a market "has little regard for the harsh consequences it produces, whether they are inadequate returns on investment, exorbitant rents, housing shortages, deteriorating housing stock, or homelessness." *Id.* To address these problems, the City, State, and federal governments have, over the past century, regulated the [City's] rental market." *Id.*

The New York State Division of Housing and Community Renewal (DHCR) administers the RSL. State Law incorporates the City's Rent Stabilization Law of 1969, as amended, codified at Title 26, Chapter 4 of the NYC Administrative Code ("Admin. Code").[3]

---

[3]  The RSL consists of state and local legislation supplemented by the Rent Stabilization Code (RSC), promulgated by DHCR.  9 N.Y.C.R.R. §§ 2520.1-2531.9; N.Y. Unconsol. Law §§ 8601-8617 (also known as the Local Emergency Housing Rent Control Act).

4

Rent stabilization generally covers buildings constructed before 1974 with six or more dwelling units, as well as buildings whose owners opted into the program in exchange for certain public subsidies.  *See id.* § 26-504; N.Y. Real Prop. Tax Law § 421-a(2)(f); N.Y. Private Hous. Fin. Law § 452(8).

Currently, approximately 996,600 apartments in the City, comprising 41 percent of the rental market, are subject to the RSL.[4]  These apartments are home to more than two million New Yorkers.  The median income of residents of rent-stabilized apartments is significantly lower than the median household income of market-rate renters, making rent stabilized units a critical source for housing for lower income New Yorkers.  2023 HVS Findings 49.  By regulating evictions and the pace of rent increases, the RSL protects tenants from dislocation and limits the disruption to neighborhoods and communities that would result from dramatic changes in rental rates and rapid annual turnover.  *See* Admin. Code § 26-501; *CHIP*, 59 F.4th at 557; *Fed. Home Loan Mortg. Corp. v. N.Y.S. Div. of Hous. & Cmty. Renewal ["FHLMC"]*, 87 N.Y.2d 325, 332 (1995).

The Local Emergency Housing and Rent Control Act of 1962 ("LEHRCA") requires the City to survey the conditions of its housing stock and determine the rental vacancy rate every three years.  1962 N.Y. Laws ch. 21, § 3.  The RSL's protections in the City have thereafter been triggered by declarations of need issued by the New York City Council ("City Council") based on these surveys – most recently in 2024 – in recognition that the tight housing market continues.  The City's RGB, an official body with members representing the interests of landlords, tenants, and the general public, annually determines permissible rent increases within

---

[4] *See* Elyzabeth Gaumer, 2023 New York City Housing and Vacancy Survey: Selected Initial Findings, 5, available at https://perma.cc/JZ4J-LRTP [hereinafter "2023 HVS Findings"].

the City.  As described below, this complex regulatory regime has evolved over time in response to changing conditions and policy priorities.  *CHIP*, 59 F.4th at 544-46.

**B.  History of Rent Regulation in NYC**

The City Council introduced the prevailing rent regulation scheme of RSL in 1969, after finding that many landlords "were demanding exorbitant and unconscionable rent increases" that led to "severe hardship to tenants … and were uprooting long-time city residents from their communities."  Admin. Code §§ 26-501–520.  The City Council concluded that such practices "will produce serious threats to the public health, safety, and general welfare."  *Id.*

The RSL has been amended many times since 1969.  In 1971, the Legislature adopted a form of "decontrol" that removed vacated apartments from rent stabilization. *KSLM-Columbus Apartments, Inc. v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 6 A.D.3d 28, 32 (1st Dep't 2004).[5]  The result was "ever increasing rents" for tenants in deregulated units, without the anticipated increase in construction of new housing.  *La Guardia*, 53 N.Y.2d at 74.  Following this failed experiment, the Legislature reaffirmed its commitment to rent stabilization by passing the Emergency Tenant Protection Act ("ETPA").  *KSLM-Columbus Apartments*, 6 A.D.3d at 32; *see* ETPA of 1974, 1974 N.Y. Laws ch. 576 (codified at NY. Unconsol. Law Ch. 249-B, §§ 1-14 (Consol. 2021)).  Since 1974, the Legislature has revised the RSL, at times making the program friendlier to landlords and at times more protective of tenants.

In 1993, the Legislature allowed some units with maximum legal rents above a certain amount to be permanently removed from rent stabilization and allowed additional rent increases to compensate owners for improvements to individual apartment units ("IAIs").  *See*

---

[5] The Legislature also eliminated the City's authority to make substantive changes to rental regulations.  Thus, related amendments to the Admin. Code have since been made by the Legislature, *not* the City Council.  *La Guardia v. Cavanaugh*, 53 N.Y.2d 67, 74 (1981), *superseded by statute*.

6

1993 N.Y. Laws ch. 253, §§ 4-10, 19-21.  In 1997, the Legislature allowed landlords to further increase rents at vacancy ( "vacancy bonus").  1997 N.Y. Laws. Ch. 116, §§ 19-20.  And in 2003, the Legislature allowed landlords to increase renewal rents to the maximum legal rent even if the prior rent had been below the prior year's maximum legal rent (so-called "preferential rent").  2003 N.Y. Laws ch. 82, § 3.

More recently, the Legislature has amended the RSL to restore tenant protections. In 2015, it restricted certain opportunities for rent increases and unit decontrol and revised what landlords could recover through rent increases for major capital improvements to the building ("MCIs").  2015 N.Y. Laws ch. 20, Part A.  The Legislature further strengthened tenant protections with the Housing Stability and Tenant Protection Act of 2019 ("HSTPA").  2019 N.Y. Laws ch. 36, *available at* https://perma.cc/TH4B-5WNQ.  The HSTPA was a "response to an ongoing housing shortage crisis" that caused tenants to "struggle to secure safe, affordable housing" and municipalities to "struggle to protect their regulated housing stock."  Sponsor's Mem., 2019 N.Y. Laws ch. 36.  The HSTPA modified the RSL in several ways, including by repealing or limiting changes the Legislature made from 1993 to 2003 to weaken tenant protections.  *See* 2019 N.Y. Laws ch. 36, Parts B, D, E, & K.

Among other things, the HSTPA repealed the RSL provisions authorizing removal of units from rent stabilization to prevent the rapid loss of regulated units and widespread tenant harassment to induce vacancies.  *See id.*, Part D.  Prior to the HSTPA, owners could automatically raise rents by up to 20 percent upon vacancy.  *Id.*  The HSTPA eliminated the vacancy bonus and now regulates the rent that a landlord may charge for a vacant rent-stabilized unit to a new tenant based on the apartment's last legal rent.  *Id.*, Part B.  The HSTPA also prohibited local RGBs from setting their own vacancy bonuses.  *Id.*, Part C.

These changes responded to evidence that the repealed measures had frequently been abused to raise rents or remove tenants improperly. The Legislature received testimony that landlords used combinations of vacancy bonuses, MCIs, and IAIs to increase rents on rent-stabilized apartments – by harassing tenants, inflating the cost of improvements, and conducting unnecessary improvements – both to collect greater rents and to drive units' rents toward the then-existing decontrol threshold.[6]

## C. The RSL's Regulation of Rent Increases

The RSL applies in New York City if the City Council finds a continuing need for statutory protection "on the basis of the supply of housing accommodations …, the condition of such accommodations[,] and the need for regulating and controlling residential rents." N.Y. Unconsol. Law Ch. 249-B, § 3. "A declaration of emergency may be made … if the vacancy rate for the housing accommodations … is not in excess of five percent." *Id.* The City Council most recently found an emergency in 2024, after the 2023 Housing and Vacancy Survey ("HVS") found an estimated rental vacancy rate in New York City of 1.41%, the lowest since 1968, and a significant decline from 2021, when the last vacancy rate measured 4.54%. 2023 HVS Findings, 68. The RSL does not set rents; it instead regulates the rate by which landlords may periodically increase the rent on stabilized apartment units. Admin. Code § 26-510(b).

Under the RSL, the RGB is responsible for determining the maximum permissible rent increase annually for rent-stabilized units in New York City. *Id.* § 26-510(b). If a property owner believes the permitted rental increase would create a hardship, it may petition DHCR for an exemption. *Id.* § 26-511(c)(6)(a). As discussed, landlords may raise rents to a certain extent

---

[6] *Hearing before N.Y. Senate Standing Comm. on Hous., Constr. and Cmty. Dev.*, 2019 Leg., 242 Sess. 28 (testimony of Darryl Randall, Crown Heights Tenant Union), 34 (testimony of Sara Lazur), 40 (testimony of Michael Barbosa, Assistant N.Y.S. Att'y Gen.), & 346 (testimony of Emily Mock, Organizer, CAAAV) (May 16, 2019), https://perma.cc/AWH8-DL8A.

beyond the otherwise allowed amount to recoup the cost of improvements (IAIs or MCIs). *Id.* §§ 26-511(c)(6)(b) & (13). The HSTPA reformed those provisions by, among other things, limiting the additional amounts recoverable annually and making the increases time-limited. *See* 2019 N.Y. Laws ch. 36, Part K.

## ARGUMENT

A federal court "has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014). "Determining the existence of subject matter jurisdiction is a threshold inquiry [,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

To survive a Rule 12(b)(6) motion to dismiss, a pleading must contain sufficient factual matter, accepted as true, so as to make a claim plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). To meet the "facial plausibility" standard, a pleading must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This standard requires a court to reject "threadbare recitals" of the elements of a cause of action "supported by mere conclusory statements," and requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

9

## POINT I

### CITY DEFENDANTS HAVE NOT CAUSED PLAINTIFFS' ALLEGED INJURIES.

Plaintiffs lack standing to sue City Defendants because the City does not enforce the RSL provisions challenged by Plaintiffs, and therefore the City has not caused Plaintiffs' alleged injuries. *Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York ["BRI"]*, Nos. 19-cv-11285, 20-cv-634, 2021 U.S. Dist. LEXIS 174535, at *39 (S.D.N.Y. 2021) (dismissing property owners' challenge to RSL, as amended by the HSTPA, including constitutional challenges to the repeal vacancy bonus repeal, against the City for lack of standing because the City does not enforce the HSTPA). To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Sonterra Cap. Master Fund, Ltd. v. UBS AG*, 954 F.3d 529, 534 (2d Cir. 2020) (internal quotation omitted). Plaintiffs fail to meet the second step because they cannot "demonstrate a causal nexus between the defendant's conduct and the injury." *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992).

Here, Plaintiffs have not alleged that the City's actions have caused any of their alleged injuries – a predicate of standing. The City has two discrete roles under the RSL. First, the ETPA authorizes local legislative bodies to declare the existence of a housing emergency whenever the vacancy rate falls below five percent, after which housing becomes subject to the ETPA. ETPA § 3. Under LEHRCA, the City must make a new determination of emergency at least every three years following a survey of the supply of housing accommodations, the most recent of which was in 2023. Second, RGB meets annually to set the permissible percentage adjustment to monthly rent. Admin. Code § 26-510(a). In all other respects, however, enforcement of the RSL is left to the State. *Rent Stabilization Ass'n v. Higgins*, 83 N.Y.2d 156,

10

165 (1993) ("The legislature in 1983 designated DHCR 'the sole administrative agency to administer the regulation of residential rents under the rent control and rent stabilization statutes"); *BRI*, 2021 U.S. Dist. LEXIS 174535, at \*38-39.  Plaintiffs concede as much.  Compl. ¶¶ 42-43 (State DHCR enforces RSL violations, which include when an owner collects rent above the rent authorized by the RSL); *id.* ¶ 44 (alleging the State imposes civil penalties on owners for RSL violations).

Here, to achieve standing, Plaintiffs would need to challenge City-specific conduct, which they fail to do.  Plaintiffs fail to challenge the City Council's 2024 declaration of a housing emergency or any of the RGB's annual rent adjustment(s).  *See generally*, Compl. Indeed, Plaintiffs' purported claims against the RGB and its members should be dismissed outright because Plaintiffs have failed to plead *any* facts as to their involvement in the alleged constitutional violations.  *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003).[7]  Far from pleading that Plaintiffs' purported injuries are fairly traceable to the City's conduct, the Complaint does not identify *any* City action that has harmed them.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Instead, Plaintiffs challenge three RSL provisions, as amended by the HSTPA in 2019, that, collectively, prohibit a landlord from charging a vacancy bonus and prevent Plaintiffs from charging market rate to new tenants upon the vacancy of rent-stabilized units.  Compl. ¶¶ 1, 37-41.  Plaintiffs seek compensatory damages for lost rental income from these RSL provisions, and Plaintiffs further allege that these state statutes are unconstitutional.  *See* Compl. Wherefore Clause.  But the City neither enacted, nor enforces, these challenged RSL provisions and,

---

[7]As a City agency, RGB and its members (sued only in their official capacities) are non-suable entities and must, therefore, be dismissed from this action. *Ximines v. George Wingate High Sch.*, 516 F.3d 156 (2d Cir. 2008); City Charter § 396.

therefore, has not caused Plaintiffs' alleged injuries.  *See* Compl. ¶¶ 42-44.  The amendments repealing the vacancy bonus are a result of *state* law.  *See* 2019 N.Y. Laws ch. 36, part B.[8]  In fact, the RSL *limits* the RGB's authority by precluding it from authorizing separate vacancy increases.  *Id.* ch. 36, part C ("County rent guidelines boards shall no longer promulgate adjustments for vacancy leases unless otherwise authorized by this chapter.").  Under the current framework of the RSL, City Defendants have no authority to afford property owners the ability to set rents at market rate upon vacancy.  Accordingly, this Court should dismiss Plaintiffs' claims against City Defendants.

## POINT II

### PLAINTIFFS FAIL TO STATE A TAKINGS CLAIM BECAUSE THE PROPER UNIT TO CONSIDER IS THE WHOLE BUILDING.

Plaintiffs raise two types of facial and as-applied regulatory takings challenges: (1) a *per se* (or categorical) taking, which involves "regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property"; and (2) and a non-categorical taking under the *Penn Central* test.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)).  In both types of cases, a court must determine the "unit of property whose value is to furnish the denominator of the fraction."  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 at 497 (1987) (internal quotation omitted).  Plaintiffs fail to plausibly allege that the relevant unit of property for a regulatory takings analysis – the "denominator" – is each individual rent stabilized apartment, rather than the building as a whole.  Compl. ¶¶ 99–113, 180, 211, 250, 263.

---

[8] The HSTPA, in part, amends the Admin. Code.  These provisions, although codified in City law, have the force and effect of state law.

Supreme Court precedent confirms that the relevant unit of property in challenging rent regulations is the entire building. In *Murr v. Wisconsin*, the Court confronted the question of how to determine "the proper unit of property against which to assess the effect of the challenged government action" in a taking analysis. *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017). This unit of property constitutes the denominator in "compar[ing] the value that has been taken from the property with the value that remains in the property . . . ." *Id. Murr* makes clear that Plaintiffs cannot manufacture a taking by narrowly "defining the property interest taken in terms of the very regulation being challenged." *Id.* at 396 (internal quotation omitted). Yet this is precisely what Plaintiffs seek to do. Plaintiffs urge the Court to accept an artificially narrow understanding of the denominator as individual rent-stabilized apartments – discrete portions of their property defined by the challenged regulations – which *Murr* explicitly rejects.

*Penn Central* also points conclusively toward treating the entire building as the proper denominator. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 130 (1978). In *Penn Central*, the Court "rejected a challenge to the denial of a permit to build an office tower above Grand Central Terminal. The Supreme Court refused to measure the effect of the denial only against the 'air rights' above the terminal, cautioning that 'taking jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.'" *Murr*, 582 U.S. at 396 (quoting *Penn Cent.*, 438 U.S. at 130). The Court found that the takings analysis must instead focus on the "nature and extent of the interference with rights in the *parcel as a whole*." *Penn Cent.*, 438 U.S. at 130-31 (emphasis added).

In addition, the Second Circuit has rejected prior takings challenges to the RSL through analyses that implicitly reject the notion that the relevant unit of property is the

13

individual rent-stabilized unit. *Greystone Hotel Co. v. City of N.Y.*, No. 98-9116 1999 U.S. App. LEXIS 14960, at \*4 (2d Cir. 1999) (rejecting takings challenge to the RSL because the owner was making an "ordinary profit" on the "commercial portions of the building"); *CHIP*, 59 F.4th at 554-56 (applying and analyzing *Penn Central* factors as to plaintiffs' *entire buildings*, which contained rent-stabilized and market rate units); *74 Pinehurst*, 59 F.4th at 566 (same); *335-7*, 2023 U.S. App. LEXIS 4940, at \*10-22 (same); *BRI*, 2024 U.S. App. LEXIS 5905, at \*7-11 (same).

Plaintiffs attempt to assess the impacts of the challenged regulatory acts to particular segments of a single parcel – *i.e.*, individual vacant rent-stabilized apartments within rental buildings. The Court should follow the precedent set in *Murr* and *Penn Central* and reject Plaintiffs' argument. In "determining the denominator," courts are to "consider a number of factors," including "treatment of the land under state and local law; the physical characteristics of the land; and the prospective value of the regulated land." *Murr*, 582 U.S. at 397. And the purpose of the inquiry is to resolve "whether reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." *Id.* In applying this test, the proper denominator here is the building as a whole.

Each building is a separate parcel – a single building located on a single lot – and has a single owner. Each Plaintiff purchased the entire building, pays taxes and makes capital improvements on the entire building, and may use the entire building as collateral for loans. Zoning designations are based on the entire building, not individual apartments. Though Plaintiffs avoid discussing the building-wide nature of their properties, they acknowledge the interconnectedness of different apartments in a building, supporting a finding that the relevant

14

denominator is the building.  For example, Plaintiffs allege that certain stabilized rents may "limit[] the owner's ability to charge a fair market rent that would allow the owner to cover the building's common expenses," and argue that if they choose not to rent a particular apartment, "the owner cannot use rent revenue from that apartment to pay for things like repairs to exterior walls, hallways, or heating systems."  Compl. ¶ 110.

Plaintiffs focus on physical barriers between separate apartment units, arguing that each apartment constitutes "a separate and contained physical space within [each] building, with its own locked door separating it from the rest of the building."  Compl. ¶¶ 145, 150, 186, 218.  The fact that a building may be carved into separate apartments cannot, by itself, transform one parcel into multiple properties for the purpose of a takings analysis.  Defining the relevant property interest in terms of the challenged regulation is precisely what the Supreme Court has repeatedly warned against.  *See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 327, 331 (2002).  The questions to be answered in a regulatory takings analysis are whether the challenged law renders the plaintiff's business "commercially impracticable," *Keystone*, 480 U.S. at 495-96, and whether "the property use allowed by the regulation is sufficiently desirable to permit property owners to sell the property to someone for that use," *Park Ave. Tower Assocs. v. New York*, 746 F.2d 135, 139 (2d Cir. 1984) (internal quotation omitted).  Neither of these inquiries could be answered by focusing only on each apartment *unit*, as opposed to the entire building.  Accordingly, the proper denominator is the entire building.

## POINT III

### PLAINTIFFS FAIL TO STATE A *PER SE* REGULATORY TAKINGS CLAIM.

Plaintiffs' facial and as-applied *per se* taking claims (first cause of action) should be dismissed.  The Fifth Amendment "prohibits the government from taking private property for

15

public use without just compensation." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). The case law recognizes two general types of takings – physical and regulatory. *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006). The government commits a physical taking where it appropriates or invades private land, or authorizes third-party "permanent physical occupation." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). Plaintiffs do not assert a physical taking claim.

Where the government acts "in a regulatory capacity, such as when it bans certain uses of private property [] or limits the rent a landlord may charge tenants," its actions are considered under the framework of regulatory takings. *Buffalo Teachers*, 464 F.3d at 374 (internal citations omitted). "Regulatory actions generally will be deemed *per se* takings … where regulations completely deprive an owner of '*all* economically beneficial use' of her property." *Lingle*, 544 U.S. at 538 (quoting *Lucas*, 505 U.S. at 1019). This deprivation is only found "in the extraordinary circumstance when no productive or economically beneficial use of land is permitted[.]" *Lucas*, 505 U.S. at 1017. Here, Plaintiffs claim that the challenged provisions of the RSL constitute both facial and as-applied *per se* regulatory takings.

## A. Plaintiffs Do Not Plausibly Allege a Facial *Per Se* Taking

Plaintiffs face a steep burden in attempting to mount a facial challenge to a statute, and here, their attempt fails. In order to successfully bring a facial challenge, a "plaintiff must 'establish that no set of circumstances exists under which the [challenged] Act would be valid." *CHIP*, 59 F.4th at 548 ("Facial challenges to the RSL have regularly fallen short of this high bar."); *74 Pinehurst*, 59 F.4th at 562; *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993). Here, Plaintiffs do not plausibly allege that the challenged provisions of the RSL, which prohibit the RGB from setting different rent increases for renewal and vacancy leases,

16

amount to a facial *per se* taking by depriving *all* property owners of "*all* economically beneficial use" of their property.  *Lucas*, 505 U.S. at 1019.

Plaintiffs argue that "[b]y setting the rent that can be charged for some vacant apartments at levels so low that those apartments cannot be rented for a reasonable profit, [the RSL] entirely confiscates the value of the leasehold interest for those apartments[.]"  Compl. ¶ 263.  This argument fails to state a facial claim for several reasons.  *First*, Plaintiffs erroneously allege that the challenged provisions of the RSL "set the rents" for vacant apartments.  *Id.*  As discussed, *supra*, the challenged provisions of the RSL do not set rents in rent-stabilized apartments; rather, the RGB makes a yearly determination as to the allowable rent increases.  9 N.Y.C.R.R. § 2522.8.  The RSL prohibits the RGB from setting different maximum rent increases for renewal and vacancy leases.  N.Y. Unconsol. Law § 8624(e).

*Second*, as established in Point II, *supra*, Plaintiffs improperly identify an individual rent-stabilized apartment as the denominator for considering their regulatory taking claims.  The proper denominator, as supported by Supreme Court precedent, is the entire building containing the rent-stabilized apartment.  Using the correct denominator, Plaintiffs' facial *per se* taking claim fails because they do not allege that the challenged provisions of the RSL have denied all owners of rent stabilized properties all economically viable use of their buildings.  *See generally,* Compl.; *CHIP*, 59 F.4th at 548 (citing *Salerno*, 48 U.S. at 745).

*Third*, even if an individual apartment is the relevant unit of property, Plaintiffs fail to plead that each application of the RSL to every vacant apartment subject to the RSL is a *per se* taking.  Plaintiffs merely allege that *some* apartments' rents are set so low as to constitute a *per se* taking.  Compl. ¶ 263.  In fact, Plaintiff RPN Management Co., Inc. ("RPN") admits that at least three stabilized units in its own property rent for lower than the legal regulated rent,

17

meaning that at vacancy, they had legal regulated rents *above* market rate, and RPN chose to lease them at lower rents. Compl. ¶¶ 148, 153, 155. As such, the challenged provisions of the RSL do not – and cannot – deny all owners of buildings with rent stabilized apartments the economically viable use of each apartment, and Plaintiffs' facial *per se* claim fails.

## B.  Plaintiffs' As-Applied *Per Se* Taking Claim Fails

Plaintiffs' as-applied *per se* taking claim fares no better. Plaintiffs fail to plead that the challenged "regulations completely deprive [them] of '*all* economically beneficial use'" of their buildings. *Lingle*, 544 U.S. at 538 (quoting *Lucas*, 505 U.S. at 1019). Here, Plaintiffs merely allege that, collectively, four specific apartments in their buildings "cannot be profitably rented because of rent stabilization." Compl. ¶ 264. This claim should be dismissed.

*First,* Plaintiff Small Property Owners of New York ("SPONY") fails to plead any facts sufficient to make out an as-applied taking claim, or any of the other claims alleged in the Complaint. SPONY merely asserts, without any detail, that "its membership includes small property owners with apartments that cannot be rented" due to the challenged provisions of the RSL. Compl. ¶ 9. "[A]n association has standing to bring suit on behalf of its members when," *inter alia*, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d at 596 (internal quotation omitted). The as-applied taking claim asserted here involves an "essentially ad hoc, factual inquiry." *Id.* (internal quotation omitted). Accordingly, "in takings cases . . . 'the constitutionality of statutes ought not be decided except in an actual factual setting.'" *Id.* (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 10 (1988)). SPONY's vague allegations regarding its unidentified members do not set forth sufficient (or any) facts to allow the Court to conduct such an inquiry. Any attempt by SPONY to assert an as-applied taking claim must therefore be dismissed.

18

*Second*, and as detailed more fully in Point IV, *infra*, the owner-Plaintiffs' claims are not ripe for judicial review. Plaintiffs RPN and PKM Home LLC ("PKM") both admit that they have not applied for hardship exemptions. Compl. ¶ 164-67, 198-200. The third Plaintiff, 135 W 78th, LLC ("135 W. 78th"), has a pending hardship application with DHCR. Compl. ¶ 237-38. Accordingly, Plaintiffs' as-applied per se taking challenge should be dismissed as premature. *74 Pinehurst*, 59 F.4th at 565; *335-7*, 2023 U.S. App. LEXIS 4940, at *7-8.

*Third*, even if Plaintiffs' challenges were ripe, none has plausibly pled an as-applied *per se* taking. As established, the proper denominator in conducting a regulatory taking analysis is the entire building. Here, Plaintiffs do not even attempt to allege that the challenged portions of the RSL have denied them all economically viable use of their own buildings. Rather, Plaintiffs acknowledge that their buildings retain value. *See* Compl. ¶¶ 148, 153, 155, 200, 248. And in fact, Plaintiffs RPN and PKM admit their buildings are profitable. Compl. ¶¶ 166, 200. Accordingly, Plaintiffs fail to plead an as-applied *per se* taking of their property.

*Fourth*, and finally, even if an individual apartment is deemed the relevant unit of property, Plaintiffs fail to plead that the challenged provisions of the RSL have resulted in a *per se* taking of the four specific apartments at issue in the Complaint. "Anything less than a 'complete elimination of value,' or a 'total loss,'" does not amount to a *per se* taking. *Tahoe-Sierra*, 535 U.S. at 330 (quoting *Lucas*, 505 U.S. at 1019-20). 'The typical "regulation[] that leave[s] the owner of land without economically beneficial or productive options for its use … require[es] land to be left substantially in its natural state[.]" *Lucas*, 505 U.S. at 1018.

Here, Plaintiffs acknowledge that they *can* rent the vacant apartments that they own, just not at the market rents they wish to charge upon vacancy. Compl. ¶¶ 134, 176, 207, 246. Thus, Plaintiffs clearly retain economically viable use of their property, even if the

19

denominator is each apartment, thereby foreclosing their as-applied *per se* taking claims. Plaintiffs' vague allegations regarding supposedly "legally mandated repairs" they must complete prior to being able to rent their vacant apartments to new tenants fail to establish that the challenged RSL provisions actually prevent Plaintiffs from leasing their vacant apartments. Plaintiffs further fail to acknowledge the income they would bring in from the rents they can charge – which they have voluntarily forgone in their alleged choice not to rent their apartments.[9]

Plaintiffs essentially assert a right to make a certain amount of anticipated profit, a right which does not exist, and is not the same as being able to make productive use of their property.  It is well established that loss of profit alone, or the failure to reap an anticipated reasonable return, on a rent-stabilized unit does not constitute a taking as a matter of law.  *BRI*, 2024 U.S. App. LEXIS 5905, at \*10; *74 Pinehurst*, 59 F.4th at 566; *FHLMC*, 83 F.3d 45, 48 (2d Cir. 1996); *Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Trust for S. California*, 508 U.S. 602, 645 (1993); *Park Ave. Tower*, 746 F.2d at 139.

The RSL, which has prohibited owners from increasing rents for stabilized apartments to "market rate" upon vacancy since 1974, has been upheld numerous times, and there is no basis for this Court to deviate from this established precedent.  *E.g.*, *CHIP*, 59 F.4th at 547 (listing failed challenges to the RSL); *74 Pinehurst*, 59 F.4th 557; *BRI*, 2024 U.S. App. LEXIS 5905.

---

[9] RPN's two units are $710 and $860, and would bring in $8,500-$10,300 annually.  Compl. ¶¶ 146 & 151.  RPN has kept these units vacant for three and six years, respetively.  Compl. ¶¶ 144 & 149.  PKM's unit is $1,315, and would bring in over $15,700 annually.  Compl. ¶ 187.  135 W 78's unit is $1,200 and would bring in $14,400 annually.  Compl. ¶ 219.  These Plaintiffs have chosen not to rent these units.  Compl. ¶¶ 185, 217.

## POINT IV

## PLAINTIFFS FAIL TO STATE A NON-CATEGORICAL REGULATORY TAKING CLAIM.

Plaintiffs fail to plausibly allege that the challenged RSL provisions effect a facial or as-applied non-categorical regulatory taking, which occurs when a regulation goes "too far" in restricting a landowner's ability to use its own property. Non-categorical takings are analyzed under the *Penn Central* test: (1) the "economic impact of the regulation," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) the "character of the governmental action." *Penn Cent.*, 438 U.S. at 124.

### A. Plaintiffs Do Not State a Facial Regulatory Taking

The Second Circuit has repeatedly rejected facial regulatory takings challenges to the RSL, reasoning that such a facial challenge under the *Penn Central* test is infeasible. *CHIP*, 59 F.4th at 549 (dismissing facial regulatory taking claim because plaintiffs failed to allege that no set of circumstances exists under which the RSL would be valid); *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d at 596. Plaintiffs' generalized allegations here are no more amenable to a facial challenge than the allegations in these earlier cases.

**Economic Impact.** As for the first *Penn Central* factor, the economic impact of the RSL "cannot be ascertained on a collective basis, as it necessarily varies among properties." *74 Pinehurst*, 59 F.4th at 564-65. Some landlords subject to the RSL "might have been harmed while others might not have been." *Id.* "This variation necessarily means that plaintiffs cannot establish that the RSL can never be applied constitutionally[,]" the requirement for a facial challenge. *Id.* at 565.

Instead of alleging that *every* landlord has suffered an adverse economic impact from the RSL's provisions regarding vacancy increases, Plaintiffs complain that *some* – not even

21

all – of their own individual rent-stabilized units cannot be rented at vacancy for the market rent they wish to charge. Plaintiff RPN chooses to keep two units vacant out of the thirty-three units in the building because "it does not make business sense to rent them out at the regulated rents." Compl. ¶¶ 143, 156. But, as noted above, RPN also acknowledges that the rents it charged for at least three other stabilized units at the last vacancy were *lower* than the legal regulated rents. Compl. ¶¶ 148, 153, 155. The disparity of the RSL's application to RPN's property not only highlights the reasons why a facial challenge to the RSL is infeasible, but also that Plaintiffs have failed to plausibly allege (as they must) that the challenged RSL provisions amount to a facial regulatory taking in their application to *each* of the nearly one million apartments they govern.

**Investment-Backed Expectations.** The second *Penn Central* factor, the extent of the interference with reasonable investment-backed expectations, also does not support Plaintiffs' facial claim. Plaintiffs have failed to establish that the RSL "interferes with *every* property owner's investment-backed expectations, which is required on a facial challenge, because such expectations can be assessed only on a case-by-case basis." *CHIP*, 59 F.4th at 554. "Different landlords, who purchased properties at different times and under different" iterations of the RSL, "will necessarily have a range of different expectations." *Id.* Some landlords "may have been aggrieved by various provisions of the RSL, while others may not have been, and, indeed, others may have seen the profitability of their investments rise." *Id.* at 554-55. Thus, it is "impracticable to assess a class of owners' expectations without analysis on an individualized basis." *Id.* at 555.

Moreover, Plaintiffs' facial challenge fails because any reasonable landlord involved in New York's rental market "would have anticipated their rental properties would be

22

subject to regulations, and that those regulations in the RSL could change yet again." *BRI*, 2024 U.S. App. LEXIS 5905, at *10 (internal quotation omitted).  Given the RSL's ever-changing requirements, no property owner could reasonably expect the continuation of any particular combination of RSL provisions. *CHIP*, 59 F.4th at 555.  Accordingly, "the investment-backed expectations factor does not support the contention that the RSL has effected, facially, a regulatory taking." *Id.*

**Character of the Government Action.**  Finally, it is well-settled that the character of the RSL confirms that it is not a regulatory taking. *CHIP*, 59 F.4th at 555-56 (holding that the character of the regulation does not support the conclusion that the RSL effects a regulatory taking); *BRI*, 2024 U.S. App. LEXIS 5905, at *11 (finding that the character of the government action weighs against a taking).

Indeed, the RSL is part of a comprehensive regulatory regime that governs nearly one million housing units in the City. *CHIP*, 59 F.4th at 555.  The Legislature has determined that the RSL is necessary to prevent "serious threats to the public health, safety and general welfare." *74 Pinehurst*, 59 F.4th at 568 (citing Admin. Code § 26-501).  "No one can seriously contend that these are not important public interests and courts are not in the business of second-guessing legislative determinations such as this one." *Id.*  The fact that the RSL affects landlords unevenly is of no moment because "[l]egislation designed to promote the general welfare commonly burdens some more than others." *Id.* (quoting *Penn Cent.*, 438 U.S. at 133).  Accordingly, the balance of factors under *Penn Central* cuts against the conclusion that the RSL effects a regulatory taking.

**B. Plaintiffs Do Not State an As-Applied Challenge Under *Penn Central***

   **i.    Plaintiffs' Claims Are Not Ripe**

As a threshold matter, Plaintiffs' as-applied regulatory taking challenges are premature because they failed to avail themselves of the remedial provisions in the RSL that permitted them to apply to DHCR for hardship exemptions. *74 Pinehurst*, 59 F.4th at 565; *335-7*, 2023 U.S. App. LEXIS 4940 at *8; *BRI*, 2024 U.S. App. LEXIS 5905 at *7. Plaintiffs RPN and PKM have not filed for hardship exemptions with DHCR, and 135 W 78th has a pending hardship application. Compl. ¶¶ 164-67, 198-200, 237-38.

As in *74 Pinehurst*, *335-LLC*, and *BRI*, Plaintiffs complain about the hardship application process and hardship formulas. *Id.* ¶¶ 77-97. Plaintiffs also allege hardship would be futile, as it would not provide them with enough relief and, instead, serve to "exacerbate the disparity between apartments' stabilized rents." *Id.* ¶ 86. But such arguments that the "hardship procedures are … inefficient and ineffective and that exemptions would not address all of [Plaintiffs'] concerns," are simply "not sufficient to avoid the finality requirement." *335-7 LLC*, 2023 U.S. App. LEXIS 4940, at *9. Accordingly, Plaintiffs' as-applied regulatory takings claims are not ripe for judicial review.

   **ii.    Plaintiffs Fail to State a Claim**

**Economic Impact.** Even if Plaintiffs' claims were ripe, none has plausibly alleged that the challenged provisions of the RSL are so burdensome as to constitute a regulatory taking. The Complaint does not allege *any* facts about the RSL's purported impact on the value of Plaintiffs' *buildings*, which, as set forth above, is the proper denominator for conducting a regulatory taking analysis. *See generally*, Compl. To the contrary, RPN alleges its building retains value, as it is "able to collect rent" from the twenty-eight non-vacant apartments in the building and because RPN can rent out at least two units for preferential rent that is lower than

24

market rate.  Compl. ¶¶ 148, 153, 167.  Plaintiffs PKM and 135 W. 78th also collect rents from their non-vacant units.  *Id.*, ¶¶ 183-184, 213, 215, 221.

Even if Plaintiffs had alleged facts showing negative economic impacts on their buildings due to the RSL's provisions regarding vacancy increases, such claims must be dismissed because it is well-settled that "the mere diminution in the value of property, however serious, is insufficient to demonstrate a taking."  *BRI*, 2024 U.S. App. LEXIS 5905 at *10 (quoting *Concrete Pipe & Prods.*, 508 U.S. at 645); *Park Ave. Tower*, 746 F.2d at 139-40 (collecting cases rejecting takings claims where property value declined by 75% to 90%).

Plaintiffs' principal grievance appears to be that they cannot recover a "reasonable profit" on four vacant units in their collective buildings because the RSL caps rents at vacancy, and Plaintiffs must pay for necessary repairs prior to a new tenancy.  *Id.*, ¶¶ 176, 210-211, 215, 222, 223, 246.  RPN alleges it cannot rent two vacant units to new tenants at market rate, which would allow RPN to "make a reasonable profit sufficient to justify the costs and liabilities that are incurred" by bringing these vacant apartments "up to code" and renting them to new tenants.  *Id.* ¶ 176.  PKM and 135 W. 78th allege that they cannot earn a reasonable profit renting out vacant units and, instead, wish to charge market rate.  *Id.* ¶¶ 210-211, 215, 222, 246.

Plaintiffs' allegations, even if accepted as true, amount to nothing more than a claim that the RSL prevents them from making a reasonable profit on *some* of their units.  These claims must be dismissed because it is well-settled that allegations of loss of profit are wholly insufficient to plead a regulatory taking as a matter of law.  *Park Ave. Tower*, 746 F.2d at 139 ("[T]his court rejected the notion that loss of profit – must less loss of a reasonable return – alone could constitute a taking.").  As the Second Circuit observed in rejecting a prior challenge to the

25

RSL, these landlords "may still rent apartments and collect the regulated rents" even though they "will not profit as much as [they] would under a market-based system." *FHLMC*, 83 F.3d at 48. Indeed, Plaintiffs admit that they can rent their vacant units at the legal regulated rents, just not at the market rates that they wish to charge. Compl. ¶¶ 146, 151 (RPN can rent its two vacant units for $710 and $860 per month); *id.* ¶ 187 (PKM can rent its vacant unit for $1,315 per month); *id.* ¶ 219 (135 W. 78th can rent its vacant unit for $1,200 per month). Plaintiffs' assertion that they are precluded from using these units in the most profitable manner is not cognizable as a regulatory takings claim. *See 74 Pinehurst*, 59 F.4th at 566 (rejecting regulatory taking claim where the RSL requires landlords to offer "below market rates").

Finally, Plaintiffs' vague allegations that the cost of repairs to these vacant units prevent them from recovering a profit fail to demonstrate economic harm under *Penn Central*. Plaintiffs do not allege any specific diminution in the value of their buildings or their vacant units. Plaintiffs fail to allege that they have undertaken IAI investments they cannot recoup under the RSL. Nor do Plaintiffs allege that they can no longer find buyers for their buildings. *Park Ave. Tower*, 746 F.2d at 139 (citing as a key inquiry in regulatory takings analysis "whether others might be interested in purchasing all or part of the land for permitted uses"). Finally, Plaintiffs fail to allege that they have sought hardship exemptions to mitigate any economic harms that might occur from making repairs to the vacant units.

Plaintiffs, rather, appear to complain that they cannot recoup IAI expenses quickly enough to justify the cost of making them. Compl. ¶¶ 161, 195, 228. But Plaintiffs can recover some of the future costs associated with IAIs under the RSL, and Plaintiffs can even recover them faster than the RSL contemplates by raising the rents on the market-rate units in the same building; applying to DHCR for a hardship exemption; collecting the regulated rents rather

26

than choosing to keep four units vacant; and even by selling their buildings altogether. Accordingly, Plaintiffs' claims that the RSL keeps them from profiting as much as they would without the regulatory scheme is simply insufficient to demonstrate economic harm under the first prong of *Penn Central*.

**Investment-Backed Expectations**.  Plaintiffs have not plausibly alleged that the RSL interfered with their reasonable investment-backed expectations.  "The purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (internal quotation omitted).  The critical time for considering reasonable investment-backed expectations is the time the property is acquired.  *CHIP*, 59 F.4th at 555.

At the time Plaintiffs purchased their properties, the RSL had been in effect for *decades*, so they purchased their buildings with the expectation that the apartments would be rent stabilized.  Given the RSL's ever-changing requirements since its enactment in 1969, no property owner could reasonably expect the continuation of any particular combination of provisions.  *CHIP*, 59 F.4th at 555; *BRI*, 2024 U.S. App. LEXIS 5906 at *10 ("[A]ny reasonable investor would have anticipated their rental properties would be subject to regulations, and that those regulations in the RSL could change yet again." (internal quotation omitted)).  Plaintiffs chose to invest in heavily regulated markets by acquiring multi-unit residential buildings already subject to the RSL.  *See generally*, Compl.  Significantly, the Complaint is completely silent as to each Plaintiffs' investment-backed expectations at the time of purchase.  *Id.*

Two of the three Plaintiffs purchased their buildings years *after* the enactment of the 2019 HSTPA, which eliminated vacancy bonuses and implemented other tenant protective

27

measures.   Plaintiff 135 W. 78th purchased its building in 2022, *id.* ¶ 213; Plaintiff PKM purchased in July 2025, while the apartment in question (unit 3L) had already been vacant for a year, *id*. ¶¶ 182, 185.   Accordingly, 135 W. 78th and PKM cannot plausibly claim shock or surprise that they cannot now charge an increase, let alone market rate, for a vacant unit.   Rather, these Plaintiffs "acquired their property … with full knowledge that it was subject" to the *exact* provisions of the RSL that exist today.   *Harmon v. Markus*, 412 F, App'x 420, 422 (2d Cir. 2002) (summary order).

Plaintiff RPN purchased its building in 1991, before statutory vacancy bonuses and vacancy decontrol.   Those RSL features were not introduced by the Legislature until 1997 and 1993, respectively.   *See* 1993 N.Y. Laws ch. 253, §§ 4-10, 19-21; 1997 N.Y. Laws ch. §§ 19-20.   Thus, Plaintiff RPN bought its property prior to the 20 percent vacancy bonus, and at a time when rents could not increase to market rate at vacancy.

All three owner-Plaintiffs seek the same remedy – the ability to charge market rate for a rent-stabilized unit upon vacancy and then keep the unit subject to the RSL until the next vacancy.   Pls. Letter, ECF Doc. No. 61 at 1.   But this drastic relief has *never* been a feature of the RSL in any of its forms dating back to its enactment in 1969.[10]   Nor do Plaintiffs allege as much.   Accordingly, it is axiomatic that Plaintiffs' purported expectations that they can claim market rate rent upon vacancy is not reasonable.   Plaintiffs have not satisfied the second prong of *Penn Central*.

**Character of Government Action**.   As set forth above, the character of the government action does not support the conclusion that the RSL effects a regulatory taking. Plaintiffs' as applied challenge fails for the same reasons as their facial challenge.   *74 Pinehurst*,

---

[10] Excepting a brief period from 1971-74, which the Legislature deemed a failure.

59 F.4th at 568 ("The character of the regulation does not change whether the challenge is as applied or facial").

## POINT V

## PLAINTIFFS FAIL TO STATE SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION CLAIMS.

### A.  Plaintiffs' Substantive Due Process Claim Fails

Plaintiffs' substantive due process claim (second cause of action) must be dismissed.  The "Due Process clause cannot do the work of the Takings Clause because where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *CHIP*, 59 F.4th at 556-57 (internal quotation omitted).   Even if a due process challenge were available, Plaintiffs' arguments fail because the challenged RSL provisions survive rational basis review.  *Id.* at 557.

To sustain a facial due process challenge, Plaintiffs must demonstrate that the challenged legislation was "arbitrary, conscience-shocking, or oppressive in a constitutional sense," and not merely "incorrect or ill-advised."  *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995).  Plaintiffs must also overcome the strong presumption of constitutionality that attaches to the challenged legislation.  *Rent Stabilization Ass'n v. Higgins*, 83 N.Y.2d at 171.  Legislative acts, such as the RSL, that do not "interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if rationally related to a legitimate state interest."  *Beatie v. City of N.Y.*, 123 F.3d 707, 711 (2d Cir. 1997) (internal citations omitted).  Thus, "as long as the City officials responsible for enforcement guidelines reasonably might have conceived that the policies would serve legitimate interests, those guidelines must be sustained."  *All Aire Conditioning, Inc. v. City of*

29

*N.Y.*, 979 F. Supp. 1010, 1018 (S.D.N.Y. 1997); *see also BRI*, 2024 U.S. App. LEXIS 5905, at *14-15.

### i.    The RSL Serves Rational Government Interests

As an initial matter, although Plaintiffs claim that they solely challenge the constitutionality of RSL portions that prohibit additional increases to stabilized apartments at vacancy, above what is permitted for renewal leases, the Complaint is rife with general grievances about the rent stabilization system as a whole, which has long faced and survived judicial scrutiny. *E.g.*, Compl. ¶¶ 49-50, 58, 283-86. Plaintiffs' claims must be dismissed, as courts have consistently rejected such challenges to the RSL, finding that the statutory scheme serves the legitimate State interest of protecting tenants from a housing crisis. *W. 95 Hous. Corp. v. N.Y. City Dep't of Hous. Pres. & Dev.*, 2001 U.S. Dist. LEXIS 7784, at *28, *aff'd*, 31 F. App'x 19 (2d Cir. 2002) (summary order) ("[T]he RSL and ETPA were enacted to combat the ill effects of a perceived housing shortage – clearly a valid governmental concern."). And in fact, the most recent slate of challenges to the RSL attacked the same provisions Plaintiffs target here, also on substantive due process grounds, and were unsuccessful. *CHIP*, 59 F.4th at 557; *BRI*, 2024 U.S. App. LEXIS 5905, at *14-15.

Further, the maintenance of rent stabilization for apartments at vacancy is not new to the overall rest stabilization system. Since 1974, through more than a half century of legislative changes, the RSL has never allowed property owners to increase the rents of stabilized apartments to market rate at vacancy. At times, RGB had discretion to allow certain additional rent increases above the renewal rate for apartments that had become vacant over the preceding year, and in 1997, the RSL was amended to include the vacancy bonus – allowing owners to increase rents by as much as twenty percent at vacancy. *Cmty. Hous. Improvement Program v. City of New York, et al.*, 492 F. Supp. 3d 33, 51 (E.D.N.Y. 2020). Other changes to

the rent stabilization system have been legislated since its inception, many of which indisputably favored building owners. *Id.* at 39. In 2019, as part of the HSTPA, the Legislature eliminated the vacancy bonus and prohibited RGB from setting different rent increases for renewal and vacancy leases. *Id.*; 9 N.Y.C.R.R. § 2522.8; N.Y. Unconsol. Law § 8624(e). The RSL does not (and has never) set rent amounts for rent stabilized apartments. The RGB sets the percentage by which property owners may increase rents.

### ii.    The RSL Satisfies Rational Basis Review

"It is beyond dispute" that the RSL is rationally related to a legitimate government interest of "neighborhood continuity and stability." *CHIP*, 59 F.4th at 557. The provisions of the RSL that eliminated vacancy increases in 2019 were enacted to preserve rent stabilized units, particularly those at rents affordable to low-and moderate-income people, and without which many New Yorkers would not be able to continue to reside in New York City. Providing Plaintiffs the relief they seek herein – namely, permitting vacant rent stabilized apartments to be rented at "market rate" – would result in the rapid increase of rents for stabilized apartments (contrary to the Legislature's intent) and undermine the entire rent stabilization scheme.

Prior to the 2019 HSTPA, the rent stabilization scheme offered the largest increases when units became vacant.[11] Owners could raise rents by as much as 20 percent upon vacancy and obtain additional increases through other mechanisms that have also been curtailed.[12] The vacancy bonus resulted in significant rent increases for rent-stabilized units.

---

[11] *Hearing before N.Y. Senate Standing Comm. on Hous., Constr. and Cmty. Dev.*, 2019 Leg., 242 Sess. 13, 21-24 (testimony of Louise Carroll, HPD Commissioner and Elyzabeth Gaumer, HPD Assistant Commissioner) (May 9, 2019), available at https://perma.cc/DAZ6-KHDZ.

[12] *Id.*

This created a strong incentive to remove tenants from their units, which would then allow owners to increase rents after they left (or were forced out).[13]  Prior to the HSTPA, owners could also remove units from rent stabilization when their rents reached set dollar amounts, so owners had an additional incentive to increase rents through vacancies.  The result was the loss of regulated, low-cost housing for low- and moderate-income New Yorkers.  The disproportionate value of vacancy in rent stabilized units created the incentive to harass current tenants, particularly the longest tenured and most vulnerable.

Though Plaintiffs here insist that they are not asking to end rent stabilization altogether (Pls. Letter, ECF Doc. No. 61 at 1), functionally, what they seek would have very similar results.  To illustrate, the apartment at issue in Plaintiff 135 W 78th's building is a one-bedroom apartment with a monthly legal rent of approximately $1,200.  Compl. ¶¶ 218-19.  If permitted to raise the rent, 135 W 78th, LLC would instead seek to charge "between $4,500 and $5,100 per month" for this same apartment.  *Id*. ¶ 220.  In one vacancy, if Plaintiffs had their way, this apartment's rent would increase *more than four-fold*, almost instantly transforming from a home affordable to people earning modest incomes to one that is out of reach for most New Yorkers.[14]

Even if these newly high-rent apartments would still be subject to rent stabilization, there is little doubt that these apartments will no longer be available to low-income New Yorkers, who already face many difficulties in finding places to live.  Additionally, there can be no dispute that the prospect of a four-fold rent increase – significantly more than the

---

[13] *Id.* at 24-25.

[14] The other two owner Plaintiffs would seek to set rents with similarly significant increases. RPN would seek to charge more than three times the rent for both of its apartments at issue here (from $710 to $2,600 and from $860 to $3,000), and PKM would seek to charge nearly double (from $1,315 to $2,500) for its apartment.  Compl. ¶¶ 146-47, 151-52, 187-88.

twenty percent vacancy bonus that existed prior to 2019 – could create an incentive for a building owner to remove an existing tenant, possibly through harassment or other illegal means. Maintaining New York's stock of low-cost apartments and preventing tenant harassment – both of which are important parts of "neighborhood continuity and stability" – were explicit goals of the Legislature in eliminating the vacancy bonus, and are valid rationales for the challenged provisions of the RSL. *CHIP*, 59 F.4th at 557; *see also 74 Pinehurst*, 59 F.4th at 569; *BRI*, 2024 U.S. App. LEXIS 5905, at *14-15. Accordingly, the challenged provisions of the RSL are rationally related to the Legislature's valid goals of preserving affordable housing stock, preventing eviction and tenant harassment, and maintaining neighborhood continuity and stability. Plaintiffs' substantive due process claim must therefore be dismissed.

## B. Plaintiffs' Equal Protection Claim Fails

Plaintiffs' equal protection claim (third cause of action) similarly fails because the challenged provisions of the RSL survive rational basis review, as detailed above. Compl. ¶¶ 289-299. Plaintiffs claim that there is "no rational reason why" the RSL's application should be limited to pre-1974 buildings. *Id.*, ¶ 295. The Second Circuit has explicitly rejected such claims premised on the RSL's distinct treatment of buildings constructed prior to 1974. *W. 95 Hous. Corp.*, 31 F. App'x at 21 (summary order). The RSL applies to buildings constructed before 1974 because that is the year the Legislature enacted the ETPA to address the severe housing shortage in the City. Buildings constructed prior to 1974 were already part of the existing rental housing stock when the Legislature sought to broaden tenant protections. It was rational for the Legislature to exempt buildings constructed after 1974 to also encourage new development in the City.

Moreover, Plaintiffs' claims that there is no difference between buildings constructed before and after 1974, Compl. ¶ 292, and that "there is no rational, legitimate reason

33

to set disparate maximum rents among vacant apartments," *id.* ¶ 298, amount to nothing more than "policy and efficacy disagreements with the legislature," which are not sufficient to defeat rational basis review. *BRI*, 2024 U.S. App. LEXIS 5905, at * 14-15 ("[R]ational basis review is not a mechanism for judges to second guess legislative judgment[.]").    Plaintiffs' equal protection claim must be dismissed.

## CONCLUSION

For the reasons set forth above, City Defendants respectfully request that this Court grant their motion to dismiss the Complaint in its entirety, together with such other and further relief as the Court may deem just and proper.

Dated:       New York, New York
             March 18, 2026

                                  **STEVEN BANKS**
                                  Corporation Counsel of the City of New York
                                  Attorney for City Defendants
                                  100 Church Street
                                  New York, New York 10007
                                  (212) 356-2190


                          By:     */s/ Rachel K. Moston*
                                  */s/ Leah A. Reiss*
                                  Rachel K. Moston
                                  Leah A. Reiss
                                  Assistant Corporation Counsels

## WORD COUNT CERTIFICATION

According to Microsoft Word, the portions of this memorandum of law that must be included in a word count, pursuant to Local Civil Rule 7.1 and the Part's Individual Practices in Civil Cases, contain **10,470 words** (including footnotes), exclusive of cover page, table of contents, table of authorities, signature block, and this certification, in accordance with this Court's Order, dated February 27, 2026 (ECF Doc. No. 71).

Dated:      New York, New York
            March 18, 2026

STEVEN BANKS
Corporation Counsel of the City of New York
Attorney for City Defendants
100 Church Street
New York, New York 10007
(212) 356-2190


By:    */s/ Rachel K. Moston*
       */s/ Leah A. Reiss*
       Rachel K. Moston
       Leah A. Reiss
       Assistant Corporation Counsels