**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SMALL PROPERTY OWNERS OF NEW
YORK, INC., et al.,

                Plaintiffs,

**-against-**

THE CITY OF NEW YORK, et al.,

                Defendants.

Civil Case No.
**1:25-cv-09425-JPC**

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES..................................................................................................iii

INTRODUCTION ............................................................................................................... 1

STATEMENT REQUESTING ORAL ARGUMENT ........................................................ 3

STATEMENT OF FACTS .................................................................................................. 3

    I.  Plaintiffs Own Vacant Apartments Whose Rent Caps Take Them Off the Market. ........ 3

        A.  Pashko and Tony Lugjuraj (Plaintiff RPN Management Co., Inc.) .................. 3

        B.  Bipin Mathew (Plaintiff PKM HOME LLC)..................................................... 5

        C.  Ilan Rabinovitch (Plaintiff 135 W 78TH, LLC)................................................. 5

        D.  Small Property Owners of New York. ............................................................... 6

    II.  New York Prevents "Vacant Increases" in Pre-1974 Buildings—Tying Vacant Units' Rents to Historical Accident.................................................................... 7

    III.  New York's Building-Wide "Hardship" Provisions Do Not Solve the Problem ...................................................................................... 9

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT..................................................................................................................... 12

    I.  Plaintiffs Present a Unique Challenge, and Their Requested Relief is Not "Radical." ................................................................................... 14

    II.  Plaintiffs Have Stated Cognizable Claims. .................................................... 18

        A.  Plaintiffs Have Plausibly Alleged an As Applied Taking. .................................. 18

            1.  The "denominator" in this case, for purposes of determining loss of property value, is the unit's leasehold .......................................... 19

            2.  Plaintiffs have plausibly alleged an as applied *Lucas* taking....................................................................... 27

            3.  Plaintiffs have plausibly alleged an as applied *Penn Central* taking.................................................................. 31

        B.  Plaintiffs Have Plausibly Alleged a Facial Takings Claim.............................. 33

i

C. Plaintiffs Have Plausibly Alleged a Due Process Claim. ................................... 40

    1. The Takings Clause does not subsume the
       Due Process Clause. .................................................................................... 41

    2. Plaintiffs have plausibly alleged that the rent caps on their vacant
       apartments are arbitrary. .............................................................................. 43

D. Plaintiffs Have Plausibly Alleged an Equal Protection Claim. .......................... 46

III. There is No Hurdle to Reaching the Merits of Plaintiffs' Claims................................... 49

A. Plaintiffs' Claims are Ripe................................................................................... 49

B. Plaintiffs' Claims are Not Time Barred. ............................................................. 52

C. Plaintiff SPONY Has Standing............................................................................ 57

D. The City is a Proper Defendant. .......................................................................... 59

E. Plaintiffs Preserve Their Arguments Regarding New York's Sovereign
    Immunity ............................................................................................................... 60

CONCLUSION.................................................................................................................................... 61

CERTIFICATION PURSUANT TO CIVIL RULE 7.1(C) OF THE JOINT
    LOCAL RULES OF THE UNITED STATES DISTRICT COURTS FOR THE
    SOUTHERN AND EASTERN DISTRICTS OF NEW YORK ............................................. 63

# TABLE OF AUTHORITIES

**Page(s)**

**Case(s)**

*74 Pinehurst LLC v. New York*,
   59 F.4th 557 (2d Cir. 2023) ...................................................... 14, 15, 25, 31, 43, 44, 50, 52, 61

*74 Pinehurst LLC v. New York*,
   146 S. Ct. 540 (2024) ........................................................................................................... 15

*335-7 LLC v. City of N.Y.*
   524 F.Supp.3d 316 (2021) ...................................................................................................... .16

*335-7 LLC v. City of New York*,
   Case No. 21-823, 2023 WL 2291511(2d Cir. Mar. 1, 2023) ............................................. 15, 25

*2910 Ga. Ave. LLC v. District of Columbia*,
   234 F. Supp. 3d 281 (D.D.C. 2017) ........................................................................................ 24

*Anaheim Gardens, L.P. v. United States*,
   953 F.3d 1344 (Fed. Cir. 2020) .............................................................................................. 31

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ................................................................................................... 12

*Auracle Homes, LLC v. Lamont*,
   478 F. Supp. 3d 199 (D. Conn. 2020) ...................................................................................... 25

*Bano v. Union Carbide Corp.*,
   361 F.3d 696 (2d Cir. 2004) ............................................................................................. 58, 59

*Becker v. City of Hillsboro*, Mo.
   125 F.4th 844 (8th Cir. 2025) .................................................................................................. 23

*Blakelick Props., LLC v. Vill. of Glen Ellyn*,
   No. 25-CV-04569, 2025 WL 3763905 (N.D. Ill. Dec. 30, 2025) ........................................... 30

*Block v. Hirsh*,
   256 U.S. 135 (1921) ................................................................................................................ 37

*Bowles v. Willingham*,
   321 U.S. 503 (1944) ................................................................................................................ 37

*Bronx 444 E. 187 St., L.P. v. Perea*,
   131 N.Y.S.3d 533, 2020 WL 5949936 (N.Y. Civ. Ct. Oct. 1, 2020) ...................................... 20

*Bucklew v. Precythe*,
   587 U.S. 119 (2019) ................................................................................................................ 55

iii

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021)...................................................................................... 34, 38

*Charles Wolff Packing Co. v. Ct. of Indus. Rels. of State of Kansas*,
  262 U.S. 522 (1923)............................................................................................. 37

*Chastleton Corp. v. Sinclair*,
  264 U.S. 543 (1924)............................................................................................. 47

*Citizens United v. Federal Election Com'n [FEC]*,
  558 U.S. 310 (2010)............................................................................................. 55

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)............................................................................................. 48

*City of Ctr. Point v. Atlas Rental Prop., LLC*,
  371 So. 3d 856 (Ala. 2022).................................................................................. 17

*City of Las Vegas v. 180 Land Co., LLC*,
  546 P.3d 1239 (Nev. 2024)............................................................................ 20, 23

*Colony Cove Prop.'s, LLC v. City of Carson*,
  640 F.3d 948 (9th Cir. 2011) ............................................................................... 56

*Cmty. Hous. Improvement Program v. City of N.Y.*,
  59 F.4th 540 (2d Cir. 2023)............................................... 1, 14, 15, 25, 32, 42, 43

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024).............................................................................................. 55

*Craigmiles v. Giles*,
  312 F.3d 220 (6th Cir. 2002)................................................................................ 45

*Crown Point Dev., Inc. v. City of Sun Valley*,
  506 F.3d 851 (9th Cir. 2007)................................................................................ 41

*Cully Corp. v. United States*,
  160 Fed. Cl. 360 (2022)................................................................................... 21, 22

*Devines v. Maier*,
  665 F.2d 138 (7th Cir. 1981)................................................................................ 20

*Dias v. City and Cnty. of Denver*,
  567 F.3d 1169 (10th Cir. 2009) ................................................................. 46, 47, 49

*DM Arbor Ct., Ltd. v. City of Hous., Tex.*
  150 F.4th 418 (5th Cir. 2025).......................................................................... 28, 30

iv

*Doe v. Columbia Univ.*,
  831 F.3d 46 (2d Cir. 2016) ......................................................................................... 12

*EklecCo NewCo LLC v. Town of Clarkstown*,
  No. 16-CV-6492, 2018 WL 3023159 (S.D.N.Y. June 18, 2018) ........................................... 55

*Elmsford Apt. Assocs., LLC v. Cuomo*,
  469 F. Supp. 3d 148 (S.D.N.Y. 2020) ................................................................................ 25

*Elsmere Park Club Ltd. v. Town of Elsmere*,
  771 F. Supp. 646 (D. Del. 1991) ....................................................................................... 24

*First Eng. Evangelical Lutheran Ch. of Glendale v. L.A. Cnty., Cal.*,
  482 U.S. 304 (1987) ............................................................................... 28, 57, 60, 66

*Flynt v. Shimazu*,
  940 F.3d 457 (9th Cir. 2019) ................................................................................ 53, 54

*Fortress Bible Church v. Feiner*,
  694 F.3d 208 (2d Cir. 2012) ............................................................................................. 48

*Fulton v. Fulton Cnty. Bd. of Comm'rs*,
  148 F.4th 1224 (11th Cir. 2025) ....................................................................................... 61

*Girard v. Town of Allenstown*,
  428 A.2d 488 (Pa. 1981) .................................................................................................. 17

*Great Atl. & Pac. Tea Co. v. State of N.Y.*,
  22 N.Y. 2d 75 (N.Y. 1968) ............................................................................................... 20

*Greene v. Town of Blooming Grove*,
  Case No. 87-CIV-0069, 1988 WL 126877 (S.D.N.Y. Nov. 21, 1988) .................................... 53

*Greene v. Town of Blooming Grove*,
  879 F.2d 1061 (2d Cir. 1989) ........................................................................................... 53

*Guggenheim v. City of Goleta*,
  638 F.3d 1111 (9th Cir. 2010) .......................................................................................... 56

*Gutierrez v. Saenz*,
  606 U.S. 305 (2025) ........................................................................................................ 60

*Heights Apts., LLC v. Walz*,
  30 F.4th 720 (8th. Cir. 2022) ........................................................................................... 31

*Hodel v. Irving,*
  481 U.S. 704 (1987) ................................................................ 22, 32, 34, 35, 37, 39, 40

*Horne v. Dep't of Agric.*,
  576 U.S. 350 (2015) ................................................................................ 34, 38, 39

*Horne v. Flores*,
  557 U.S. 433 (2009) ............................................................................................ 58

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................................................ 57

*In re City of N.Y. (G & C Amusements)*,
  55 N.Y.2d 353 (N.Y. 1982) ................................................................................ 20

*In re Broadway Realty I Co., LLC*,
  No. 25-11050 (Bankr. S.D.N.Y. Jan. 5, 2026) .................................................. 19

*John Corp. v. City of Hous.*,
  214 F.3d 573 (5th Cir. 2000) ............................................................................. 41

*Kaufmann's Carousel, Inc. v. City of Syracuse Indus. Dev. Agency*,
  301 A.D.2d 292 (N.Y. App. Div. 2002) ............................................................. 20

*Keshbro, Inc. v. City of Mia.*,
  801 So.2d 864 (Fla. 2001) .................................................................................. 30

*Knick v. Twp. of Scott, Pa.*,
  588 U.S. 180 (2019) ............................................................................... 39, 49, 56

*Knight v. Columbus, Ga.*,
  19 F.3d 579 (11th Cir. 1994) ............................................................................. 53

*Koontz v. St. Johns Riv. Water Mgt. Dist.*,
  570 U.S. 595 (2013) ....................................................................................... 37-40

*Legacy Hous. Corp. v. City of Horseshoe Bay, Tex.*,
  158 F.4th 636 (5th Cir. 2025) ............................................................................ 32

*Levald, Inc. v. City of Palm Desert*,
  998 F.2d 680 (9th Cir. 1993) ............................................................................. 56

*Lingle v. Chevron, U.S.A., Inc.*,
  544 U.S. 528 (2005) ................................................................... 35, 37, 41, 42

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ..................................................................................... 34, 38

*Lost Tree Vill. Corp. v. United States*,
  707 F.3d 1286 (Fed. Cir. 2013) ......................................................................... 23

*Lost Tree Vill. Corp. v. United States*,
    787 F.3d 1111 (Fed. Cir. 2015).................................................................... 30

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)........................................................................13, 18, 27-30

*Lynch v. City of N.Y.*
    952 F.3d 67 (2d Cir. 2020) ........................................................................ 12

*Manocherian v Lenox Hill Hosp.*,
    84 N.Y.2d 385 (N.Y. 1994) ................................................................. 14, 21

*Merrifield v. Lockyer*,
    547 F.3d 978 (9th Cir. 2008)..................................................................... 45

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
    436 U.S. 658 (1978).................................................................................. 60

*Morales v. 1160 Cromwell Crown LLC*,
    150 N.Y.S.3d 570 (N.Y. Civ. Ct. 2021)..................................................... 4

*Murr v. Wisconsin*,
    582 U.S. 383 (2017)............................................... 19, 22, 23, 26, 32

*Muskin v. State Dep't. of Assessments and Tax'n*,
    30 A.3d 962 (Md. 2011)............................................................................ 21

*Myers v. Cnty. of Orange*,
    157 F.3d 66 (2d Cir. 1998) ....................................................................... 48

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)..................................................................................... 39

*Nebbia v. People of N.Y.*,
    291 U.S. 502 (1934).................................................................................. 37

*Ne. Fla. Ch. of the Assoc.d Gen. Contractors v. City of Jacksonville, Fla.*,
    508 U.S. 656 (1993).................................................................................. 59

*OM 309-311 6th St., LLC v. City of Union City*,
    No. 21-12051, 2022 WL 855769 (D.N..J. Mar. 23, 2022)............................. 24, 31

*Pakdel v. City & Cnty. of San Francisco, Cal.*,
    594 U.S. 474 (2021)........................................................................... 49, 59

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001).................................................................................. 57

*Park W. Mgt. Corp. v. Mitchell*,
  47 N.Y.2d 316 (1979)...................................................................................... 20

*Pearson v. City of Grand Blanc*,
  961 F.2d 1211 (6th Cir. 1992) ........................................................................ 42

*Penn Cent. Transp. Co. v. City of N.Y.*,
  438 U.S. 104 (1978).................................................................. 13, 18, 25, 31

*Pennell v. City of San Jose*,
  485 U.S. 1 (1988)......................................................................... 40, 43, 44

*Pa. Coal Co. v. Mahon*,
  260 U.S. 393 (1922)..................................................................... 17, 18, 30, 40

*Pittsfield Dev., LLC v. City of Chic.*,
  No. 17 C 1951, 2025 WL 43123 (N.D. Ill. Jan. 7, 2025)........................................ 29

*Preseault v. I.C.C.*,
  494 U.S. 1 (1990)................................................................................... 22

*Quick Cash of Westchester Ave. LLC v. Vill. of Port Chester*,
  No. 11-CV-5608, 2013 WL 135216 (S.D.N.Y. Jan. 10, 2013)................................ 50

*Rent Stabilization Ass'n of the City of N.Y. v. Dinkins*,
  5 F.3d 591 (2d Cir. 1993) ...................................................................... 57, 58

*Rumsfeld v. F. for Acad. & Inst. Rights, Inc.*,
  547 U.S. 47 (2006).................................................................................. 58

*S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*,
  539 F. Supp. 2d 547 (D. Conn. 2008) ............................................................. 53

*Schweiker v. Wilson*,
  450 U.S. 221 (1981)................................................................................. 48

*Seawall Associates v. City of N.Y.*,
  74 N.Y.2d 92 (N.Y. 1989) ................................................................. 22, 30, 32, 40

*Seneca Nation v. Hochul*,
  58 F.4th 664 (2d Cir. 2023)....................................................................53-56

*Sheetz v. Cnty. of El Dorado, Cal.*,
  601 U.S. 267 (2024)................................................................................. 38

*Sherman v. Town of Chester*,
  752 F.3d 554 (2d Cir. 2014) ....................................................................... 53

viii

*S. Nassau Bldg. Corp. v. Town Bd. of Town of Hempstead*,
  624 F. Supp. 3d 261 (E.D.N.Y. 2022) ............................................ 20

*Stahl York Ave. Co., LLC v. City of N.Y.*,
  162 A.D.3d 103, (N.Y. App. Div. 2018) .......................................... 25

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
  560 U.S. 702 (2010) .......................................................................... 42

*Suitum v. Tahoe Reg'l Plan. Agency*,
  520 U.S. 725 (1997) .......................................................................... 50

*The Slaughterhouse Cases*,
  83 U.S. 36 (1873) .............................................................................. 13

*Thomas v. Cnty. of Humboldt, Cal.*,
  124 F.4th 1179 (9th Cir. 2024) .................................................. 55, 57

*Tri County Indus., Inc. v. District of Columbia*,
  104 F.3d 455 (D.C. Cir. 1997) .................................................... 41, 42

*Tyler v. Hennepin Cnty., Minn.*,
  598 U.S. 631 (2023) .......................................................................... 35

*United States v. 32.42 Acres of Land*,
  No. 05-cv-1137, 2009 WL 2424303 (S.D. Cal. Aug. 6, 2009) ........ 21

*United States v. Carolene Prods. Co.*,
  304 U.S. 144 (1938) .......................................................................... 47

*United States v. James Daniel Good Real Prop.*,
  510 U.S. 43 (1993) ............................................................................ 41

*United States v. Petty Motor Co.*,
  327 U.S. 372 (1946) .......................................................................... 21

*United States v. Right to Use & Occupy 3.38 Acres of Land*,
  484 F.2d 1140 (4th Cir. 1973) .......................................................... 21

*Vargas v. 112 Suffolk St. Apt. Corp.*,
  66 Misc. 3d 1214(A), 120 N.Y.S.3d 724 (N.Y. Civ. Ct. Jan. 28, 2020) ................................ 25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .......................................................................... 59

*Villager Pond, Inc. v. Town of Darien*,
  56 F.3d 375 (2d Cir. 1995) ......................................................... 42, 43

*W. 95 Hous. Corp. v. NYC Dep't of Hous. Pres. & Dev.*,
  31 F. App'x 19 (2d Cir. 2002) ............................................................................. 47

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012) ............................................................................... 48

*Winston v. City of Syracuse*,
  887 F.3d 553 (2d Cir. 2018) ............................................................................... 48

*Yee v. City of Escondido, Cal.*,
  503 U.S. 519 (1992)................................................................... 38, 50, 51, 58

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. V ....................................... 3, 14, 15, 18, 21, 22, 34, 38-43, 54, 57

U.S. CONST. amend XIV.............................................. 3, 13, 18, 40-44, 51, 58

## CODES and STATUTES

50 Ill. Comp. Stat. 825/5.................................................................................... 17

Ariz. Rev. Stat. § 9-461.16................................................................................. 17

Ark. Code § 14-16-601 ...................................................................................... 17

Cal. Civ. Code § 1947.12(b) .............................................................................. 17

Cal. Civ. Code § 1954.53 ................................................................................... 17

Chesilhurst Borough, N.J. Mun. Code § 373-2.................................................. 17

Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 ............................................. 37

Colo. Rev. Stat. § 38-12-301.............................................................................. 17

Fla. Stat. § 125.0103(2)...................................................................................... 17

Ga. Code § 44-7-19............................................................................................. 17

Idaho Code § 55-306........................................................................................... 17

Ind. Code § 32-31-1-20...................................................................................... 17

Iowa Code § 364.3(9) ......................................................................................... 17

Kan. Stat. § 12-16,120 ....................................................................................... 17

x

Ky. Rev. Stat. § 65.875 ........................................................................................ 17

La. Stat. § 9:3258 ................................................................................................. 17

Mass. Gen. Laws ch. 40P, § 5 ............................................................................. 17

Mich. Comp. Laws § 123.411 .............................................................................. 17

Miss. Code § 21-17-5(2) ...................................................................................... 17

Mo. Rev. Stat. § 441.043 ..................................................................................... 17

Mont. Code § 7-1-111 .......................................................................................... 17

N.C. Gen. Stat. § 42-14.1(a) ................................................................................ 17

N.D. Cent. Code § 47-16-02.1 ............................................................................. 17

N.M. Stat. § 47-8A-1 ........................................................................................... 17

N.Y.C. Admin. Codes
    § 26-403(e)(2)(i)(9) ..................................................................................... 45
    § 26-510(b) .................................................................................................. 56
    § 26-510(j) ....................................................................................... 8, 33, 59
    § 26-512(a) .................................................................................................. 59
    § 26-517(a) .................................................................................................. 20
    § 27-2004(14) .............................................................................................. 22
    § 27-2004(a)(48) ......................................................................................... 45
    § 27-2005(d) ................................................................................................ 45
    § 27-2056.8 ................................................................................................... 4

N.Y. Gen. Bus. Law § 352-eeee(2)(c)(vii) .......................................................... 45

N.Y. Mult. Dwell. Law § 4(15) ........................................................................... 22

N.Y. Penal Codes
    § 241.00 ....................................................................................................... 45
    § 241.02 ....................................................................................................... 45
    § 241.05 ....................................................................................................... 45

N.Y. Unconsol. Law
    § 8623(a) ................................................................................................. 8, 46
    § 8624(e) .......................................................................................... 8, 33, 59
    § 8625(a)(5) ............................................................................................ 8, 46

Neb. Rev. Stat. § 13-331(2) ................................................................................. 17

Ohio Rev. Code § 5321.19(A) ............................................................................. 17

Okla. Stat. tit. 11, § 14-101.1(A) .................................................................................. 17

Or. Rev. Stat. § 90.323 ................................................................................................. 17

Rent Regul. Reform Act of 1997, ch. 116, § 19............................................................. 8

S.C. Code § 27-39-60................................................................................................... 17

S.D. Codified Laws § 6-1-13 ........................................................................................ 17

Takoma Park, Md. Mun. Code. § 6.20.060(B)(3)........................................................ 17

Tenn. Code § 66-35-102(a)–(b) ................................................................................... 17

Tex. Loc. Gov't Code § 214.902 .................................................................................. 17

Utah Code § 57-20-1(1) ............................................................................................... 17

Wash. Rev. Code § 59.18.700(1)(b)............................................................................ 17

Wis. Stat. § 66.1015 .................................................................................................... 17

## REGULATIONS

9 N.Y.C.R.R.
   § 2522.4(c) ........................................................................................................ 10
   § 2522.4 (c)(3)(i)......................................................................................... 10, 27
   § 2522.4(c)–(d) .................................................................................... 10, 27, 50
   § 2522.4(d) ........................................................................................................ 10
   § 2522.4(d)(2)(i) ................................................................................................ 10
   § 2522.5(a) ................................................................................................... 33, 60
   § 2522.8................................................................................................... 8, 33, 60
   § 2523.5(a) ........................................................................................................ 33
   § 2528.3(a) ........................................................................................................ 20

## OTHER AUTHORITIES

3 William Blackstone, *Commentaries*.............................................................................. 36

16 Washington & Lee University Law Review 275, *A Reversion and a Remainder Distinguished*,
   (1959)........................................................................................................................ 36

74 N.Y. Jur. 2d Landlord and Tenant
   § 126 ........................................................................................................... 21, 36
   § 135............................................................................................................ 21, 36

74A N.Y. Jur. 2d Landlord and Tenant § 939......................................................... 34

2023 New York City Housing and Vacancy Survey, *Selected Initial Findings* (2024), https://perma.cc/JZ4J-LRTP ................................................................................. 7

Hugh Rockoff, Drastic Measures: A History of Wage and Price Controls in the United States 12, 42 (3d. ed. 2004) ............................................................................................ 37

James Kent, *Commentaries on American Law* (1896) .................................................... 36

Jennifer Nedelsky, *Private Property and the Limits of American Constitutionalism: The Madisonian Framework and Its Legacy* 72–74 (1994) ...................................... 36

Thomas M. Cooley, *A Treatise On the Constitutional Limitations 807* (7th ed., 1913) .............................................................................................. 37

Lawrence Friedman, *A History of American Law* 43 (2005) ........................................ 36

Pennsylvania Council of Censors, The Proceedings Relative to Calling the Conventions of 1776 and 1790, at 86–87 (1825). ...................................................................... 36, 37

Thomas F. Devoe, *The Market Book* 145 (1862) ........................................................ 36

**INTRODUCTION**

There is a "severe housing shortage" in New York City. City Br. 33. Plaintiffs would like to help alleviate that shortage by renovating and renting out their vacant apartments to willing tenants. But Defendants are preventing Plaintiffs from doing that—through the imposition of selective and arbitrary rent caps that render Plaintiffs' vacant units, and tens of thousands of other vacant units across New York City, economically non-viable.

These rent caps are not a general regulation of the landlord-tenant relationship. A typical stabilization regime limits "rent increases" in occupied units, protecting tenants from sudden and unexpected swings in the market that would otherwise result in "frequent turnover, tenant dislocation, and eviction." *Cmty. Hous. Improvement Program v. City of New York ["CHIP"]*, 59 F.4th 540, 544, 546 (2d Cir. 2023). But a vacant unit, by definition, has no tenant with rents to "stabilize." Indeed, it is a misnomer to suppose that a vacancy lease could ever constitute a "rent increase" on anyone. These caps thus do not function as any limit on rent "increases" but, instead, are absolute price ceilings on specific apartment units.

Nor are these rent caps evenhanded. They apply only to vacant units within buildings that were constructed more than fifty years ago; landlords of other units—the majority of apartments in New York City—may freely execute vacancy leases at market rates. Moreover, these rent caps vary unit-to-unit in a way that bears no relationship to any present characteristic of the apartment, of any incoming tenant, or of necessary costs incurred to renovate or operate the unit. Instead, these caps primarily reflect nothing more than historical accident—that is, the now-vacant unit's rental history. The result is that essentially indistinguishable vacant apartments, even those located in the same building and featuring identical floorplans, are subject to wildly variant rent caps for no material reason.

It's no surprise that these rent caps, being arbitrary, are keeping many vacant units off the market. Renting out any unit requires undertaking costs and risks, and a vacant apartment must often undergo costly renovations before it may lawfully be relet (particularly following a lengthy prior tenancy). Yet the rent-stabilization law sharply limits recoverable repair costs. Moreover, the law's provisions allowing "hardship" rent adjustments grant only an absolute maximum of six percent increases each year, and eligibility for any increase is calculated on the building level, not the unit level. Thus, (1) any hardship increase can be realized only piecemeal and (2) many owners, including Plaintiffs, do not qualify for any "hardship" increase notwithstanding that they own vacant apartments whose rent caps render them non-viable. The result? Tens of thousands (and counting) of apartments in New York City are indefinitely vacant, capped at arbitrarily low rents that ensure no rational owner would ever renovate and relet them.

That includes Plaintiffs' specific apartments. Pashko and Tony Lulgjuraj own two vacant, two-bedroom apartments in upper Manhattan whose monthly rents are capped at approximately $710 and $860. Bipin Mathew owns a vacant two-bedroom apartment in Queens, capped at approximately $1,315. Ilan Rabinovitch owns a vacant one-bedroom apartment in the Upper West Side, capped at approximately $1,200. The costs of renovating each of these units would exceed $100,000. That is money that these owners would spend, if they could expect to recover it in subsequent rents. But each vacant unit's rent cap makes undertaking those renovations, or even taking on the risks involved in any tenancy, economically irrational. This is, sadly, not an unusual situation: Many of Plaintiff Small Property Owners of New York (SPONY)'s members, and many other people across New York City, own vacant units whose low rent caps render them non-viable to rent.

Defendants have filed three separate motions to dismiss, raising essentially identical

2

arguments.[1] They characterize the Complaint as merely another doomed challenge to the rent-stabilization laws generally. It is not. Rather, this is a narrow challenge to an anomalous feature of New York law: its selective and arbitrary suppression of rents for vacant apartments in pre-1974 buildings, long after the outgoing tenant has vacated, and even when doing so renders the apartment's leasehold valueless. Specifically, Plaintiffs plausibly allege that Defendants' continued enforcement of these rent caps on vacant units take property or its value (in violation of the Takings Clause), fixes prices in an arbitrary manner (in violation of the Due Process Clause), and irrationally discriminates amongst owners (in violation of the Equal Protection Clause). Those allegations are more than sufficient to satisfy the motion-to-dismiss standard.

## STATEMENT REQUESTING ORAL ARGUMENT

Given the importance and complexity of the issues presented in this case, Plaintiffs submit that oral argument is warranted and would assist this Court.

## STATEMENT OF FACTS

I.    **Plaintiffs Own Vacant Apartments Whose Rent Caps Take Them Off the Market.**

   **A.  Pashko and Tony Lulgjuraj (Plaintiff RPN Management Co., Inc.)**

Brothers Pashko and Tony Lulgjuraj operate the building located at 81 Cabrini Boulevard, through Plaintiff RPN Management Co., Inc. ("RPN"). Compl. ¶ 137. After years of working as doormen and superintendents for other buildings, they eventually purchased their building (with their late father) through RPN in 1991. *Id.* ¶¶ 138–40. Theirs is a thirty-unit building in Washington Heights, near the George Washington Bridge. *Id.* ¶ 142.

Two apartments in Pashko and Tony's building lie vacant because of the rent-stabilization

---

[1] This brief does not distinguish among the City Defendants, the State Defendants, or the Intervenors except where relevant.

law. *Id.* ¶ 143. The first, Unit 35, became vacant in summer 2019. *Id.* ¶ 144. It is a two-bedroom apartment whose monthly rent is capped at approximately $710. *Id.* ¶¶ 145–46. The second, Unit 41, became vacant in early 2022. *Id.* ¶ 149. It is also a two-bedroom apartment, subject to a monthly rent cap of approximately $860. *Id.* ¶¶ 150–51.

Units 35 and 41's rent caps ensure that they will remain vacant for the foreseeable future. Before Pashko and Tony may legally offer these units to tenants, they must first conduct substantial, necessary repairs. This includes (but is not limited to) raising and leveling floors; replacing or repairing joists; effectively replacing the bathroom and kitchen; performing lead abatement; and incurring associated costs of permitting, materials, and labor. *Id*. ¶ 159.[2] Even under conservative estimates, the costs of these necessary repairs would exceed $100,000 per unit. *Id*. ¶ 160. Yet provisions allowing rent increases to recoup renovation costs ("Individual Apartment Improvement" increases, or "IAIs") would allow Pashko and Tony to recover, at most, only $50,000 of improvements for each unit (*i.e.*, a monthly increase of $347.22) spread out over a period of fifteen years. *Id*. ¶ 161*; see also id*. ¶¶ 49–57. Even if Pashko and Tony received that maximum IAI increase, it would not be enough to justify the costs of renovating either Unit 35 or Unit 41. *Id*. ¶ 163. And even putting aside those costs, it would not make economic sense to rent out either Unit 35 or Unit 41 at their capped rates, given the costs and liabilities that come from renting any apartment. *Id*. ¶ 158. If Pashko and Tony could charge an incoming tenant market rent, they would repair and relet Units 35 and 41. *Id*. ¶ 177. But as it stands, the only economical use of the apartments is to leave them vacant, rendering the leaseholds effectively valueless. *Id*. ¶ 180.

---

[2] Applicable code provisions require lead abatement for older apartments before they may be relet after a vacancy, and they set habitability requirements that require extensive renovations for older apartments like Plaintiffs'. *See, e.g.*, N.Y.C. Admin. Code § 27-2056.8 (lead remediation required when unit turns over); *Morales v. 1160 Cromwell Crown LLC*, 150 N.Y.S.3d 570 (N.Y. Civ. Ct. 2021) (sloping floors can be housing code violation).

4

### B. Bipin Mathew (Plaintiff PKM HOME LLC)

Bipin Mathew acquired the building located at 1819 Cornelia Street in 2016, before transferring it to Plaintiff PKM HOME LLC ("PKM"), which he and his wife own. Compl. ¶¶ 181–82. It is a six-unit apartment building in Queens. *Id.* ¶ 183.

One apartment in Bipin's building, Unit 3L, lies vacant. *Id.* ¶ 184. It is a two-bedroom apartment whose monthly rent is capped at approximately $1,315 per month. *Id.* ¶¶ 186–87. It has been vacant since 2024. *Id.* ¶ 185.

Again, Unit 3L's rent cap ensures that it will remain vacant for the foreseeable future. Like Pashko and Tony's units, Unit 3L must undergo considerable repairs before it may legally be placed back on the market, including (but not limited to) necessary lead abatement; bathroom renovation; electrical rewiring; and incurring associated costs of permitting, materials, and labor. *Id.* ¶ 192. Those necessary repairs would exceed $100,000. *Id.* ¶ 193. Meanwhile, the maximum IAI increase available to Bipin would be $30,000 (*i.e.*, a $178.57 monthly increase), recovered over fifteen years. *Id.* ¶ 195.[3] Even if Bipin received that maximum IAI increase, it would not be enough to justify the costs of renovating Unit 3L. *Id.* ¶ 206. And even putting aside those costs, it would not make economic sense to rent out Unit 3L at its capped rate, given the costs and liabilities that come from renting any apartment. *Id.* ¶ 191. If Bipin could charge an incoming tenant market rent, he would repair and relet Unit 3L. *Id.* ¶ 208. But as it stands, the only economical use of the apartment is to leave it vacant, rendering the leasehold effectively valueless. *Id.* ¶ 211.

### C. Ilan Rabinovitch (Plaintiff 135 W 78TH, LLC)

Ilan Rabinovitch, through Plaintiff 135 W 78TH, LLC, operates the building located at 135

---

[3] As explained in the Complaint, Bipin is entitled to only a $30,000 IAI increase, as opposed to $50,000 for Pashko and Tony, because of the date on which his unit was registered as vacant. *See* Compl. ¶¶ 51–52, 194–95.

West 78th Street (on the Upper West Side). Compl. ¶ 212. He first acquired the building in 2020 and transferred it to his LLC in 2022. *Id.* ¶ 213. The building contains four apartments. *Id*. ¶ 215.[4]

One of Ilan's units, Unit 3A, lies vacant. *Id.* ¶ 217. It is a one-bedroom apartment whose monthly rent is capped at approximately $1,200 per month. *Id.* ¶¶ 218–19. It has been vacant since October 2024. *Id.* ¶ 217.

Once again, Unit 3A's rent cap ensures that it will not be rented for the foreseeable future. Unit 3A cannot legally be placed on the rental market without first undergoing extensive repairs, including (but not limited to) reworking of gas and electrical lines; necessary lead abatement; and other necessary renovations, together with associated costs of permitting fees, materials, and labor. *Id*. ¶ 225. Those necessary repairs would exceed $100,000. *Id.* ¶ 226. Meanwhile, the maximum IAI increase available to Ilan would be $30,000 (*i.e.*, a $178.57 monthly increase), recovered over fifteen years. *Id.* ¶ 228.[5] Even if Ilan received that maximum IAI increase, it would not be enough to justify the costs of renovating Unit 3A. *Id*. ¶ 230. And even putting aside those costs, it would not make economic sense to rent out Unit 3A at its capped rate, given the costs and liabilities that come from renting any apartment. *Id*. ¶ 224. If Ilan could charge an incoming tenant market rent, he would repair and relet Unit 3A. *Id*. ¶ 247. But as it stands, the only economical use of the apartment is to leave it vacant, rendering the leasehold effectively valueless. *Id.* ¶ 250.

### D. Small Property Owners of New York

The three individual Plaintiffs are not outliers. Their situation is emblematic of many owners throughout New York City, who have collectively founded the Small Property Owners

---

[4] Ilan's building is subject to the rent-stabilization laws because, as of 1974, it contained six units. Compl. ¶ 215.

[5] Ilan, like Bipin, is limited to a maximum IAI increase of $30,000 (rather than $50,000) because of the date his unit was registered as vacant, and also because the previous tenant did not occupy it for twenty-five years or more. Compl. ¶¶ 227–28. *See* note 3, *supra*.

Association of New York, Inc. ("SPONY").

Plaintiff SPONY is a nonprofit, all-volunteer trade association focused on the interests of small-scale property owners across New York. Compl. ¶¶ 114–16. Its membership is limited to persons owning an interest in fewer than 200 housing units total (across buildings), and includes more than 300 natural persons who, in the aggregate, own more than 5,000 housing units. *Id.* ¶¶ 117, 120. Its members include Bipin Mathew and Ilan Rabinovitch. *Id.* ¶ 121.

The inability to reset rents between tenancies hits SPONY's members particularly hard. Small owners are less able than larger landlords to absorb rising costs, spread losses across buildings, access capital for renovations, or endure long periods of losses. *Id.* ¶ 126. For many of them, the rent caps on their vacant apartments place them in danger of losing their buildings entirely. *Id.* ¶ 127. Many SPONY members own vacant apartments that are permanently off the market for the same reasons as the individual Plaintiffs' units. *Id.* ¶¶ 128–30. That includes vacant apartments whose rent caps are as low as $200 or $300. *Id.* ¶ 131. Many SPONY members would renovate and rent their currently vacant stabilized apartments if they were allowed to do so at market rates. *Id.* ¶¶ 134–35. As it stands, these vacant units—like tens of thousands of other units across New York City—will not be rentable for the foreseeable future. *Id.* ¶¶ 72–76, 129.[6]

## II.    New York Prevents "Vacancy Increases" in Pre-1974 Buildings—Tying Vacant Units' Rents to Historical Accident.

The rent caps for Plaintiffs' units stem from the rent-stabilization laws, which were first enacted at the city level in 1969 before being codified into state law in 1974. Compl. ¶¶ 19–21. These laws are themselves framed as a temporary "emergency" measure, dependent on a City

---

[6] The City's official vacancy rate of 1.41%, which the City cites in its brief (City Br. 8), notably does not include units (like the units at issue here) that are "vacant and not available for rent." *See* 2023 New York City Housing and Vacancy Survey, Selected Initial Findings, at 29 (2024), https://perma.cc/JZ4J-LRTP.

declaration of an emergency and subject to expiration at the end of that emergency. *Id*. ¶¶ 23–24; *see also* N.Y. Unconsol. Law § 8623(a) (setting conditions for declaration of housing emergency). New York City has repeatedly declared such a housing emergency every three years, for more than fifty years—most recently on March 19, 2024. *Id*. ¶¶ 23–26. Even now, despite repeated amendments and an underlying emergency declared in 2024, these laws generally apply only to apartments in buildings constructed before 1974 (and which contained six or more units as of 1974). *Id*. ¶¶ 22, 27–28. *See* N.Y. Unconsol. Law § 8625(a)(5). Meanwhile, owners of other units across the City are allowed to set vacancy leases at market rates (though they are subsequently limited in ability to raise the rent on the occupied unit). Compl. ¶ 67.

The exact manner in which New York sets the rent for vacancy leases has varied over time. *Id*. ¶¶ 38–39. In the early 1970s, owners could reset the rent to market rate between tenancies. *Id*. ¶ 38. After that, owners were allowed a "vacancy increase" that, for decades, was mandated at twenty percent under state law (slightly less for one-year leases). *Ibid*. *See* Rent Regulation Reform Act of 1997, ch. 116, § 19. Currently, however the rent-stabilization laws prohibit all such "vacancy increases." Compl. ¶ 41. *See* N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. § 2522.8; N.Y.C. Admin. Code § 26-510(j). As a result, vacant units' legal rents are currently capped at whatever the last tenant happened to be paying, adjusted only by whatever percentage increase the City's Rent Guidelines Board is currently allowing for occupancy-lease renewals. Compl. ¶ 41.

Because New York's scheme has been in place for over fifty years and has been repeatedly amended over that time, any given vacant unit's rent cap reflects historical accident. Some units have rents that are set well above market levels—for instance, if they received multiple 20% vacancy increases back when such increases were available. *Id*. ¶¶ 40, 58; *see, e.g.*, *id*. ¶ 155. On the other hand, other units, like the units at issue in this case, did not ever receive such increases

8

and have rents well below market. These significant differences have nothing to do with any present characteristic of the apartment, such as its square footage, location, or condition. *Id*. ¶ 59. Nor do these differences turn on the incoming tenant's income or ability to pay. *Id.* ¶¶ 22, 59.

Pashko and Tony's building illustrates this. Recall that their vacant units, Units 35 and 41, are capped at monthly rates of $710 and $860, respectively. *Id.* ¶¶ 146, 151. The apartment directly below Unit 35 has an identical floor plan; it is subject to a rent cap of $2,735.02. *Id*. ¶ 148. The apartment directly above Unit 41 has an identical floor plan; it is subject to a rent cap exceeding $5,000, which is above market (it is currently being rented at a preferential rate of approximately $3,000 per month). *Id.* ¶ 153. Another materially identical unit is subject to a rent cap exceeding $6,000, which is also above market (it is currently being rented at a preferential rate of approximately $3,000 per month). *Id.* ¶ 155. Yet another is being rented at a stabilized rate of approximately $2,500 per month. *Id.* ¶ 154. The primary reason for these extreme variances is merely that each unit was vacated by tenants—who bear no relationship to current or incoming tenants—at different times, and at different frequencies, years ago. *See id*. ¶ 58.

## III.    New York's Building-Wide "Hardship" Provisions Do Not Solve the Problem.

New York offers a "hardship" process, whereby owners may seek permission to increase their building's stabilized rents. Compl. ¶ 77. That process is illusory: So far as Plaintiffs are aware, no one has been granted a "hardship" increase in years. *Id*. ¶ 78. But even if these increases were generally available, the hardship provisions do not meaningfully address the problem of economically non-viable vacant units, for multiple reasons.

First, any hardship relief must be realized only piecemeal. Even after New York determines that a building is not profitable, it still does not permit rents immediately to rise to profitable levels if the necessary increase exceeds six percent. *Id*. ¶ 91. If granted an increase, owners may

implement it only through a maximum increase of six percent in the building's rents per year. *Id*. ¶ 89. *See* 9 N.Y.C.R.R. § 2522.4(c)(3)(i); *id*. § 2522.4(d)(2)(i). For example, a unit whose rent is capped at $600 would rise by no more than $36 in a year, no matter how large the total hardship increase might be. Compl. ¶ 90. Thus, even if hardship relief could conceivably allow a vacant unit eventually to be placed back on the market, it would take years.

Second, whereas the rent for a stabilized apartment is set at the unit level, hardship relief (under either formula)[7] is calculated and granted at the building level. *Id*. ¶¶ 83–84. *See* 9 N.Y.C.R.R. § 2522.4(c)–(d). Hardship increases are applied to increase the regulated rents of all units in the building by the same percentage. *See* Compl. ¶ 84. Thus, any hardship relief would result in a high-rent apartment receiving a larger dollar increase than a low-rent apartment, widening the variance in rents allowed for otherwise materially identical units. *Id*. ¶¶ 86–87. To the extent that a unit's legal rent is already above market, the hardship increase has no effect. *Id*. ¶ 88. Moreover, many owners are ineligible for hardship relief because their building is theoretically profitable, notwithstanding that units within it are not. *Id*. ¶ 92.

Plaintiffs' circumstances illustrate the issue. Even though the rent caps on Pashko/Tony and Bipin's units render them economically non-viable, their buildings do not qualify for hardship

---

[7] An owner may seek a "hardship" increase under two separate formulae. The first ("comparative hardship") compares the building's current profit margins over the last three years with the building's non-inflation-adjusted profit margins between 1968–70 (or another three-year period, in limited circumstances). Compl. ¶ 80. *See* 9 N.Y.C.R.R. § 2522.4(c). If the profit margin from the earlier period exceeded that of the last three years, the owner may obtain a rental increase reflecting the difference. Compl. ¶ 80. The second hardship formula ("alternative hardship") asks whether the building's gross revenue from the last year exceeded expenses by five percent. *Id*. ¶ 81. *See* 9 N.Y.C.R.R. § 2522.4(d). If not, the owner may obtain a rental increase reflecting the difference. *Ibid*. Under both formulae, the building's current "income" includes imputed income for vacant units (and owner-occupied units) equal to the amount of maximum legal rent for the vacant unit—even if the unit's rent is set too low to justify renovation and operation costs. Compl. ¶ 82.

10

relief under either hardship formula. *Id*. ¶¶ 164, 198.[8] And even if hardship relief were somehow available, Pashko and Tony could realize it only through increases of an absolute maximum of roughly $40 each year for Unit 35, or $50 each year for Unit 41; whereas Bipin could realize $76.16 each year for Unit 3L. *Id*. ¶¶ 168–70, 201–02. Those increases would still leave all three units economically non-viable for the foreseeable future—regardless of the economic viability of the building as a whole. *Id*. ¶¶ 173–75, 204–06.

Ilan's building in theory satisfies the alternative-hardship criteria, but that still would not make Unit 3A's leasehold viable. The building qualifies for alternative-hardship relief because its expense-to-income ratio exceeded 0.95 for recent calendar years (that is, its allowable rents were well below its gross expenses). Compl. ¶¶ 231–32. However, even if he obtains a hardship increase, that would not render Unit 3A economically viable. He would be allowed to increase Unit 3A's monthly rent by an absolute maximum of $78 each year, until the full increase is realized (which, if he receives his requested increase, would take sixteen years). *Id*. ¶¶ 240–41. During that period, the building's expenses would continue to increase. *Id*. ¶ 242. Meanwhile, even if the hardship increase is granted, the rent cap on Unit 3A would still remain too low to justify putting the apartment back on the market anytime in the foreseeable future. *Id*. ¶¶ 243–45.

Moreover, Ilan is an example of how difficult it is, in practice, for owners to obtain hardship relief—even when they should qualify on paper. He previously submitted two hardship applications based on the building's 2022 and 2023 numbers. *Id*. ¶ 233. Both were denied on technical grounds unrelated to their merits. *Ibid*. The 2022 application was rejected as untimely. *Id*. ¶ 234. The 2023 application was rejected on a technicality related to the period that Ilan had

---

[8] Each building's net income for the last three years exceeded the relevant baseline period, so it does not satisfy comparative hardship. Compl. ¶¶ 165, 199. Each building's expense-to-income ratio did not exceed 0.95, so it does not satisfy alternative hardship. *Id*. ¶¶ 166, 200.

11

owned the building. *Id.* ¶ 236.[9] In March 2025, Ilan submitted a third hardship application, based on the building's numbers for calendar year 2024. *Id.* ¶ 237. As of the filing of this brief, Ilan's third hardship application is still being processed—more than one year after he submitted it.

## STANDARD OF REVIEW

A motion to dismiss asks only whether Plaintiffs have plausibly stated a claim for relief. The Court must accept Plaintiffs' factual allegations as true, draw all inferences in Plaintiffs' favor, and construe any ambiguity in the light most favorable to sustaining the claim. *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020); *Doe v. Columbia Univ.*, 831 F.3d 46, 48–49 (2d Cir. 2016). Plausibility is not probability: "[T]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). The question is not whether Plaintiffs will ultimately prove their allegations, but only whether their allegations, "if true, are plausibly sufficient to state a legal claim." *Doe*, 831 F.3d at 48.

## ARGUMENT

Part I explains what Plaintiffs do not challenge: any rent-stabilization law's application to *occupied* units. That makes this case materially distinct from previous challenges to rent stabilization, and it explains why the relief Plaintiffs seek, despite Defendants' assertion to the contrary, is not "radical."

---

[9] The City first denied Ilan's application on the ground that his LLC had not owned the building for three years. On appeal, the Deputy Commissioner agreed with Ilan that that was error because the LLC's period of ownership could be combined with the period that Ilan owned the building directly before transferring it to an LLC; nonetheless, the Deputy Commissioner rejected the appeal on the ground that Ilan did not include evidence of his prior period of ownership with his appeal (even though Ilan provided that evidence along with his original application). Compl. ¶ 236.

Part II explains that Plaintiffs have plausibly alleged multiple constitutional violations. First, Defendants' rent caps effect an as-applied taking: Plaintiffs' apartments' rent caps are set so low as to render them economically non-viable to rent, which amounts to both a *Lucas* and *Penn Central* taking. Second, Defendants' historically unprecedented policy of denying rent resets between tenancies effects a *per se* taking of property value on its face, because it selectively and directly siphons value from identified property interests. Third, Plaintiffs plausibly allege a due-process violation because these price ceilings are arbitrary: They do not turn on any material characteristic of the apartment, the owner, or the incoming tenant. Fourth, Plaintiffs plausibly allege an equal-protection violation because Defendants continue to deny vacancy resets only on units within buildings constructed before 1974, even though the operative "emergency" was most recently declared in 2024 and even though vacant apartments have no reliance-bearing tenant to protect from a vacancy "increase."[10]

Part III explains why Defendants' attempts to avoid reaching the merits fail. First, Plaintiffs' claims are ripe notwithstanding hardship-increase provisions, as facial claims require no hardship application; two of the individual Plaintiffs plausibly allege that they do not qualify for hardship relief at all; and all of Plaintiffs plausibly allege that the rent-stabilization laws violate the Constitution as applied to their particular facts even assuming they receive hardship increases. Second, Plaintiffs' claims are timely because the ongoing enforcement of these rent caps inflicts a fresh injury each day Plaintiffs are restricted in rents they may collect from their vacant apartments. Third, Plaintiff SPONY has associational standing. Fourth, the City is a proper defendant because city law and the Rent Guidelines Board independently participate in fixing and enforcing the

---

[10] Plaintiffs also allege a violation of the Fourteenth Amendment's Privileges-or-Immunities Clause. Compl. ¶¶ 301–07. That claim, Plaintiffs recognize, is currently barred by the Supreme Court's decision in *The Slaughterhouse Cases*, 83 U.S. 36 (1873).

13

restrictions Plaintiffs challenge. Fifth and finally, although current Second Circuit caselaw bars Plaintiffs from obtaining retrospective relief from the State defendants, Plaintiffs preserve the issue for appeal.

Because Plaintiffs plausibly allege that Defendants are unconstitutionally restricting their vacant apartments, and because Defendants fail to justify avoiding the merits of Plaintiffs' allegations, the motions to dismiss should be denied.

## I.    Plaintiffs Present a Unique Challenge, and Their Requested Relief is Not "Radical."

Defendants assert that Plaintiffs' claims are indistinguishable from recent failed challenges to the rent-stabilization laws and that, accordingly, they should also fail. State Br. 2; City Br. 4; Intervenors' Br. 1–2.[11] Moreover, Defendants further assert that Plaintiffs' requested relief—the allowance of rent resets between tenancies—is "radical" and would effectively "eradicate rent stabilization." State Br. 3. Both assertions are wrong.

The recent failed challenges were broadsides against rent stabilization in its entirety— focusing on its application to occupied units. The lead case asserted that it is a *per se* (physical) taking to "require[ landlords] to offer tenants renewal leases" or to "interfere[] with their ability to evict tenants," and that rent stabilization writ large should be struck down for impermissibly "confer[ring] local public assistance benefit on tenants" and for "caus[ing] more harm than good." *CHIP*, 59 F.4th at 552, 555–56. The second case asserted that it violates the Takings Clause to "lock[] in 'preferential rents for the life of a tenancy.'" *74 Pinehurst LLC v. New York*, 59 F.4th 557, 566 (2d Cir. 2023). The unpublished cases presented similar arguments, aimed at eliminating the rent-stabilization laws' application to occupied units. *See Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York ["BRI"]*, Case No. 21-2526, 2024 WL 1061142, at *2 (2d Cir.

---

[11] Challenges to certain aspects of the rent-stabilization laws have been successful in state court. *See, e.g.*, *Manocherian v. Lenox Hill Hosp.*, 84 N.Y.2d 385 (1994).

Mar. 12, 2024) (rejecting the argument that it violates the Takings Clause to require landlords to offer renewal leases to tenants); *335-7 LLC v. City of New York*, Case No. 21-823, 2023 WL 2291511, at *2 (2d Cir. Mar. 1, 2023) (rejecting the argument that it violates the Takings Clause to make it impractical to evict tenants for purposes of a condo conversion). Each challenge, if successful, would have essentially resulted in "an entirely unregulated market," leaving tenants in occupied apartments subject to eviction following a sudden and unexpected surge in rent prices. *CHIP*, 59 F.4th at 544.

The Second Circuit's opinions rejecting such broadside attacks do not preclude more focused challenges. *See 74 Pinehurst LLC v. New York*, 146 S. Ct. 540, 540 (2024) (Thomas, J., statement respecting denial of certiorari) (inviting future challenges focused on "specific New York City regulations"). To the contrary, past challenges discussed rent caps on vacancy leases either not at all, or only in passing. In the lead published case, the claimants lamented the 2019 repeal of "Luxury Decontrol" (where a vacant unit would become permanently deregulated if its rent cap exceeded a certain amount), but they did not otherwise discuss any rent cap on vacancy leases. *See* Opening Brief of Appellants, *CHIP*, No. 20-3366, at 8 (2d Cir. Jan. 15, 2021), ECF No. 75. . In the second published case, the claimants wrote in their statement of facts that "the 2019 amendments repealed the RSL's provisions allowing rents to be increased after a vacancy," but their argument did not reference that fact. Opening Brief of Appellants, *74 Pinehurst*, No. 21-467(L), 2021 WL 1847679, at *10 (2d Cir. Apr. 30, 2021).[12] Thus, while Defendants argue that

---

[12] The arguments put forward in the various unpublished cases were no different. *See* Opening Brief of Appellants, *335-7*, No. 21-823, 2021 WL 2315461, at *31 (2d Cir. June 4, 2021) (mentioning repeal of vacancy increases only as part of a long list of changes made by the 2019 amendments); Opening Brief of Appellants, *BRI*, No. 21-2526, 2022 WL 158928, at *38 (2d Cir. Jan. 13, 2022) (mentioning vacancy increases only as one among many changes in law that interfered with investment-backed expectations); Opening Brief of Appellants, *BRI*, No. 21-2448,

15

past cases "upheld" the provisions at issue here, they back up this assertion only with citations to the "Factual Background" sections of two opinions. *See* State Br. 7 (citing *BRI*, 2021 WL 4198332, at *3, and *335-7 LLC*, 524 F. Supp. 3d at 322)).

Plaintiffs' challenge, by contrast, is squarely aimed at Defendants' selective, arbitrary, and permanent rent caps on vacant units. *See* Compl. ¶ 37 (citing specific provisions that limit rent for vacant units). Plaintiffs are not challenging the 2019 amendments at issue in the prior RSL cases at all, though those amendments provide background to understand how vacancy rents are calculated.[13] Plaintiffs also do not challenge the stabilization of occupied apartments' rents; they do not assert a right to evict, or to raise the rent on, anyone. Instead, they challenge rent caps on vacant apartments—caps that do not "stabilize" any tenant's rent but, instead, ensure that many apartments across New York City remain economically non-viable and therefore indefinitely off the market, exacerbating a "severe housing shortage." City Br. 33. *See also* State Br. 24 (accepting that there is a "housing shortage"). Rather than dooming any tenant to eviction, relief in this case would in fact help ease the housing crisis by allowing tens of thousands (and counting) of currently offline apartments to become occupied by willing tenants. Compl. ¶¶ 68–76.

---

2021 WL 5448948, at *33 (2d Cir. Nov. 18, 2021) (mentioning vacancy increases in statement of facts, but otherwise presenting argument based on "aggregate effect" of 2019 amendments).

[13] So, for instance, Plaintiffs do not challenge the 2019 amendment's "reduction in the portion of renovation costs, known as Individual Apartment Improvements ('IAIs'), that landlords are permitted to charge tenants as a component of the rent." *Contra* State Br. 2. Although that reduction explains, in part, why it is economically infeasible for Plaintiffs to renovate and rent their vacant apartments, Compl. ¶¶ 46–57, 159–63, 190–97, 223–30, Plaintiffs do not seek to invalidate the IAI provisions. Instead, Plaintiffs seek only to invalidate provisions limiting rents that may be collected pursuant to a vacancy lease. *See id.*, Prayer for Relief at A. With those provisions enjoined, the IAI provisions would bear no application to vacant apartments.

In this regard, it is New York that is "radical." Defendants' rent caps on vacant apartments are an extreme outlier. Most states prohibit rent control entirely.[14] Of those jurisdictions that do allow it, most require rents to reset (at least partially) between tenancies.[15] In fact, it appears the only jurisdictions in the entire country that categorically deny any rent reset between tenancies include New York (since 2019) and a handful of jurisdictions in New Jersey and Maryland.[16] If Plaintiffs' requested relief is "radically" pro-landlord, then so too must be California. *Compare* State Br. 3 (Plaintiffs' requested relief is "radical" because it "would permit [them], when renting a vacant apartment to a new tenant, to set the rent at the prevailing market rate"), *with* Cal. Civ. Code § 1947.12(b) ("For a new tenancy in which no tenant from the prior tenancy remains in lawful possession of the residential real property, the owner may establish the initial rental rate[.]").

Defendants are free to subsidize affordable housing, or to regulate evenhandedly the landlord-tenant relationship. What they may not do is selectively, directly, and arbitrarily restrict (and even eliminate) the value of vacant apartments—even assuming the best of governmental intentions. *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) ("We are in danger of forgetting

---

[14] Thirty-one states entirely preempt government from enforcing rent control/stabilization, either by statute or through decisions by their high courts. Ariz. Rev. Stat. § 9-461.16; Ark. Code § 14-16-601; Colo. Rev. Stat. § 38-12-301; Fla. Stat. § 125.0103(2); Ga. Code § 44-7-19; Idaho Code § 55-306; 50 Ill. Comp. Stat. 825/5; Ind. Code § 32-31-1-20; Iowa Code § 364.3(9); Kan. Stat. § 12-16,120; Ky. Rev. Stat. § 65.875; La. Stat. § 9:3258; Mass. Gen. Laws ch. 40P, § 5; Mich. Comp. Laws § 123.411; Miss. Code § 21-17-5(2); Mo. Rev. Stat. § 441.043; Mont. Code § 7-1-111(26); Neb. Rev. Stat. § 13-331(2); N.M. Stat. § 47-8A-1; N.C. Gen. Stat. § 42-14.1(a); N.D. Cent. Code § 47-16-02.1; Ohio Rev. Code § 5321.19(A); Okla. Stat. tit. 11, § 14-101.1(A); S.C. Code § 27-39-60; S.D. Codified Laws § 6-1-13; Tenn. Code § 66-35-102(a)–(b); Tex. Loc. Gov't Code § 214.902; Utah Code § 57-20-1(1); Wis. Stat. § 66.1015. *See also City of Center Point v. Atlas Rental Prop., LLC*, 371 So. 3d 856, 860–61 (Ala. 2022); *Girard v. Town of Allenstown*, 428 A.2d 488, 490–91 (Pa. 1981).

[15] For example, California, Oregon, and Washington all require full market resets between vacancies. *See* Cal. Civ. Code § 1954.53; Or. Rev. Stat. § 90.323; Wash. Rev. Code § 59.18.700(1)(b).

[16] *See, e.g.*, Chesilhurst Borough, N.J. Mun. Code § 373-2; Takoma Park, Md. Mun. Code. § 6.20.060(B)(3).

17

that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."). That, as explained further below, is precisely how this scheme operates.

## II.    Plaintiffs Have Stated Cognizable Claims.

Plaintiffs have stated multiple constitutional violations. They plausibly allege the rent caps on their units violate the Takings Clause (A) by effecting an as-applied *Lucas* and *Penn Central* taking and (B) by effecting a *per se* taking of property value on its face. Moreover, they plausibly allege that these arbitrary and discriminatory caps violate (C) the Due Process Clause and (D) the Equal Protection Clause.

### A.  Plaintiffs Have Plausibly Alleged an As-Applied Taking.

Plaintiffs have alleged that Defendants' rent caps effect an as-applied taking by rendering specific vacant units economically non-viable to rent. Compl. ¶¶ 259–64, 274. In response, Defendants assert that the "denominator" (for purposes of determining loss of property value) must be the entire building, not individual apartment leaseholds within it. State Br. 15–18. Secondarily, they suggest that Plaintiffs have not plausibly alleged that their vacant apartments are valueless, because—even accepting that the "denominator" is the landlord's interest in the leasehold, and that these laws render Plaintiffs' units economically non-viable to rent—Plaintiffs could conceivably sell the building (and the units along with it), or they could occupy the units themselves, or they could operate the units at a loss in order to (supposedly) benefit the building's value. *Id.* at 21. Defendants are mistaken.

Let's step back to consider the ramifications of Defendants' argument. Were Defendants correct, government would have a free hand to render millions of apartments permanently offline, and the Takings Clause would have little to say about it. Defendants could issue a rent cap of *zero* dollars for a vacant apartment, and on Defendants' theory they still would not have taken anything

18

at all. Or Defendants could categorically forbid owners from collecting any rent at all, and Defendants would not have taken anything so long as owners could sell their property at bargain-basement prices to buyers banking on the regulations' eventual repeal; or the owners of multi-unit buildings could conceivably occupy every unit in the building themselves; or the entirely non-paying tenants could somehow keep the building from going derelict.[17] It cannot be that the Constitution's explicit protections for private property would allow such actions. And indeed, as demonstrated below, that is not the law.

> **1. The "denominator" in this case, for purposes of determining loss of property value, is the unit's leasehold.**

Defendants insist "that in evaluating a regulatory takings claim, the relevant unit – the 'denominator of the fraction' – is the property as a whole," *i.e.*, the entire building. State Br. 15. But there is no categorical rule that the analysis must invariably consider the law's economic impact on the entire building instead of an individual apartment's leasehold. *Murr v. Wisconsin*, 582 U.S. 383, 397 (2017) ("[N]o single consideration can supply the exclusive test for determining the denominator."). "Instead, courts must consider a number of factors," which include (but are not limited to) "the treatment of the land under state and local law; the physical characteristics of the land; and the prospective value of the regulated land [*i.e.*, the regulation's effect on the value of the rest of the land]." *Ibid*. At bottom, the inquiry asks what makes the most sense, given "background customs and the whole of our legal tradition." *Ibid*. Here, all the *Murr* factors support viewing each apartment leasehold as a separate "denominator" for purposes of the takings analysis.

*First*, state and local law treat an apartment's leasehold as its own, separate property

---

[17] These concerns are not hyperbolic. As the City recognizes, its rent caps can and do preclude running certain apartment buildings as "a supportable business" given "rent stabilized or rent controlled units" whose rents "are very low-averaging." City's Supp. Objection to Confirmation of Plan & to Sale of Props. ¶ 10, *In re Broadway Realty I Co., LLC*, No. 25-11050 (Bankr. S.D.N.Y. Jan. 5, 2026), ECF No. 924.

interest. There can be no real question that ownership of rental property carries with it the right to sell the leasehold interest, and each leasehold is conveyed separately. *See Bronx 444 E. 187 St., L.P. v. Perea*, 131 N.Y.S.3d 533, 2020 WL 5949936, at *3 (N.Y. Civ. Ct. Oct. 1, 2020). The leasehold interest has deep roots under "traditional common-law principles governing the landlord-tenant relationship" and has been reaffirmed by modern property law. *Park W. Mgt. Corp. v. Mitchell*, 47 N.Y.2d 316, 322 (1979). Indeed, the rent-stabilization laws themselves recognize the separate existence of each unit's leasehold, as they set the legal rent separately for "each housing accommodation"—implicitly viewing each leasehold as a separate property interest with a distinct price. *See* 9 N.Y.C.R.R. § 2528.3(a); N.Y.C. Admin. Code § 26-517(a); *see also City of Las Vegas v. 180 Land Co.*, 546 P.3d 1239, 1250 (Nev. 2024) ("[T]hat the City approved development on the 17-acre parcel, but not on the 35-acre parcel, further demonstrates the 35 acres' separate nature."); *S. Nassau Bldg. Corp. v. Town Bd. of Town of Hempstead*, 624 F. Supp. 3d 261, 273 (E.D.N.Y. 2022) (finding that "the 'treatment of the land under state and local law' support[ed] treating each subdivision as an independent parcel").

Unsurprisingly, then, courts in New York recognize that the government can take the leasehold interest through eminent domain even if it does not take the underlying real property. *Kaufmann's Carousel, Inc. v. City of Syracuse Indus. Dev. Agency*, 301 A.D.2d 292, 301 (N.Y. App. Div. 2002). When it does so, it takes "an interest in property which is compensable." *Great Atl. & Pac. Tea Co. v. State*, 22 N.Y.2d 75, 84 (1968). *Accord In re City of New York (G & C Amusements)*, 55 N.Y.2d 353, 361 (1982) ("In the present case, the real property condemned was owned by the City of New York and leased to the claimants. A leasehold interest is, however, considered real property for the purpose of condemnation under the provisions of the Administrative Code of the City of New York."). New York is no anomaly: Federal courts have long recognized that the

confiscation of a leasehold interest is a taking of property for purposes of the Takings Clause. *See United States v. Petty Motor Co.*, 327 U.S. 372, 380–81 (1946); *Devines v. Maier*, 665 F.2d 138, 142 (7th Cir. 1981); *United States v. Right to Use & Occupy 3.38 Acres of Land*, 484 F.2d 1140 (4th Cir. 1973).

The same is true when the government takes the landlord's right to the leasehold—commonly referred to as the "reversionary interest" or "the reversion." *See* 74 N.Y. Jur. 2d Landlord and Tenant § 126 ("[t]his estate of the landlord . . . is called the reversion"); *see also id.* § 135 ("[T]he transfer of the reversion is a transfer of the lease and of its rights and obligations."). Thus, in *Manocherian v Lenox Hill Hospital*, 84 N.Y.2d 385, 398 (1994), the New York Court of Appeals found a taking where a law interfered with a landlord's "reversionary property interests" in a property's leasehold. *See also Muskin v. State Dep't of Assessments & Taxation*, 30 A.3d 962, 974 (Md. 2011) (finding a taking because "[t]he loss of the reversionary interest necessarily means the loss of the future ground rent income"); *United States v. 32.42 Acres of Land*, No. 05-cv-1137, 2009 WL 2424303, at *3–4 (S.D. Cal. Aug. 6, 2009) (government owed compensation for taking of "reversionary lease fee interest"); *Cully Corp. v. United States*, 160 Fed. Cl. 360, 381 (2022) (finding a taking where government "acted to cloud and forestall" a "valid, reversionary interest"). The owner's ability to relet a vacant apartment, after a tenancy has ended, is a property interest that is protected by the Takings Clause.

Defendants, in response, do not deny that the law treats each leasehold as a separate interest, but instead argue that the law also recognizes a property interest in the building as a whole. They point out that building owners can buy and sell entire buildings; pay taxes on the building as a whole; are responsible for the building's fixed costs (insurance, property taxes, mortgage payments, etc.); and are subject to zoning laws that apply to the entire building. State Br. 16–18;

21

City Br. 14–15; Intervenors' Br. 14–16. Those observations, however, do not negate the fact that the leasehold interest is a separate property interest with a separate existence both as a matter of law and fact. *See Cully*, 160 Fed. Cl. at 380 (finding a taking based on loss of reversionary interest, as that interest was "one of the sticks in the bundle of rights that inhered in ownership of the underlying res"); *see also Seawall Assocs. v. City of New York*, 542 N.E.2d 1059, 1067–68 (N.Y. 1989) (citing *Hodel v. Irving,* 481 U.S. 704 (1987), and explaining that the Takings Clause requires compensation when the government takes "one of those rights" in the "total 'bundle' comprising the owners' property interests"); *Preseault v. ICC*, 494 U.S. 1, 23–25 (1990) (O'Connor, J., concurring) ("The Government's appropriation of other, lesser servitudes may also impose a burden requiring payment of just compensation."). The law recognizes a property interest in the building, to be sure, but the law also recognizes a property interest in the leasehold, and an owner purchases a multi-unit apartment building reasonably expecting that he will be allowed to make productive use of each unit's leasehold. *See Murr*, 582 U.S. at 399 (the inquiry must "capture the central legal and factual principles that inform reasonable expectations about property interests").

*Second*, the "physical characteristics" of these units support viewing each apartment's leasehold as a separate property interest. Every apartment unit must provide minimum living accommodations for a family and be physically separate from all other units in the building. *See* N.Y. Mult. Dwell. Law § 4(15) (defining "apartment"); N.Y.C. Admin. Code § 27-2004(14) (same). *Accord* Compl. ¶ 99 ("Apartment units have locked external doors, such that access to the building hallways does not provide access to the separate apartment units."). When determining whether a given rent price is reasonable, owners and tenants alike consider the specific characteristics of the unit—including its particular floorplan and square footage—which has nothing to do with the building as a whole. *See id*. ¶ 100 ("[I]t is possible (and customary) to state

22

the square footage of a particular apartment unit."). Thus, notwithstanding that this case involves buildings, a key "physical characteristic[]" of these buildings is that they contain "distinguishable," separate apartment units. *Murr*, 582 U.S. at 398.

There is no reason why an evaluation of Defendants' varied price controls on each unit should consider the value of the entire building, rather than the value of separate and distinct units. *See 180 Land*, 546 P.3d at 1250 (no physical characteristic "require[d] treating the entirety of the golf course acreage as a single parcel"). To the contrary, an owner's decision to renovate and rent any given unit depends on the profitability of that unit, not the profitability of the building as a whole. Compl. ¶ 93. *See Lost Tree Vill. Corp. v. United States*, 707 F.3d 1286, 1293 (Fed. Cir. 2013) ("[E]ven when contiguous land is purchased in a single transaction, the relevant parcel may be a subset of the original purchase where the owner develops distinct parcels at different times and treats the parcels as distinct economic units."). This, too, supports viewing these units' leaseholds as the "denominator" in this case, where Plaintiffs are asserting a right to put specific leaseholds to productive use.

*Third*, when it comes to the "value of the property under the challenged regulation, with special attention to the effect of [the regulation] on the value of other holdings," *Murr*, 582 U.S. at 398, restricting or eliminating the value of one apartment's leasehold does not add any value to the rest of the building. Compl. ¶¶ 108–09. In fact, it "works to the detriment of other apartments in the building—as it limits the owner's ability to charge a fair market rent that would allow the owner to cover the building's common expenses," making it more difficult "to pay for things like repairs to exterior walls, hallways, or heating systems." *Id*. ¶ 110. *Compare with Murr*, 582 U.S. at 404 (finding that a regulation's effect was to increase the value of two property interests beyond what they would otherwise be worth separately), *and Becker v. City of Hillsboro*, 125 F.4th 844,

23

857 (8th Cir. 2025) (dividing property into more discrete units would decrease their value). [18] This, too, supports viewing the "denominator" as the individual unit's leasehold.

Defendants' cited cases are not to the contrary. A number of them in fact support Plaintiffs: One held in the claimant's favor, finding that a downward recalculation of allowable rent for a single unit within a building supported a regulatory-takings claim. *OM 309-311 6th St., LLC v. City of Union City*, No. 21-12051, 2022 WL 855769 (D.N.J. Mar. 23, 2022). Another specifically recognized that a building owner had "protected property interests in [its] basement level apartments" before going on to hold that the government was not responsible for a taking after a flood rendered the units uninhabitable. *Elsmere Park Club Ltd. v. Town of Elsmere*, 771 F. Supp. 646, 652 (D. Del. 1991). [19] Finally, a third case found that the denominator should be an entire condominium building *only after* reviewing the "factual record as a whole" (which revealed the developer-claimant had consistently treated the entire construction project as a single unit throughout the relevant period), having gone the other way on the government's motion to dismiss, *2910 Ga. Ave. LLC v. District of Columbia*, 234 F. Supp. 3d 281, 295 (D.D.C. 2017). The decision in *2910 Georgia Avenue* recognizes that the definition of the relevant parcel can be a "fact-intensive inquiry," suggesting that, at a minimum, this issue cannot appropriately be resolved via

---

[18] Defendants state that, "[e]ven assuming the apartments cannot profitably be renovated and relet, tenancies benefit the building as a whole by reducing the risks that vacant apartments pose to occupied apartments, such as 'inadequate firestopping, leaks, defective plumbing, mold, accumulation of refuse,' and other issues." State Br. 21. Even if this Court could consider this factual allegation from outside the Complaint (and the Court cannot do so), it actually would support Plaintiffs' position: If, in fact, a tenancy would benefit the rest of the building, then discouraging owners from making use of a leasehold interest would harm the rest of the building.

[19] The court in *Elsmere* also held that for purposes of *Penn Central* the value of the parcel was the value of the building as a whole, *see* 771 F. Supp. at 653, but that part of the decision was not necessary to its decision (nor could it consider the *Murr* factors, having predated *Murr* by decades), and the court also separately held that the *Penn Central* factors did not support finding a taking "even focusing solely on the basement units," *ibid.*

a motion to dismiss. *Id.* at 294.

Defendants' other cases, meanwhile, did not involve any allegation that the government had confiscated the value of the leasehold interest. That includes past challenges to the rent-stabilization laws, in which claimants did not allege that the laws had taken their leaseholds and instead brought claims focused on the impact of the RSL on their entire buildings. *See BRI*, 2024 WL 1061142; *335-7 LLC*, 2023 WL 2291511; *74 Pinehurst*, 59 F.4th 557; *CHIP*, 59 F.4th 540. *See also supra* Argument pt. I (discussing those cases further). Likewise, while Defendants cite cases that upheld COVID-19 orders temporarily protecting tenants from eviction due to financial hardship, there was no allegation in those cases that the leasehold interests had been taken from the building owner. *See Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 155 (S.D.N.Y. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 222 (D. Conn. 2020). In another case, the claimant sought to attack a landmark designation based on its effect on individual buildings; again, there was no allegation regarding particular leaseholds, and the court found that "the buildings in question [were] capable of earning a reasonable return." *Stahl York Ave. Co. v. City of New York*, 162 A.D.3d 103, 116 (N.Y. App. Div. 2018).[20]

Finally, Defendants cite *Penn Central*, which rejected a takings challenge to a landmark law that limited the owner of Grand Central Station's ability to construct a skyscraper above the building. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). Of course, *Penn Central* was decided long before *Murr*, and, to the extent that it can be read as inconsistent with *Murr*'s multi-factor test, the rule articulated in *Murr* controls. But if anything, contrasting the facts

---

[20] *Vargas v. 112 Suffolk St. Apt. Corp.,* 66 Misc. 3d 1214(A), 120 N.Y.S.3d 724 (N.Y. Civ. Ct. Jan. 28, 2020), meanwhile, did not involve a takings claim at all. The court discussed takings principles as relevant to a question of New York statutory law involving whether it would "infeasib[le]" to make repairs to a fire-damaged, occupied unit.

of *Penn Central* with the facts of this case supports Plaintiffs' position. The Court in *Penn Central* held that "air rights" to the space above the station did not constitute a separate unit of property apart from the existing station, and that makes perfect sense: A developer could not build on top of the station without altering the station itself (which is precisely why the designation of the existing station as a historical landmark affected the ability to exercise those "air rights"). *See id.* at 118. Putting that in terms of the three *Murr* factors: The historical designation in *Penn Central* operated on the entire parcel, not a distinct property interest (whereas the RSL regulates each leasehold separately); physically the "air rights" could not be disentangled from that entire parcel (whereas each unit is clearly demarcated and leased separately); and the valuation of the various parts of the parcel was inherently linked (whereas each leasehold is separately priced). And *even then*, *Penn Central* ended its analysis by noting that the owners' air rights had not actually been abrogated, as they could be transferred to owners of neighboring parcels (allowing them to build higher than they otherwise could), for "valuable" profit. *Id.* at 137.

To be sure, the relevant property "denominator" for purposes of the *Lucas* analysis should not be limited "in an artificial manner" to support an owner's litigation strategy. State Br. 15 (quoting *Murr*, 582 U.S. at 395–96). But that observation goes both ways. *See Murr*, 582 U.S. at 399 ("[T]he State [may not] define the relevant parcel in a way that permits it to escape its responsibility to justify regulation in light of legitimate property expectations[.]"). In this case, accepting Defendants' argument would disregard the reality of the relevant property interest (the leasehold interest) and would serve only to allow Defendants to prevent New Yorkers from making productive use of their vacant apartments (and, in turn, to prevent other New Yorkers from living in those apartments as tenants). This Court should decline that invitation.

### 2.  Plaintiffs have plausibly alleged an as-applied *Lucas* taking.

With the value "denominator" understood to be specific apartments' leaseholds, Plaintiffs have certainly alleged a categorical *Lucas* taking. "[W]here regulation denies all economically beneficial or productive use of" property, "the Fifth Amendment is violated" *per se*. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–16 (1992). Each individual Plaintiff owns one or two vacant units that, because of a lengthy prior tenancy, cannot legally be rented without first undergoing at least $100,000 in repairs. Compl. ¶¶ 159–60, 192–93, 225–26. Even if Plaintiffs obtained all potentially available Individual Apartment Improvement increases, that would allow them to recover only $50,000 (Pashko/Tony) or $30,000 (Bipin and Ilan) of those repair costs, over a period of fifteen years. *Id*. ¶¶ 151, 195, 228. Meanwhile, the rent caps on Plaintiffs' units are set so low as to render them uneconomical to rent, even considering only "the costs and liabilities that come from renting any apartment." *Id*. ¶¶ 158, 191, 224. Thus, these vacant units, like tens of thousands across New York City, are being kept permanently off the rental market. *Id*. ¶¶ 69–76, 129–30, 179–80, 210–11, 249–50.

Moreover, Plaintiffs plausibly allege that this is true notwithstanding the State's "hardship" process. Hardship increases are limited by law to an absolute maximum increase of six percent in the building's allowable rents each year, until the full increase is realized. Compl. ¶ 89. *See also* 9 N.Y.C.R.R. §§ 2522.4(c)(3)(i), 2522.4(d)(2)(i). Thus, even if Ilan's current hardship application is eventually successful, that would allow him to increase the rent of his vacant apartment by a whopping $78 each year, for the next sixteen years. Compl. ¶¶ 240–41. That number would be even lower for the other individual Plaintiffs—assuming, contrary to their allegations, that they would in fact qualify for a hardship increase of some kind. *Id*. ¶¶ 169–70 (a six-percent rent increase for Pashko/Tony's two vacant units would be approximately $40 and $50, respectively), 202 (a six-percent increase for Bipin's vacant unit would be $76.16). Given inflation and the cost

27

of bringing these units up to code, Plaintiffs' vacant units would remain economically non-viable even with these increases. *Id.* ¶¶ 156–63, 173–75, 189–93, 204–06, 222–26, 243–45.[21]

Defendants, in response, argue that Plaintiffs have no "right to make a certain amount of anticipated profit" on their apartment units. City Br. 20; *see also* Intervenors' Br. 21. *Lucas*, however, is clear that property owners suffer a taking if a regulation prevents them from making "economically beneficial or productive use" of property, 505 U.S. at 1015–16, which is what Plaintiffs here allege. Plaintiffs have not alleged merely that their apartments have leased for less than they might otherwise lease; Plaintiffs allege that their apartments are sitting totally vacant because they cannot economically be leased. The Fifth Circuit has found a *Lucas* taking under directly analogous facts, where a regulation meant that "property's highest and best use was to hold it 'for future development' until development becomes 'feasible.'" *DM Arbor Ct., Ltd. v. City of Houston*, 150 F.4th 418, 424 (5th Cir. 2025) ("In other words, the property should sit idle until some unknown point in the future."). Precisely the same reasoning applies here.

Defendants' other arguments, meanwhile, ask the Court to look past the pleadings and disregard factual allegations, which this Court cannot do. The City asserts that "Plaintiffs' vague allegations regarding supposedly 'legally mandated repairs' they must complete prior to being able to rent their vacant apartments to new tenants fail to establish that the challenged RSL provisions actually prevent Plaintiffs from leasing their vacant apartments," City Br. 20, but the allegations

---

[21] The leasehold interest is sold on an annual basis, and, even if a succession of 6% increases would somehow eventually allow Plaintiffs' units to become economically viable at some point years down the line—which the Complaint specifically alleges is not the case—Defendants would still be responsible for a temporary taking for the intervening years between now and then. *See First Eng. Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 319 (1987). Otherwise, the City could prevent a landlord from leasing an apartment for years or even decades, and avoid the obligation to pay just compensation for those lost years on the ground that the landlord could still lease the apartment at some future date down the line.

in the Complaint on this point are in no sense "vague" and instead explain the nature of the problem in detail. *See* Compl. ¶¶ 159–60, 192–93, 225–26. Defendants may contest Plaintiffs' factual allegations on these points, but that cannot be resolved on a motion to dismiss. *See Pittsfield Dev., LLC v. City of Chicago*, No. 17 C 1951, 2025 WL 43123 (N.D. Ill. Jan. 7, 2025) (finding a material dispute concerning whether allowed economic uses were, in fact, feasible). Defendants certainly cannot overcome Plaintiffs' well-pled allegations by merely dismissing them as "vague."

Defendants' other arguments on this point likewise improperly invite the Court to venture beyond the face of the Complaint. For instance, Defendants speculate that, "[e]ven assuming the apartments cannot profitably be renovated and relet"—*i.e.*, even if the unit's leasehold is rendered valueless—then allowing someone to live there at a loss might nevertheless "benefit the building as a whole by reducing the risks that vacant apartments pose to occupied apartments." State Br. 21. Plaintiffs, however, allege the contrary—that the only thing that makes economic sense is to leave these units vacant. *See* Compl. ¶¶ 180, 211, 250. Defendants also speculate that Plaintiffs can derive "value" from these units by occupying "an unlimited number" of the apartments "for personal use." State Br. 21. But, again, Plaintiffs have alleged that apartments derive economic "value" only through their leasehold interest, which produces income. Compl. ¶ 111. Whether Defendants' proposed alternate uses would be economically worthwhile, that is an inherently factual question that should be assessed with the benefit of a full factual record.

Moreover, Defendants' arguments are irreconcilable with *Lucas*. The question is not whether Plaintiffs are literally prevented from making any use of, or selling, their units. Rather, *Lucas* applies where an owner must essentially "leave his property economically idle." *Lucas*, 505 U.S. at 1019. Thus, a coastal-zone construction ban effected a categorical taking of Mr. Lucas's beachfront lots, notwithstanding that he could still "put his land to 'other uses'—fishing or

camping, for example—or [to] sell his land to his neighbors as a buffer." *Id*. at 1065 n.3 (Stevens, J., dissenting). It therefore makes no difference whether Plaintiffs could make personal use of their units; whether Plaintiffs could sell their units along with their buildings; or whether Plaintiffs could operate the units at a loss in order to benefit some other property. *See DM Arbor*, 150 F.4th at 425 ("[S]peculating about a sale—indeed, one that would have to be at fire sale prices—cannot defeat a *Lucas* taking claim."); *Lost Tree*, 787 F.3d at 1117 ("When there are no underlying economic uses, it is unreasonable to define land *use* as including the sale of the land."); *Blakelick Props., LLC v. Vill. of Glen Ellyn*, No. 25-CV-04569, 2025 WL 3763905, at *4 (N.D. Ill. Dec. 30, 2025) (granting preliminary injunction against a ban on short term rentals because the plaintiff plausibly alleged that "maintaining the property solely for the purpose of longer-term rentals would be 'economically infeasible' because the market for such rentals, for a house like the Property, essentially does not exist"); *Keshbro, Inc. v. City of Miami*, 801 So. 2d 864, 875 (Fla. 2001) (owners living in four rooms of a 57-unit motel was not an economically viable use).

The purpose of owning an apartment in a multi-unit building is to make productive use of its leasehold. Indeed, that is the entire premise of Defendants' vast edifice of landlord-tenant laws, as well as the rent-stabilization laws themselves, all of which reflect the commonsensical idea that apartments exist to be leased to tenants. Plaintiffs have plausibly alleged that Defendants' rent caps make it economically infeasible for them to use their apartments in this way and, accordingly, they have stated an as-applied *Lucas* claim. *See Mahon*, 260 U.S. at 414 ("What makes the right to mine coal valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it."). *See also Lucas*, 505 U.S. at 1014 (citing *Mahon* approvingly); *Seawall Assocs.*, 74 N.Y.2d at 108 (striking down law that "forced [owners] to devote their properties to another use

30

which, albeit one which might serve the City's interests, bears no relation to any economic purpose which could be reasonably contemplated by a private investor").

### 3. Plaintiffs have plausibly alleged an as-applied *Penn Central* taking.

Plaintiffs have also plausibly alleged that Defendants' rent caps on their vacant apartments constitute an as-applied regulatory taking under *Penn Central*. That is, even if this Court must consult the *Penn Central* multi-factor test, Plaintiffs have plausibly alleged that it is met here. Compl. ¶ 274. *See Penn Central*, 438 U.S. at 124 (*Penn Central* test looks to various inexhaustive *ad hoc* factors, including the law's economic impact, effect on owner expectations, reciprocity of advantage, and character). Taking each *Penn Central* factor in turn:

*First*, the economic impact of these laws on these specific vacant apartments is to deprive Plaintiffs of their economic use. Assuming *arguendo* that this, for some reason, is insufficient to plead a *Lucas* claim, the apartments nevertheless are rendered unable "to generate a future stream of rental income." *Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1354 (Fed. Cir. 2020). *See also Heights Apts., LLC v. Walz*, 30 F.4th 720, 735 (8th Cir. 2022) (COVID-19 eviction order deprived owner of "investment in the form of rental income"). That concrete impact is completely different from previous challenges, where claimants "fail[ed] to allege any specific impact on profit or revenue" and offered only "generalized allegations about being required to accept below-market and preferential rents." *74 Pinehurst*, 59 F.4th at 566. And as Defendants' own cited case states, because Plaintiffs are losing the ability to make use of a specific "property interest" associated with their building, that supports finding a meaningful economic impact "even if the diminution of value of the properties as a whole was relatively small." *OM*, 2022 WL 855769, at *15. *See* State Br. 16 (citing *OM*).[22]

---

[22] For this reason, Plaintiffs have stated an as-applied *Penn Central* claim even if the analysis focuses on the building as a whole.

***Second***, when it comes to reasonable expectations of property ownership, while it might be unreasonable to expect that New York's rent regulations would remain forever "unchanged," State Br. 27, it is certainly reasonable for an owner of an apartment building to expect to be allowed to make productive use of its units. *See supra* Argument pt. II(A)(1). *Accord Seawall*, 74 N.Y.2d at 109 ("A rough analogy might be telling [] mine owners . . . that they could no longer mine coal and that they must instead put their properties to some worthy, but less remunerative, purpose— say, storing nuclear waste."). That holds, notwithstanding that these laws were in place when some Plaintiffs (Bipin and Ilan) purchased their buildings. *Legacy Hous. Corp. v. City of Horseshoe Bay*, 158 F.4th 636, 644 (5th Cir. 2025) ("[A]lthough the fact that a limitation was pre-existing is relevant in evaluating a landowner's reasonable, investment-backed expectations, it must not be afforded *per se* dispositive status." (citing *Murr*, 582 U.S. at 398)). Indeed, if owners cannot reasonably expect that they will be allowed to rent out apartments for at least *some* profit, then nobody of sound mind would ever attempt to operate a multi-unit apartment building in New York.

***Third***, there can be no "reciprocity of advantage" in this case; *i.e.*, rendering Plaintiffs' leaseholds non-viable cannot be said to benefit Plaintiffs in some way. To the contrary, when apartments are forced to remain permanently vacant, everyone loses—Plaintiffs, as well as other New Yorkers. *See* Compl. ¶ 273 ("No owner, by renting his or her apartment unit at market rates, would be harming the City's interest in ensuring its residents have access to housing, such that the City would be better off without the unit being on the market at all."). That makes this case critically different from challenges to rent stabilization as applied to *occupied* apartments, which this Circuit has held provides a "reciprocity of advantage" to owners by increasing community stability in their buildings' neighborhoods. *CHIP*, 59 F.4th at 556. *Cf. Irving*, 481 U.S. at 715–16

32

(finding "reciprocity of advantage" where restriction caused "owners of escheatable interests [to] benefit from the escheat of others' fractional interests").

*Fourth* and finally, as explained in more detail below, the "character" of the rent caps at issue independently establishes a taking, as these caps directly and selectively diminish the value of specific property interests—in sharp contrast to historical limits on price controls. *See infra* Argument pt. II(B). At a minimum, at the motion to dismiss stage, Plaintiffs' as-applied *Penn Central* claim should be allowed to proceed so that this Court can consider all these questions on a full factual record.

### B. Plaintiffs Have Plausibly Alleged a Facial Takings Claim.

In addition to their as-applied claim, Plaintiffs also bring a facial takings claim challenging the specific provisions that restrict the rent that can be charged in a vacancy lease (the first lease of a vacant apartment). *See* N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. §§ 2522.5(a), 2522.8. *See also* N.Y.C. Admin. Code § 26-510(j). It is important to emphasize that Plaintiffs do not challenge the separate provisions limiting landlords' ability to raise the rent on existing tenants. *See* 9 N.Y.C.R.R. § 2523.5(a) (restricting rent increases for occupied units). Accordingly, should Plaintiffs prevail on their facial challenge, owners of rent-stabilized apartments could enter into vacancy leases at market rates, whereupon the rent-stabilization laws would protect the tenant from rent increases. Therefore, while Plaintiffs do pursue a facial challenge, that facial challenge is far narrower than Defendants suggest. *See supra* Argument pt. I.

Defendants' rent caps on vacant apartments are akin to a servitude on burdened apartments, extending the rent-price provisions of prior leases indefinitely into the future even after the tenant has vacated the unit. Under ordinary operation of property law, an owner conveys an interest in the property to a tenant when leasing an apartment but retains the right to re-lease the apartment

33

again to a new tenant, at a new agreed-upon rent, when the prior tenant vacates it. *See* 74A N.Y. Jur. 2d Landlord and Tenant § 939 (upon surrender of the lease, "the term merges with the reversion," the "relationship of landlord and tenant are necessarily terminated," and the effect is to "release the parties from any further liability on their covenants in the lease"). By denying rent resets between tenancies, however, Defendants are requiring that owners effectively carry the price terms of a lease forward even after it has terminated—permanently and selectively limiting a vacant apartment's leasehold value based on that particular apartment's past rental history. Below, Plaintiffs first set out the legal test the Court should apply to consider whether this bears the "character" of a taking and, second, apply that test to this case.

While Plaintiffs' as-applied claims argue that the effect of this servitude is to destroy the value of particular apartments, Plaintiffs' facial claim asserts that the imposition of this servitude (by virtue of its "character") is a taking in every case—even where vacant apartments retain some rental value. Although regulatory-takings claims typically require applying an *ad hoc*, multi-factor balancing test under *Penn Central*, the "character" of regulation can be so extraordinary that it is dispositive. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982) (finding "'the character of the government action' not only is an important factor in resolving whether the action works a taking but also is determinative"). In such cases, the law violates the Takings Clause on its face, "without regard to other [*Penn Central*] factors." *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015). *See, e.g.*, *Hodel v. Irving*, 481 U.S. 704, 716 (1987) ("If we were to stop our analysis at this point, we might well find § 207 constitutional. But the character of the Government regulation here is extraordinary."). [23]

---

[23] For this reason, Defendants miss the point when they assert that "a facial challenge under the *Penn Central* test is infeasible." City Br. 21; *see also* State Br. 22. Where the "character" prong is dispositive, a law is defective on its face, as a law's "character" does not change depending on

34

Notably, this "character" question does not ask whether the law sufficiently promotes the public good. *Lingle v. Chevron, U.S.A., Inc.* 544 U.S. 528, 543 (2005). *Contra* State Br. 25. Instead, the analysis asks whether the restriction is "extraordinary" in light of history and tradition. *Irving*, 481 U.S. at 716; *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021) (asking whether the property restriction is "consistent with longstanding background restrictions on property rights"). One way that a restriction is "extraordinary" is if it is akin to a "physical" appropriation, as the right to exclude others from property is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Irving*, 481 U.S. at 716. But the right to exclude is not the only such "stick" that can support a *per se* takings claim. *Contra* State Br. 14. For instance, in *Irving*, the Court found a *per se* taking where "the regulation [at issue] amounts to virtually the abrogation of the right to pass on a certain type of property—the small undivided interest—to one's heirs," because, "[i]n one form or another, the right to pass on property—to one's family in particular—has been part of the Anglo-American legal system since feudal times." *Irving*, 481 U.S. at 716. And in *Tyler*, the Court looked to Anglo-American history before finding that government may not take more money than it is owed following a tax foreclosure sale. *Tyler v. Hennepin County*, 598 U.S. 631, 640–42 (2023). To assess whether the regulation here likewise extraordinarily intrudes on an essential aspect of property ownership, the Court should look to history and tradition as a guide.

The interest at issue here supports a finding of a taking because, like the right to exclude, or the right to pass on property interests to one's heirs, the right to reassert unrestricted ownership following a leasehold (the so-called "reversionary interest," discussed *supra* Argument pt.

---

its application. That is demonstrated by *Irving*, which, as discussed above, held an Act of Congress unconstitutional on its face.

II(A)(1)), has long been understood as an essential aspect of property ownership. Blackstone traced this "doctrine of reversions" back to "the feudal constitution," explaining that, under feudal law, when an estate terminated the property returned "to the lord or proprietor, to be again disposed of at his pleasure." 2 William Blackstone, Commentaries *175. This reversionary interest "can never be limited, unless by either deed or devise." *Id.* at *175–76; *see also* 4 James Kent, Commentaries on American Law 354 (1896) ("The reversion arises by the operation of law and not by deed or will; and it is a vested interest or estate."); *A Reversion and a Remainder Distinguished*, 16 Wash & Lee L. Rev. 275, 278 (1959) (citing older common law authorities and explaining that "[a] reversion is always a vested interest"). The rent-stabilization laws' restrictions on vacancy leases abrogate that reversionary interest by, in effect, permanently tying a vacant apartment's rent price to its particular rental history—including its history of tenant turnover over the past five decades.

The character of this cloud on the reversionary interest is extraordinary, as the right to set a price on conveyance has always been an essential part of what it means to own property. In colonial America, a common sentiment was that colonists "were born free Englishmen, and had the liberty, as such, to sell our own effects at our own liberty." Thomas F. Devoe, The Market Book 145 (1862). Colonial authorities sometimes tried to impose price controls; these attempts were "virtually abandoned by 1700" due to widespread opposition, Lawrence Friedman, A History of American Law 43 (2005), including opposition from a slew of founding fathers who viewed such price controls as an "invasion of the rights of property." Jennifer Nedelsky, Private Property and the Limits of American Constitutionalism: The Madisonian Framework and Its Legacy 72–74 (1994) (statement of Gouverneur Morris). Likewise, shortly before the Constitutional Convention in Philadelphia, the Pennsylvania Council of Censors concluded that price controls are "inconsistent with . . . the rights of property." Council of Censors, The Proceedings Relative to

36

Calling the Conventions of 1776 and 1790, at 86–87 (1825). Hence, leading constitutional scholars and jurists in post-independence America "commonly supposed that a general power in the State to regulate prices was inconsistent with constitutional liberty." Thomas M. Cooley, A Treatise on the Constitutional Limitations 807 (7th ed. 1913). Indeed, amid hyperinflation in the Civil War, government still did not attempt to impose price controls—absent "a few isolated attempts in the South," which failed. Hugh Rockoff, Drastic Measures: A History of Wage and Price Controls in the United States 12, 42 (1984). The Civil Rights Act of 1866—widely viewed as the predecessor to the Fourteenth Amendment—affirmed all Americans' right "to inherit, purchase, *lease*, sell, hold and convey real and personal property." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (emphasis added). Thus, when the Supreme Court first upheld rent-control measures, it emphasized the temporary emergency nature of the measures—which, by their nature, left the landlord's reversionary interest undisturbed. *Block v. Hirsh*, 256 U.S. 135, 157 (1921) (finding rent control immediately after World War I "justified only as a temporary measure" that was set to end within two years); *Bowles v. Willingham*, 321 U.S. 503, 517 (1944) (upholding rent control in designated defense areas "as a war emergency measure").

To be sure, the modern Supreme Court has abandoned its once-held view that all price controls are presumptively unconstitutional outside limited subject matters. *Compare Charles Wolff Packing Co. v. Ct. of Indus. Rels.*, 262 U.S. 522, 537 (1923), *with Nebbia v. New York*, 291 U.S. 502 (1934). However, the Supreme Court has distinguished permissible exercises of government's "broad authority to adjust [] rules" of conduct in a way that incidentally affects property values, *Irving*, 481 U.S. at 717, from impermissible regulations that limit the value of "a specific, identifiable property interest." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595,

37

614 (2013).[24] Defendants' rent caps on vacant apartments fit within the latter category: Unlike most price control measures, they impose prices directly on property in what amounts to a servitude carrying the terms of otherwise-terminated tenancies forward into the future. *Compare Lingle*, 544 U.S. at 533 (law at issue capped rent for gas service stations at 15% of tenant's gross profits—a generally applicable restriction unrelated to past tenancies). That is critically distinct from any evenhanded limitation on owners' ability to raise the rent on occupied units—which can be described as a general regulation of "the landlord-tenant relationship." *Yee v. City of Escondido*, 503 U.S. 519, 528–29 (1992).

To further explain the point, consider an analogous restriction on raisin prices. It's one thing for government to limit the price at which people may sell raisins. Now imagine that, instead, government enforces different price ceilings for raisins depending on the price that particular farm charged at some arbitrary point in the past, such that raisins produced at Farm A may be sold for no more than $X; whereas raisins produced at Farm B may be sold for no more than $Y; and raisins produced at Farm C may be sold at any price. Such a scheme, in substance, would be far more than a "price control" on raisins. Rather, it would represent the uncompensated taking of property interests in those specific farms, directly and selectively limiting their value. It would not matter—

---

[24] This distinction undergirds the entirety of the Court's land-use exactions doctrine—which is why permitting fees are subject to heightened scrutiny, notwithstanding that broadly applicable property taxes are not. *See Koontz*, 570 U.S. at 614. *See also Sheetz v. County of El Dorado*, 601 U.S. 267 (2024) (extending land-use exactions scrutiny to legislation). Indeed, the principles underlying the Court's land-use exactions doctrine must also apply here, where Defendants are selectively allowing certain vacant units to be rented only on the "condition" that the owner surrender a portion of its leasehold value. *See Cedar Point*, 594 U.S. at 143 (it violates the Takings Clause *per se* to condition owners' ability to operate a commercial agriculture farm on their allowing labor union representatives to enter the property); *Horne*, 576 U.S. at 365 (it violates the Takings Clause *per se* to condition commercial farmers' ability to grow raisins on their surrendering a portion of the raisins' value); *Loretto*, 458 U.S. at 438–39 & n.17 (it violates the Takings Clause *per se* to condition owners' ability to rent out their buildings on their agreeing to a cable box installation).

except for purposes of calculating the amount of just compensation for past losses—whether the government is allowing the farmers to earn some profit from their raisin sales. *See Horne*, 576 U.S. at 355 (conditional raisin reserve requirement effected a *per se* taking, notwithstanding that the owners "retain[ed] an interest in any net proceeds from sales the Raisin Committee makes"). The same observation applies here: In the absence of allowable rent resets between tenancies, Defendants' rent caps cease to be an evenhanded regulation of the landlord-tenant relationship and, instead, selectively impose absolute price ceilings on "specific, identifiable property interest[s]"— akin to the imposition of a servitude running with the land, directly taking value from it. *Koontz*, 570 U.S. at 614.[25]

The history of price controls in this country reveals no precedent for this, anywhere, even now—outside of New York (and a handful of jurisdictions in New Jersey and Maryland), which itself had allowed at least some sort of vacancy reset until 2019. *Supra* Argument pt. I. That is not nearly enough to establish a sufficient historical pedigree. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 11 (2022) (New York's restriction on firearm license failed to comport with history and tradition, notwithstanding that it had been in place since "the early 1900s"); *id*. at 24 ("This Second Amendment standard accords with how we protect other constitutional rights."); *Knick v. Twp. of Scott*, 588 U.S. 180, 189 (2019) (courts should not "relegate[] the Takings Clause 'to the status of a poor relation' among the provisions of the Bill of Rights"). This holds true, regardless of whether these laws are somehow serving a public interest. *See Irving*, 481 U.S. at

---

[25] Defendants contend that these laws "do not set rents in rent-stabilized apartments; rather, the RGB makes a yearly determination as to the allowable rent increases." City Br. 17. But as explained above, in the absence of resets between tenancies, the effect of these laws is to set absolute rent ceilings that vary across vacant units.

718 (recognizing that Congress was attempting to address "the extreme fractionation of Indian lands[, which] is a serious public problem").

Thus, Plaintiffs have plausibly alleged that Defendants' rent caps on vacant apartments violate the Takings Clause both facially and as applied. "Whatever the wisdom of" this policy, and whatever its precise impact on any given property's value (or its owner's expectations), it effectively "transfer[s] an interest in property from the landowner to the government" and therefore violates the Takings Clause *per se. Koontz*, 570 U.S. at 615. *Accord Irving*, 481 U.S. at 716 (striking down Act of Congress); *Seawall*, 74 N.Y.2d at 106 (holding New York anti-warehousing law "facially invalid as a regulatory taking"); *Mahon*, 260 U.S. at 414–16 (striking down Pennsylvania statute, even "assum[ing] that an exigency exists that would warrant the exercise of eminent domain").

### C.  Plaintiffs Have Plausibly Alleged a Due-Process Claim.

"The standard for determining whether a state price-control regulation is constitutional under the Due Process Clause is well established: Price control is unconstitutional if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt." *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988) (cleaned up). Hence, Plaintiffs have plausibly alleged that Defendants' rent-price ceilings on vacant units are set in a manner that is arbitrary, discriminatory, and demonstrably irrelevant. That is, the rent cap on any given vacant apartment does not reflect a characteristic of the apartment itself, such as its size, location, or condition. Compl. ¶ 59. *See, e.g., id*. ¶¶ 151, 155 (two of Pashko and Tony's units, featuring identical floorplans and located within the same building, are subject to monthly rent caps of $860 and $6,000, respectively). Nor does it reflect any characteristic of a new incoming tenant; it remains the same regardless of the new tenant's income. *Id*. ¶ 59. Nor still does it reflect any attempt to ensure that the unit may be

40

rented at a reasonable profit. *Id*. ¶¶ 68–76. Instead, these rent caps primarily reflect the unit's prior rental history—that is, its history of tenant turnover over the last fifty years. *Id*. ¶¶ 40, 60, 63. Depending on when apartments turned over, and what rules were in effect when they did, some vacant apartments are now subject to price ceilings well above market rates, *id*. ¶ 61, whereas materially identical vacant units are stuck at 1970s-level prices, *id*. ¶ 63. If these price ceilings are not arbitrary, it is difficult to imagine what would be.

Defendants contend that Plaintiffs' due-process claim nevertheless fails for two reasons. They assert that it is necessarily subsumed by Plaintiffs' takings claims. State Br. 28–29; City Br. 29; Intervenors' Br. 22–23. They further assert that, even so, the law's arbitrary rent caps on vacant units are rationally related to legitimate state interests and satisfy due-process review. State Br. 29–30. *See also* City Br. 29–33; Intervenors' Br. 23–24. Both assertions are incorrect.

### 1. The Takings Clause does not subsume the Due Process Clause.

The Takings Clause cannot categorically subsume due-process claims attacking a restriction on property. The Supreme Court has explained that the test for whether a regulation is "so arbitrary or irrational that it runs afoul of the Due Process Clause" is different from any test "discerning whether private property has been 'taken' for purposes of the Fifth Amendment." *Lingle*, 544 U.S. at 542. Thus, a property restriction may violate the Takings Clause, or it may independently violate the Due Process Clause (or the Fourth Amendment, etc.). *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49–50 (1993) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands."). Accordingly, circuits across the country—including this one—have allowed substantive due-process claims to proceed against property restrictions.[26]

---

[26] *See, e.g.*, *Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851 (9th Cir. 2007); *John Corp. v. City of Houston*, 214 F.3d 573 (5th Cir. 2000); *Tri Cnty. Indus., Inc. v. District of Columbia*,

Defendants imply that all these cases are abrogated by Justice Scalia's plurality opinion in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, 560 U.S. 702, 720–21 (2010). *See* State Br. 28–29; Intervenors' Br. 22–23. That is incorrect. The question in that case was only whether "the Takings Clause applies to judicial action." *Stop the Beach*, 560 U.S. at 719 (plurality op.). Justice Scalia wrote that it does, *id.* at 715, and he further wrote to express his disagreement with Justice Kennedy's proposal that the Court instead reach the same result under the Due Process Clause. *Id.* at 720–21; *see also id.* at 733–42 (Kennedy, J., concurring in the judgment). Justice Kennedy's proposal, in Justice Scalia's view, would merely have had "due process to do the work of the Takings Clause." *Id.* at 721 (plurality op.). It is a completely different situation where the Due Process Clause is in fact performing different "work." *See Lingle*, 544 U.S. at 542.

Nor do the recent rent-stabilization cases require a different approach. Those cases, given the backdrop of Supreme Court precedent, must be read to rest on a conclusion that the claimants' takings and due-process claims were premised on the same theory. The claimants argued that rent stabilization fails *Penn Central*'s "character" prong because it does not serve the public interest, "confer[ring] a local public assistance benefit on tenants" and effectively forcing one group of private parties (landlords of stabilized buildings) to confer a benefit on another private group of private parties (tenants fortunate enough to find themselves within a stabilized unit). *CHIP*, 59 F.4th at 555. At the same time, their due-process claim asserted that rent stabilization only "secures housing for the wealthy, increases rent for uncontrolled units, and discriminates in favor of tenants over owners" and therefore "causes more harm than good." *Id.* at 556. Those arguments (the

---

104 F.3d 455 (D.C. Cir. 1997); *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375 (2d Cir. 1995); *Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992).

Second Circuit concluded) were essentially the same, meaning that the claimants were indeed trying to force the Due Process Clause to "do the work of the Takings Clause." *Ibid*.

Plaintiffs' due-process claim, by contrast, is distinct from their takings claims. Plaintiffs' due-process claim asserts that Defendants' rent caps on vacant apartments are set in an arbitrary, discriminatory, and demonstrably irrelevant manner, such that there is no material basis underlying any given vacant apartment's rent ceiling. Compl. ¶¶ 278–88. Plaintiffs' takings claims, meanwhile, assert that these caps violate the Takings Clause because their application renders certain apartments economically non-viable, *supra* Argument pt. II(A); or because they impose a restriction on the reversionary interest that directly confiscates the owners' property, *id*. pt. II(B). These types of claims, as Second Circuit precedent recognizes, are independent from each other. *See Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 379 (2d Cir. 1995) (reversing and remanding so district court could determine "whether the adding of the condition of conveying two parcels was so arbitrary that substantive due process was violated").

### 2. Plaintiffs have plausibly alleged that the rent caps on their vacant apartments are arbitrary.

Particularly on a motion to dismiss, Defendants cannot overcome Plaintiffs' allegations that their rent caps on vacant apartments are fundamentally arbitrary, discriminatory, and irrelevant.

For the most part, Defendants simply miss the point, as they rely on cases upholding rent control broadly without addressing the substance of Plaintiffs' particular claim. State Br. 29–30; City Br. 33; Intervenors' Br. 23–24. Plaintiffs do not challenge the very concept of restricting rent prices. *Supra* Argument pt. I. They do not, for example, attack the notion that government may protect tenants from "excessive and unreasonable rent increases," *Pennell*, 485 U.S. at 12, in the name of promoting "neighborhood continuity and stability," *74 Pinehurst*, 59 F.4th at 569. *See*

43

Compl. ¶ 4 ("[This case] does not challenge the proposition that the government can limit increases in rent to protect existing tenants from being forced out of their apartments."). Nor does this case turn on any observation that rent control "causes more harm than good," *CHIP*, 59 F.4th at 556; *see also id*. at 554 ("We understand that many economists argue that rent control laws are an inefficient way of ensuring a supply of affordable housing."), or that it is irrational anytime government sets prices "less than [they] would otherwise be" in an unregulated market, State Br. 30. Instead, Plaintiffs make the far more limited allegation that New York's rent-stabilization regime, by depressing vacant units' rents based on prior rental histories and turnover of tenants that have long since departed, sets rent caps on vacant apartments in a manner that is "arbitrary, discriminatory, or demonstrably irrelevant," such that there is no material basis for any given vacant apartment's rent cap. *Pennell*, 485 U.S. at 11; Compl. ¶¶ 278–87. That plausibly states a due-process claim, regardless of cases upholding rent stabilization writ large.

Defendants argue that this arbitrary rate-setting is justified because it may have a variety of positive impacts—including providing for affordable housing and preserving neighborhood character. *See* State Br. 3; City Br. 5; Intervenors' Br. 23. Defendants also argue their approach avoids tenant harassment, as landlords otherwise might force tenants out of their apartments to raise the rent. *See* City Br. 32; Intervenors' Br. 23–25. However, Defendants could achieve all of these goals without setting rents in an arbitrary manner; Defendants could, for instance, set rents according to a set formula that applies equally to all vacant apartments. What Defendants cannot do, however, is set rents in a manner that is fundamentally arbitrary, discriminatory, and irrelevant. *Pennell*, 485 U.S. at 11. Otherwise, the City could just as easily set rents by a coin flip or a roll of the dice—as even randomly-generated prices would sometimes be lower than market rates. But, against the long history disapproving price controls, *see supra* Argument pt. II(B), the Supreme

44

Court has held that even when price controls serve permissible goals, they cannot be set in an arbitrary or discriminatory manner. However laudable the government's goals, they cannot be realized through arbitrary rate caps that subject some (but only some) apartments to artificially low rents, while allowing other apartments to rent at prices that may even exceed market rates—and leaving those artificially low rents locked in place even if an apartment sits vacant for years. *See* Compl. ¶ 144 (one of Plaintiffs' units has been vacant since 2019). At bottom, any system where absolute price ceilings on materially identical apartments can vary by a factor of *ten* is "arbitrary" and "discriminatory."

Moreover, Defendants cannot explain why their concerns matter only for a subset of apartments. Rents for many rent-stabilized apartments have been allowed to rise to market levels. Compl. ¶¶ 61–62. Plus, when it comes to the specific issue of tenant harassment, it is separately unlawful for landlords to engage in such harassment, N.Y.C. Admin. Code §§ 27-2004(a)(48), 27-2005(d); N.Y. Penal Law §§ 241.00, 241.02, 241.05, and this protection is apparently enough for tenants living in apartments that are allowed to reset rents upon vacancies.[27] The inconsistency of these laws undermines any assertion that they justify the fundamentally arbitrary regulation of Plaintiffs' properties here. *See Craigmiles v. Giles*, 312 F.3d 220, 228 (6th Cir. 2002) (purported rationale for licensing law was undermined by fact that others similarly situated were not "required to have this [] training"); *see also Merrifield v. Lockyer*, 547 F.3d 978, 988–92 (9th Cir. 2008)

---

[27] That is, tenants in non-stabilized apartments; holdover tenants in previously stabilized units after a condo conversion; and even tenants occupying rent-stabilized units but who are paying preferential rent. *See* Compl. ¶ 67; N.Y. Gen. Bus. Law § 352-eeee(2)(c)(vii) (after a holdout tenant vacates a converted condo, the condo ceases to be stabilized); N.Y.C. Admin. Code § 26-403(e)(2)(i)(9) (when an apartment subject to New York's separate system of "rent control" laws becomes vacant, the owner may enter into a vacancy lease at market rates).

(finding that the government's justification for a law seemed rational in the abstract but is irrational when viewed in context).

In any event, this issue arises on a motion to dismiss, and the question of arbitrariness is ultimately one that should be considered on a factual record. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1184 (10th Cir. 2009). At this stage, Plaintiffs have sufficiently alleged that these rent caps are arbitrarily set, and the Court should deny the motion to dismiss so that claim can be tested on the facts.

### D.  Plaintiffs Have Plausibly Alleged an Equal-Protection Claim.

Plaintiffs' final claim asserts that New York's classification between vacant units in buildings constructed prior to 1974 (which are subject to rent caps) and vacant units in buildings constructed in or after 1974 (which may be rented at market rates) is irrational and, therefore, violates the Equal Protection Clause. Compl. ¶¶ 290–99. In 2026, there is no reason why a vacant apartment should be subject to punishing rent caps just because it sits within a building constructed 53 years ago, when it would be allowed to rent for market rates were it located within a building constructed just a year later—still over a half-century before the present date.

In response, Defendants contend that the law "applies to buildings constructed before 1974 because that is the year the Legislature enacted the ETPA," and "[i]t was rational for the Legislature to exempt buildings constructed after 1974 to [] encourage new development in the City." City Br. 33. *See also* Intervenors' Br. 26 (same). Perhaps that reasoning would suffice if 1974 were not a half-century ago. But as Defendants admit, these laws have been "repeatedly amended" in the decades since, State Br. 1, yet their application remains limited to buildings constructed before 1974, N.Y. Unconsol. Law § 8625(a)(5). Moreover, the rent stabilization law is an expressly temporary "emergency" measure, *see id.* § 8623(a), and the operative "emergency" that justifies their current application was declared only in 2024. Compl. ¶ 26. Whatever the rationality of

46

exempting "new" construction from emergency rent caps, that rationale cannot support exempting all housing that has been built within the last five decades. *See, e.g.*, *Dias*, 567 F.3d at 1183 (claimants plausibly alleged that "although pit bull bans sustained twenty years ago may have been justified by the then-existing body of knowledge, the state of science in 2009 is such that the bans are no longer rational").

It is no answer to say that the law's rationality in 1974 suffices to uphold that law today. Courts assess rationality based on present facts, not facts as they existed a generation ago. *See, e.g.*, *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547–49 (1924) (allowing constitutional challenge to rent-control law to proceed on the basis that the law, even if valid at the time of its original passage, could no longer be justified due to changed facts). *Accord Dias*, 567 F.3d at 1183 (law that might have been rational "twenty years ago" was "no longer rational"). "[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938). Particularly as the law has been amended and renewed multiple times—most recently in 2024—rationality in 1974 is properly beside the point.

Nor is there any reliance interest that would justify continuing to apply that 1974 cut-off to vacant apartments today. No doubt, individual tenants may have a reliance interest in the set of rules in place when they rented their apartments. *See W. Hous. Corp. v. NYC Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002). But vacant apartments do not have any tenants in place, and there is therefore no such reliance interest to protect. *See* Compl. ¶ 4. Building owners, meanwhile, certainly have not "relied" on these punishing rent caps; even putting aside the fact

47

that the RSL has changed repeatedly since 1974, owners do not "rely" on regulations that constrict their ability to lease their properties at a reasonable rate of return.[28]

Rational-basis review is deferential, but it does not require the Court to turn a blind eye to such blatant irrationality: "[W]hile rational basis review is indulgent and respectful [to the legislature], it is not meant to be 'toothless.'" *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (quoting *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981)). Hence, even under rational-basis review, the Second Circuit has repeatedly struck down laws that do not survive judicial scrutiny. *See, e.g.*, *Winston v. City of Syracuse*, 887 F.3d 553, 563–64 (2d Cir. 2018) ("[T]he City's policy . . . 'divorces itself entirely from the reality of legal accountability for the debt involved[.]'"); *Fortress Bible Church v. Feiner*, 694 F.3d 208, 220 (2d Cir. 2012) ("[O]n the record before us there was no rational basis for the Town's actions."); *Myers v. County of Orange*, 157 F.3d 66, 75–76 (2d Cir. 1998) ("The facts in this case serve to illustrate the policy's distortion of the goal of even-handed justice and impartial administration of the law.").

Alternatively, as in the due process context, Defendants argue that these laws are justified to "maintain[] affordable housing for millions of low and middle income tenants." State Br. 32 (citation omitted). Essentially the same response applies here: However laudable that goal, there is no reason—and certainly not one apparent on the face of Plaintiffs' complaint—why that need should turn on whether the building is more than fifty years old. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (basing its decision on the factual record before the Court)

---

[28] Owners of post-1974 buildings, meanwhile, certainly do not have any reliance interest in the law's less favorable treatment of pre-1974 buildings. Moreover, the City can hardly say that it is interested in respecting the reliance interests of owners of post-1974 buildings when it has repeatedly imposed new onerous obligations on those building owners, including (in 2024) enacting new rules that impose rent restrictions for occupied apartments. *See* Compl. ¶ 67.

48

Finally, as with Plaintiffs' other claims, at a minimum this question of rationality should be decided on a full factual record—not on a motion to dismiss. *See Dias*, 567 F.3d at 1184 This Court need not finally resolve the question of rationality at this stage of the litigation, but the Court should not find the City's discrimination rational as a matter of law.

### III.    There Is No Hurdle to Reaching the Merits of Plaintiffs' Claims.

Defendants assert that various procedural hurdles prevent this Court from reaching the merits of Plaintiffs' claims. Defendants are mistaken. Below, Plaintiffs explain that (A) their claims are ripe, notwithstanding that they have not exhausted the State's hardship exemption process; (B) none of their claims are time-barred; (C) Plaintiff SPONY has associational standing; (D) the City is a proper defendant; and (E) although Plaintiffs recognize that current Second Circuit law has gone the other way, the State's sovereign immunity does not apply to a suit seeking just compensation for the taking of property.

#### A.  Plaintiffs' Claims Are Ripe.

Defendants suggest that Plaintiffs' claims are unripe because they have not "exhaust[ed] their administrative remedies" by submitting a "hardship" exemption, which can "permit rent increases in excess of those permitted by the RGB." State Br. 11. *See also* City Br. 24; Intervenors' Br. 9–10. Defendants further suppose that Plaintiffs have merely "assert[ed] in conclusory fashion that it would be futile to apply for hardship exemptions." State Br. 12. *See also* City Br. 24; Intervenors' Br. 10–11. Defendants are incorrect.

Plaintiffs are not required to "exhaust their administrative remedies." It is well settled that Section 1983 claims carry no exhaustion requirement. *Knick*, 588 U.S. at 185 (overruling prior cases that had imposed an exhaustion requirement on takings claims). Instead, what is required is "relatively modest" finality. *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 478 (2021). Specifically, the Court must know how the "regulations at issue apply" to the subject property,

such that the legal issues presented are capable of adjudication. *Ibid*. Hence, "nothing more than *de facto* finality is necessary." *Id*. at 479.

Thus, Plaintiffs' facial arguments are necessarily ripe. *Yee*, 503 U.S. at 534 (facial takings challenge to rent-control ordinance was ripe, notwithstanding that owners could still seek rent increases). *Accord 74 Pinehurst*, 59 F.4th at 564–65 (reaching merits of facial challenge, notwithstanding that the claimant's as-applied challenge was unripe). Even Defendants tacitly acknowledge that this is so. *See* State Br. 12 (asserting only that Plaintiffs' "*as-applied* takings claims [are] unripe" (emphasis added)).

Likewise, Plaintiffs' as-applied arguments are ripe, for two reasons. First, Plaintiffs RPN and PKM (Pashko/Tony and Bipin) have plausibly alleged that their buildings do not meet the hardship criteria. An owner need not "take steps to obtain a final decision" as a mere formality when it is apparent that the relevant "agency has no discretion" to grant administrative relief. *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997). Here, hardship applications are not decided according to criteria that are even remotely discretionary. Compl. ¶ 79. Instead, owners are eligible for hardship increases only to the extent that (A) "the building's non-inflation-adjusted profit margins between 1968–70" exceeded "the building's current profit margins over the last three years," or (B) "the building's gross revenue from the last year exceeded expenses by five percent" or less. *Id*. ¶¶ 80–81. *See also* 9 N.Y.C.R.R. §§ 2522.4(c)–(d). Plaintiffs have plausibly alleged that their buildings' finances do not qualify under either hardship basis. Compl. ¶¶ 164–67, 198–200. That is not "conclusory." *Contra* State Br. 12. *Cf., e.g., Quick Cash of Westchester Ave. LLC v. Vill. of Port Chester*, No. 11-CV-5608, 2013 WL 135216, at \*9 (S.D.N.Y. Jan. 10, 2013) (claimant alleged "it could not have established the criteria" for a use variance, but "nothing in the [complaint] allows me to conclude that should Plaintiff make an application for a variance,

50

it would certainly be denied"). *See* Intervenors' Br. 10–11 (relying on *Quick Cash*). Rather, it establishes how the hardship provisions "apply to the particular land in question": They don't. *Pakdel*, 594 U.S. at 478.

Second, Plaintiffs have plausibly alleged as-applied claims that are viable, regardless of any potential hardship increase. The reason a facial challenge is necessarily ripe is because it presents arguments that hold "no matter how" the law is applied. *Yee*, 503 U.S. at 534. Here, that observation extends to Plaintiffs' as-applied arguments. That is—even assuming that all Plaintiffs received maximum annual hardship relief for the foreseeable future—their as-applied claims would remain unaffected.

Plaintiffs have explained why their as-applied takings claims would not be addressed by any hardship relief. *Supra* Argument pt. II(A)(2). The same observation applies to Plaintiffs' due-process and equal-protection claims. Because hardship increases are realized in an even percentage across the building's units, any hardship relief would only *worsen* the arbitrary variance in rent caps among Plaintiffs' materially identical units. *Id*. ¶¶ 86–87 ("[H]ardship relief exacerbates the disparities between apartments' stabilized rents."). And, of course, a hardship increase would not somehow make it rational to continue discriminating against Plaintiffs' vacant units while exempting those in buildings constructed within the last fifty years.

Moreover, Ilan, the only Plaintiff who is not categorically ineligible for any hardship increase, has already submitted a hardship application and been rejected—twice. That is, his 2022 and his 2023 applications were both denied on technical grounds, and his 2025 application is still being processed over one year after he submitted it. Compl. ¶¶ 233–37. Although Ilan certainly hopes that this latest application will finally be successful, there is ample reason to suspect it, like

apparently every other application the State receives, will again be denied. *See id*. ¶ 78 (no owner has successfully obtained a hardship increase in years).

Therefore, this case is nothing like previous challenges that were held unripe. In those cases, the claimants did not allege that they were categorically ineligible for hardship increases; instead, they only "speculate[d] that the hardship provisions offer economic relief 'in theory' but practically 'result in few applications being granted.'" *74 Pinehurst*, 59 F.4th at 565 (ellipsis omitted). *See also, e.g.*, *BRI*, 2024 WL 1061142, at *3 (as-applied regulatory takings claims were "not ripe because the property owners have not tried to take advantage of *available* hardship exemptions" (emphasis added)). Nor did those claimants plausibly allege that their as-applied regulatory takings claims were viable, regardless of any hardship increase. And none of those claimants had (like Ilan) already applied and been rejected. By contrast and as explained above, Plaintiffs have plausibly alleged either that there is no hardship increase "available" to them, or that their as-applied claims are viable regardless of any possible increase. For that reason, the mere existence of the hardship provisions cannot render any of Plaintiffs' claims unripe.

### B. Plaintiffs' Claims are Not Time-Barred.

Defendants assert that there is a statute-of-limitations problem unique to all Plaintiffs' facial takings claims and one Plaintiff's as-applied takings claim. They contend that Plaintiffs' facial takings claims "accrued on June 14, 2019, when the [law prohibiting vacancy increases] was enacted, and expired on June 14, 2022"; or, even worse, that they expired fifty years ago when rent stabilization first was enacted (decades before any of Plaintiffs owned their buildings). State Br. 13. They further contend that Pashko and Tony's as-applied takings claim for one of their two vacant units expired in 2022, given that the unit first became vacant in 2019. *Id*. at 13–14.

Defendants are mistaken. At the threshold, Defendants wrongly assert that the relevant laws trace back beyond the governing statute of limitations, when, in fact, the rent caps on Plaintiffs'

vacant apartments expire on their own terms every three years and were last re-enacted in March 2024. *See* Compl. ¶ 26. That re-enactment falls comfortably within the three-year statute of limitations for Section 1983 claims in New York. *See Sherman v. Town of Chester*, 752 F.3d 554, 567 (2d Cir. 2014) (rejecting statute-of-limitations bar to lawsuit challenging a "series of regulations," one of which fell within limitations period). But even setting that aside, there would be no limitations issue even if this Court looked back to earlier enactments of the rent-stabilization laws: All Plaintiffs' claims, whether styled "facial" or "as applied," reflect the same injuries resulting from the ongoing enforcement of rent caps on their vacant apartments. Aside from Plaintiffs' request for damages (which are limited to losses incurred only within the limitations period), there can be no statute-of-limitations bar here.

"When the continued enforcement of a statute inflicts a continuing or repeated harm, a new claim arises (and a new limitations period commences) with each new injury." *Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019) (listing cases). *Accord Seneca Nation v. Hochul*, 58 F.4th 664, 671 (2d Cir. 2023) ("[The claimant's] free use and enjoyment of its land is continually violated by the presence of an unlawful easement that began in 1954."). Each day that the statute is enforced constitutes a new injury, "giv[ing] rise to a new cause of action" and therefore "begin[ning] a new statute of limitations period." *Knight v. Columbus*, 19 F.3d 579, 582 (11th Cir. 1994). That analysis applies to the property realm, where the enforcement of an allegedly unlawful property restriction "would constitute the equivalent of a continuing invasion of plaintiffs' property rights akin to a continuing trespass—a situation in which a new cause of action arises in plaintiff's favor against the [the defendant] each day." *Greene v. Town of Blooming Grove*, Case No. 87-CIV-0069, 1988 WL 126877, at *4 (S.D.N.Y. Nov. 21, 1988), *aff'd in part and rev'd in part on other grounds*, 879 F.2d 1061 (2d Cir. 1989). *See also S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F.

Supp. 2d 547, 556–57 (D. Conn. 2008) (allowing facial takings challenge to proceed as timely, notwithstanding that the ordinance was enacted years earlier). *Accord Seneca Nation*, 58 F.4th at 671.

Plaintiffs' injuries flow from the ongoing enforcement of Defendants' rent caps on their vacant apartments. It does not matter whether these laws were first enacted (or whether an apartment first became vacant) in 2019, in 1974, or even "in 1954." *Ibid*. The fact remains that Plaintiffs *today* would expose themselves to immediate and severe civil penalties should they enter into any vacancy lease allowing rent collection exceeding their units' rent caps. Compl. ¶¶ 42–45. Thus, today—and tomorrow, and the day after, and each day so long as these restrictions remain in force—reflects a "repeated harm" where Plaintiffs are actively prevented from renting their units at market rates (or rates that would justify necessary costs). *Flynt*, 940 F.3d at 462. Plaintiffs' request for relief from that repeated harm cannot be time-barred.

Any holding to the contrary is squarely foreclosed by this Circuit's recent caselaw. In *Seneca Nation*, the claimant sought to invalidate an easement that New York had obtained decades earlier. 58 F.4th at 667. New York invoked its sovereign immunity (which bars most claims seeking retrospective relief), asserting that the lawsuit did "not allege an ongoing violation of federal law but only that the 1954 grant of the easement violated federal law." *Id*. at 670. This Circuit disagreed:

> The Supreme Court has noted that easements "burden land that continues to be owned by another," and if unlawfully obtained by the state amount to a taking under the Fifth Amendment. The complaint's allegation that the Nation's free use and enjoyment of its protected land is continuously impaired by the presence of an unlawful easement therefore reflects an ongoing harm to the Nation.

*Id*. at 670–71 (footnotes omitted). There is no reason why an unlawful burden on private property should be an ongoing violation of the Takings Clause for sovereign-immunity purposes, but not for statute-of-limitations purposes. Accordingly, this Court's previous statement that "the harm

associated with a taking—the burdening of property rights or depreciation of property value—is complete as soon as the purported taking is effectuated via the challenged statute," *EklecCo NewCo LLC v. Town of Clarkstown*, No. 16-CV-6492, 2018 WL 3023159, at *9 (S.D.N.Y. June 18, 2018), is inconsistent with intervening Second Circuit caselaw. *See* State Br. 13 (citing *EklecCo*). [29]

Nor does it matter that Plaintiffs request facial relief. "[T]he statute of limitations" analysis is the same, regardless of whether the claimant seeks "facial or as-applied" relief. *Thomas v. County of Humboldt*, 124 F.4th 1179, 1191 (9th Cir. 2024); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 813–21 (2024) (rejecting the contention that facial APA claims begin running the day of a regulation's enactment). That makes sense: "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications"—*i.e.*, that it is inherently defective, as opposed to failing based on the claimant's unique circumstances. *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). *See also Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (facial/as-applied distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint"). It is nonsensical to suppose that Plaintiffs have timely brought an as-applied claim against a law, but that any argument dooming the law's application broadly would be somehow untimely. *See ibid*. ("[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases."). *See also Bucklew*, 587 U.S. at 138 ("Surely it would be strange for the same words of the Constitution to bear entirely different meanings depending only on how broad a remedy the plaintiff chooses to seek."). Indeed, it did not matter that the Seneca

---

[29] It is worth noting that *EklecCo* did not concern the ongoing enforcement of a restriction on an annual leasehold's value; the claimant-developer challenged the underlying legality of a restrictive covenant it had entered into with the town decades earlier. *EklecCo*, 2018 WL 3023159, at *5, *9.

Nation sought a ruling as to "the invalidity of the easement" on its face. *Seneca Nation*, 58 F.4th at 670.

Seeking to circumvent that analysis, Defendants rely on a line of cases originating in the Ninth Circuit (and never followed in this Circuit), which held that a facial takings claim was uniquely time-barred. State Br. 13. *See also id*. at 12 (stating that "the Second Circuit has not addressed the issue"). Even accepting those cases' reasoning, they did not involve any allegation that a law's ongoing enforcement takes a leasehold interest (or part of its value) for the applicable lease period—a period that Defendants' own regulations recognize starts anew every year. *See* N.Y.C. Admin. Code § 26-510(b). Instead, they involved unique "facial" claims where an ordinance's enactment was alleged to effect a taking separate and distinct from any injury resulting from its ongoing *enforcement*. In each case, owners of a mobile-home park challenged an ordinance restricting their ability to increase the rent on mobile-home owners, on the theory that the ordinance's passage transferred a one-time premium to existing renters, who could pocket it by "sell[ing] their mobile homes to third parties." *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 684 (9th Cir. 1993). That transfer, the claimants asserted, required compensating the landlord—even if the law could be constitutionally enforced moving forward. *Id*. at 689. That, the Ninth Circuit held, articulates "a single harm, measurable and compensable when the statute [was] passed"—as distinguished from ongoing harm arising from the law's continued enforcement in other circumstances, years down the line. *Id*. at 688. *See also id*. at 689 ("[N]either the briefs nor the complaint spells out precisely how Levald believes the *application* of the statute has effected a taking."). *Accord Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 954 (9th Cir. 2011) (claimants asserted that ordinance's passage transferred "property value from [mobile-home] park owners and [gave] it to park residents" (cleaned up)), *abrogated on other grounds by Knick*, 588

U.S. 180; *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1115 (9th Cir. 2010) (en banc) ("[Plaintiffs] claim that it is the rent control ordinance itself, not its particularized application to their mobile home park or the regulatory process applied to their park, that has denied them their constitutional rights."). This reasoning should not be extended to time-bar ordinary facial challenges—even to property restrictions. *Thomas*, 124 F.4th at 1191 (allowing facial challenge to property restriction to proceed years after its enactment). This Court should follow the Second Circuit's law on this issue, not out-of-circuit case law that even the relevant circuit has distinguished.

If accepted, Defendants' contrary arguments would mean that whenever a property owner purchased property subject to regulation, the property owner would not be able to sue to invalidate the regulation because the property owner would not have suffered harm. The Supreme Court, however, has expressly rejected that argument. *Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001) ("Future generations, too, have a right to challenge unreasonable limitations on the use and value of land."). Indeed, a regulation's ongoing enforcement causes harm in the form of a "temporary" taking each day it remains in force. *First Eng. Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 319 (1987). In the City's view, regulations become insulated against facial challenge so long as they have been in place longer than the applicable statute of limitations. But, to the contrary, there is no "expiration date on the Takings Clause." *Palazzolo*, 533 U.S. at 627.

### C. Plaintiff SPONY Has Standing.

Defendants assert that Plaintiff SPONY lacks associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (standard for associational standing). They accept that SPONY satisfies the first two *Hunt* factors in that its "members would otherwise have standing to sue in their own right" and "the interests [SPONY] seeks to protect are germane to the organization's purpose." State Br. 10. However, they contend that SPONY fails the third *Hunt*

57

factor, in that its claims "require[] the participation of individual members" because they supposedly depend on factual inquiries regarding the extent to which any given owner has experienced economic loss. *Id.* at 10–11 (citing *Rent Stabilization Ass'n of N.Y.C. v. Dinkins*, 5 F.3d 591, 592–93 (2d Cir. 1993)). That contention is meritless.

As a preliminary matter, this entire inquiry is unnecessary. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). Given that the non-SPONY Plaintiffs undisputedly have "standing . . . , [this Court] need not consider whether [SPONY] also ha[s] standing." *Horne v. Flores*, 557 U.S. 433, 446 (2009).

Regardless, SPONY has standing. First, Plaintiffs' facial claims, by definition, do not depend on any given owner's specific circumstances. *See Yee*, 503 U.S. at 534 (facial takings claim "does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property"). *Accord Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (organization would have standing to seek "a purely legal ruling" on behalf of its members); *Dinkins*, 5 F.3d at 595 (noting, before considering organization's standing to sue on behalf of its members, that its claims "are not facial").[30] For that reason alone, SPONY's standing to seek prospective facial relief against Defendants does not depend on the participation of individual members.

Second, Plaintiffs' as-applied claims invoking the Equal Protection and Due Process Clauses do not depend on the precise economic impact of these laws. Defendants' own cases acknowledge this. *See Dinkins*, 5 F.3d at 596 (explaining that "associations do have standing to

---

[30] Defendants cite *Dinkins* and *Bano* for the proposition that "SPONY's facial . . . takings claims would require the participation of its members," State Br. 11, but as shown above, these cases stand for the precise opposite conclusion.

bring 'as applied' challenges . . . [invoking] the Equal Protection Clause" (discussing *Ne. Fla. Ch. of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656 (1993)). And indeed, the arbitrariness of Defendants' rent caps on any given vacant unit, and the irrationality of imposing such caps only on vacant units in buildings that are more than fifty years old, do not depend on the precise economic impact of any of these caps as applied to any given owner.

To be sure, Plaintiffs' as-applied takings arguments do depend on specific owners' circumstances—that is, on the fact that Defendants' rent caps render identified vacant apartments economically unviable. *Supra* Argument pt. II(A). But those specific owners are also Plaintiffs, obviating any need for SPONY to show standing to seek relief on those owners' behalf. *Compare Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264, & n. 9 (1977) (individual plaintiff's participation obviated need for "corporate plaintiffs" to show standing) *with Bano*, 361 F.3d at 714 (organization sought "to recover damages on behalf of its members").

### D. The City is a Proper Defendant.

The City asserts that the claims against it should be dismissed because Plaintiffs' challenge concerns only "state statutes." City Br. 11. That's incorrect. The City independently restricts all rent adjustments (vacant as well as occupied). Moreover, the City is a government unit that has obtained the value of these rental caps. For both reasons, Plaintiffs may seek prospective and retrospective relief from the City, in addition to the State.

While state law limits rents for vacant apartments, the City's rent-stabilization laws also independently limit owners' ability to collect rents in excess of rates "authorized pursuant to guidelines adopted by a rent guidelines board." N.Y.C. Admin. Code § 26-512(a). Under City law, its board may not allow rent "adjustments for vacancy leases." *id*. § 26-510(j). To be sure, state statutes have entirely prohibited vacancy increases since 2019, N.Y. Unconsol. Law § 8624(e); 9

59

N.Y.C.R.R. § 2522.5(a); *id*. § 2522.8, and, in accordance with those state statutes, the Rent Guidelines Board has allowed zero vacancy increases within the last seven years. *See* Compl. ¶ 41. Invalidating the state statutes would grant the City's Rent Guidelines Board the *option* to allow vacancy increases, but it would not guarantee that it does so—meaning that complete relief would not be possible if only the State were a defendant. Plaintiffs have standing to invalidate City-created "unconstitutional barrier[s]" to entering into vacancy leases at rates of their choosing, just as they have standing to invalidate State-imposed barriers. *Gutierrez v. Saenz*, 606 U.S. 305, 319 (2025).

Moreover, Plaintiffs may seek damages from the City. It is well-settled that just compensation is required, in addition to an injunction prohibiting further takings, in order for takings plaintiffs to be made whole. *First Eng.*, 482 U.S. at 319. Moreover, it is equally well-settled that claimants may seek just compensation from a "government unit that had the benefit of the property taken." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 687 (1978). The City, by invoking these laws (most recently in March 2024), has obtained any benefit from property taken from their enforcement. *See* Compl. ¶ 26. Hence, Plaintiffs may seek just compensation from the City.

### E.  Plaintiffs Preserve Their Arguments Regarding New York's Sovereign Immunity.

Finally, the State Defendants assert that New York's sovereign immunity bars Plaintiffs' claims against it, as well as Plaintiffs' request for retrospective relief against Commissioner Visnauskas, who is sued in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal. State Br. 8–10. As a preliminary matter, Plaintiffs note that even if that were true, it would not preclude *prospective* relief (*i.e.*, a declaration and injunction), nor would it preclude retrospective relief against the City.

Plaintiffs maintain that sovereign immunity does not apply to a suit seeking just compensation, based directly on the Constitution. As the Eleventh Circuit has recently held, in

60

accordance with the great majority of state high courts, the incorporated Fifth Amendment is "self-executing," abrogating sovereign immunity. *Fulton v. Fulton Cnty. Bd. of Comm'rs*, 148 F.4th 1224, 1261–62 (11th Cir. 2025).

Nevertheless, Plaintiffs recognize that the Second Circuit has held otherwise. *See 74 Pinehurst*, 59 F.4th at 570. Accordingly, Plaintiffs accept that under the current law of this Circuit, their claims against New York itself must be dismissed for lack of jurisdiction, and their claims against Commissioner Visnauskas would entitle them only to prospective relief. However, Plaintiffs preserve their arguments on this issue in anticipation of further review.

## CONCLUSION

For the foregoing reasons, the Defendants' respective motions to dismiss Plaintiffs' complaint should all be denied.

DATED: May 1, 2026

Respectfully submitted,

/s/ Suranjan Sen
Suranjan Sen
William Aronin
McCarley Maddock*
INSTITUTE FOR JUSTICE
901 N. GLEBE ROAD, SUITE 900
ARLINGTON, VA 22203
TEL: (703) 682-9320
FAX:  (703) 682-9321
EMAIL:  waronin@ij.com;
         ssen@ij.org;
         mmaddock@ij.com

Robert Johnson*
INSTITUTE FOR JUSTICE
16781 CHAGRIN BLVD., SUITE 256
SHAKER HEIGHTS, OH 44120
TEL: (703) 682-9320
FAX:  (703) 682-9321
EMAIL:  rjohnson@ij.com

61

*Admitted *Pro Hac Vice*
*Attorneys for Plaintiffs Small Property Owners of New York, Inc., RPN Management Co., Inc., PKM Home LLC, and 135 W 78th, LLC*

**CERTIFICATION PURSUANT TO CIVIL RULE 7.1(C) OF THE JOINT
LOCAL RULES OF THE UNITED STATES DISTRICT COURTS FOR THE
SOUTHERN AND EASTERN DISTRICTS OF NEW YORK**

The undersigned certifies that, using the Microsoft Word feature called "Word Count" and excluding the cover page, caption and signature block, the Plaintiffs' Response in Opposition to Defendants' Motions to Dismiss, dated May 1, 2026, contains 20,971 words, fewer than the 21,000-word limit set by Court's order dated February 27, 2026 (ECF No. 71).

Respectfully submitted,

/s/ Suranjan Sen
Suranjan Sen
William Aronin
McCarley Maddock*
INSTITUTE FOR JUSTICE
901 N. GLEBE ROAD, SUITE 900
ARLINGTON, VA 22203
TEL: (703) 682-9320
FAX: (703) 682-9321
EMAIL: ssen@ij.com;
        waronin@ij.org;
        mmaddock@ij.com

Robert Johnson*
INSTITUTE FOR JUSTICE
16781 CHAGRIN BLVD., SUITE 256
SHAKER HEIGHTS, OH 44120
TEL: (703) 682-9320
FAX: (703) 682-9321
EMAIL: rjohnson@ij.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs Small Property Owners
of New York, Inc., RPN Management Co., Inc.,
PKM Home LLC, and 135 W 78th, LLC*

63