# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SMALL PROPERTY OWNERS OF NEW YORK, INC., et al.,<br><br>                 Plaintiffs,<br><br>    v.<br><br>CITY OF NEW YORK, et al.,<br><br>                 Defendants. | Case No. 1:25-cv-9425-JPC |

**BRIEF OF *AMICI CURIAE* THE CHAMBER OF COMMERCE**
**OF THE UNITED STATES OF AMERICA & THE BUSINESS COUNCIL OF NEW**
**YORK STATE, INC. IN SUPPORT OF PLAINTIFFS**

William E. Evans (5664594)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*WEvans@goodwinlaw.com*

*Counsel for Amici Curiae the Chamber of Commerce of the United States of America & The Business Council of New York State, Inc.*

May 8, 2026

**TABLE OF CONTENTS**

**Page**

INTEREST OF THE *AMICI CURIAE* .................................................................................. 1

INTRODUCTION ................................................................................................................ 2

ARGUMENT ....................................................................................................................... 3

    I.    Rent-control measures like New York's Rent Stabilization Law inflict serious economic harms on the leasehold market and the community. .................... 3

        A.    Government price controls distort and harm markets. ..................................... 4

        B.    Rent-control measures like New York's Rent Stabilization Law have similar negative economic effects, harming lessors and renters alike. ............ 6

            1.    Rent control strips owners of revenue and decreases property values. ................................................................................................. 7

            2.    Rent control harms tenants by decreasing housing availability, quality, and development, with negative spillover effects for the entire community. ................................................................................. 9

    II.    The New York Rent Stabilization law imposes an uncompensated taking. ........... 12

        A.    The Complaint states a claim that the New York Rent Stabilization Law is a *per se* taking of leasehold rights from Plaintiffs. ......................... 13

        B.    The Complaint states a claim that the Rent Stabilization Law amounts to a regulatory taking even without *per se* analysis. .................... 14

CONCLUSION .................................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alamo Land & Cattle Co. v. Arizona,*
424 U.S. 295 (1976)............................................................................................13

*Armstrong v. United States,*
364 U.S. 40 (1960)..............................................................................................15

*Cedar Point Nursery v. Hassid,*
594 U.S. 139 (2021)....................................................................................... 13-14

*DM Arbor Ct., Ltd. v. City of Houston,*
150 F.4th 418 (5th Cir. 2025) ............................................................................13

*Horne v. Dep't of Agric.,*
576 U.S. 350 (2015)....................................................................................... 13-14

*Hutton Park Gardens v. Town Council,*
350 A.2d 1 (N.J. 1975)..........................................................................................7

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982)............................................................................................13

*Lucas v. S.C. Coastal Council,*
505 U.S. 1003 (1992)..................................................................................... 13-14

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
435 U.S. 679 (1978)..............................................................................................4

*Nollan v. Cal. Coastal Comm'n,*
483 U.S. 825 (1987)....................................................................................... 15-16

*Pa. Coal Co. v. Mahon,*
260 U.S. 393 (1922)..............................................................................................3

*Penn Cent. Transp. Co. v. City of New York,*
438 U.S. 104 (1978)............................................................................................14

*Pennell v. City of San Jose,*
485 U.S. 1 (1988)................................................................................................15

*Standard Oil Co. v. FTC,*
340 U.S. 231 (1951)..............................................................................................6

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)............................................................................................4

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)..........................................................................................14

**Statutes**

2019 N.Y. Laws ch. 36, pt. B, §§ 1-7 ..................................................................7

N.Y. Unconsol. Law § 8624 ................................................................................7

N.Y. Unconsol. Law § 8624(e)............................................................................2

**Regulations**

9 N.Y.C.R.R. § 2522.5(a) ....................................................................................2

9 N.Y.C.R.R. § 2522.8..........................................................................................2

**Other Authorities**

Brian Asquith, *Affordable Housing in Minneapolis & St. Paul: A Tale of Twin
    Cities*, W.E. Upjohn Inst. for Emp. Rsch., https://tinyurl.com/5hau4xfz (last
    visited May 8, 2026) ..........................................................................................6

David H. Autor, Christopher J. Palmer & Parag A. Pathak, *Housing Market
    Spillovers: Evidence from the End of Rent Control in Cambridge,
    Massachusetts*, 122 J. Pol. Econ. 661 (2014) ...................................................9

Jeffrey H. Birnbaum, *Keep Prices Out of Control*, Fortune, June 25, 2001 ...................................5

Walter Block, *Preface to Rent Control: Myths & Realities* (Fraser Inst. 1981)............................6

Steven B. Caudill, *Estimating the Costs of Partial-Coverage Rent Controls: A
    Stochastic Frontier Approach*, 75 Rev. Econ. & Stat. 727 (1993) .........................................10

Robert T. Deacon & Jon Sonstelie, *The Welfare Costs of Rationing by Waiting*,
    27 Econ. Inquiry 179 (1989)..............................................................................6

Rebecca Diamond, Tim McQuade & Franklin Qian, *The Effects of Rent Control
    Expansion on Tenants, Landlords, and Inequality: Evidence from San
    Francisco*, 109 Am. Econ. Rev. 3365 (2019).........................................................11

Rebecca Diamond, *What Does Economic Evidence Tell Us About the Effects
    of Rent Control?*, Brookings Inst. (Oct. 18, 2018),
    https://tinyurl.com/yzdwc5au...............................................................................12

Anthony Downs, *Residential Rent Controls: An Evaluation* (1988)...............................7, 11

Justin-Damien Guénette, *Price Controls: Good Intentions, Bad Outcomes* (World Bank Grp., Working Paper No. 9212, Apr. 2020), https://tinyurl.com/d8a2dexu ...............................................................................6

Konstantin A. Kholodilin, *Rent Control Effects through the Lens of Empirical Research: An Almost Complete Review of the Literature*, 63 J. Hous. Econ. 1 (2024)........................................................................ 11-12

Adam Lehodey, *Why Are 50,000 New York City Apartments Vacant?*, City J. (Dec. 17, 2025), https://tinyurl.com/3duxc97b ........................................................10

Letter from Thomas Jefferson to John Adams (Oct. 28, 1813), *Founders Online*, Nat'l Archives, https://tinyurl.com/4m4wzm67 ...................................................4

Erik W. Matson, *The Recurrent Evils of Price Controls: John Witherspoon's 1778 Letter to George Washington*, , 29 Indep. Rev. 303 (2024)......................................5

Choon-Geol Moon & Janet G. Stotsky, *The Effect of Rent Control on Housing Quality Change: A Longitudinal Analysis*, 101 J. Pol. Econ. 1114 (1993) ....................... 10-11

NYU Furman Ctr., *Housing Stability and Tenant Protection Act: An Initial Analysis of Short-Term Trends* (July 2021), https://tinyurl.com/jwyxxmns ............................................................ 7-8

Will Parker & Konrad Putzier, *Buyers Return After Rent-Control Slams New York Apartment Values*, Wall St. J. (Feb. 4, 2020), https://tinyurl.com/4mzcp5m6 .........................8

Mark J. Perry, *Many U.S. Metro Areas Have Greater GDP Than Entire Developed Nations*, Found. for Econ. Educ. (Oct. 2, 2018), https://tinyurl.com/2s46h2mc. ..................................................................2

Hugh Rockoff, *Price Controls,* Libr. of Econ. & Liberty, https://tinyurl.com/msc5z38z (last visited May 8, 2026)........................................5

Kenneth T. Rosen, *The Case for Preserving Costa-Hawkins: How Rent Control Reduces Property Values, Hurts Small Businesses and Limits State and Local Tax Revenue* (Fisher Ctr. for Real Estate & Urb. Econ., Univ. of Cal., Berkeley Oct. 2018) ...............................................................................9

Benjamin W. Schweitzer et al., *An Analysis of the Impact of Rent Control on New York City Housing*, 38 Computational Stat. 1643 (2023). ...............................................10

David P. Sims, *Out of control: What can we learn from the end of Massachusetts rent control?*, 61 J. Urb. Econ. 129 (2007)........................................................ 10-11

Thomas Sowell, *Basic Economics: A Citizen's Guide to the Economy* (2000)..............................5

Christina Stacy et al., *Rent Control and the Supply of Affordable Housing*,
     68 J. Hous. Econ. 1 (2025)........................................................................................11

Alec Stapp, *Price Controls Won't Fix What's Ailing the Restaurant Industry*,
     Progressive Pol'y Inst. (Feb. 2021), https://tinyurl.com/9vkr9frf .............................5

Mihir Zaveri, *Mamdani Promised to Freeze the Rent. Now the Fight Begins.*,
     N.Y. Times (Mar. 26, 2026) .....................................................................................9

## INTEREST OF THE *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. Those interests are keenly at stake where, as here, a government taking erodes the property rights on which commerce relies, with sweeping effects.

The Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community, including cases defending constitutional protections for private property rights against government infringement. To that end, the Chamber has filed several *amicus* briefs to inform courts of the pernicious economic consequences that flow from unwise government interference with the leasehold market, as well as their legal significance. *E.g.*, Br. of *Amici Curiae*, *Cella v. Campbell*, No. SJC-13893 (Mass. filed Apr. 16, 2026), Dkt. No. 21; Br. of the Chamber of Commerce of the United States of America as *Amicus Curiae* Supporting Pet'rs, *G-Max Mgmt., Inc. v. New York*, No. 23-1148 (U.S. filed May 23, 2024); Br. of the Chamber of Commerce of the United States of America as *Amicus Curiae* Supporting Pet'rs, *Cmty. Hous. Improvement Program v. City of New York*, No. 22-1095 (U.S. filed June 9, 2023).

The Business Council of New York State, Inc., is the leading business organization in New York State. It represents the interests of firms large and small, and its membership consists of over

---

[1] No counsel for a party authored this brief in whole or in part. No party, no counsel for a party, and no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

3,000 companies that employ more than 1.2 million New Yorkers.  As an advocate for New York's employers, the Council brings a unique perspective to this challenge to the State's Rent Stabilization Law, which negatively impacts many of the Council's members, as well as their employees in need of reasonably affordable housing.

Because the Rent Stabilization Law distorts and weakens the leasehold market of the largest metropolitan economy in the country, *amici* have a strong interest in the issues presented by this case.[2]  *Amici* submit this brief to provide additional context and evidence supporting Plaintiffs' argument that the Rent Stabilization Law is not just a flawed policy, but also a transgression of the Constitution's limits on the regulation of property.

**INTRODUCTION**

The provisions of the Rent Stabilization Law at issue in this case set draconian and arbitrary limits on the rents that can be charged in certain vacant units.  The law requires that rent for such units be set based on the same rate charged to the last occupant of the unit—no matter how anomalous and how far below current market rates that rate might be—and permits only minor upward adjustments that do not come close to capturing the costs required for improvement and maintenance of the units.  *See* N.Y. Unconsol. Law § 8624(e); 9 N.Y.C.R.R. §§ 2522.5(a), 2522.8. As Plaintiffs have ably set forth in their Complaint and opposition to the pending motions to dismiss, the law has been devastating for small-scale property owners in New York.  Some apartments in these owners' buildings have languished off the market for years—because now the maintenance and improvement costs of renting those units far exceed what can be collected in rent. The resulting harm to these small-scale owners cannot be exaggerated.  Some invested their life

---

[2] *Cf.* Mark J. Perry, *Many U.S. Metro Areas Have Greater GDP Than Entire Developed Nations*, Found. for Econ. Educ. (Oct. 2, 2018), https://tinyurl.com/2s46h2mc.

savings into buildings with units covered by the relevant regulations; their livelihoods are now at risk.

Sadly, these harms were entirely predictable. Economists broadly agree that government efforts to interfere with market prices, including housing prices, exacerbate rather than solve pricing problems. Indeed, instead of making housing cheaper and more broadly available, studies show that rent controls drive down the housing supply, run up housing costs, decrease property values, and hurt city economies. The upshot is that all parties—property owners, renters, and the broader community—are left worse off. The Rent Stabilization Law, which has *reduced* the inventory of affordable housing that it was designed to grow, confirms this consensus.

Given the extensive and specific pleadings in the Complaint and this broader context, Plaintiffs have stated a plausible takings claim (among other plausible claims) under multiple theories. First, by rendering vacant units in their buildings impossible to rent for a profit, the law deprives owners like Plaintiffs of their right to make economically beneficial use of their property—a classic *per se* taking as applied to Plaintiffs. Second, the law "goes too far" in frustrating these property owners' reasonable, investment-backed expectations, *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)—and it does so in a manner that is fundamentally arbitrary and counterproductive. On that basis as well, the law is an impermissible taking as applied to Plaintiffs.

The motions to dismiss should be denied.

## ARGUMENT

### I.    Rent-control measures like New York's Rent Stabilization Law inflict serious economic harms on the leasehold market and the community.

The Rent Stabilization Law is a price control like any other: ineffective at best, and counterproductive at worst. For decades, economic theory has foretold that rent controls badly disrupt the market and its rational pricing mechanisms, with serious negative consequences. And

3

in recent years, empirical evidence has shown the economists were right all along.  But rather than heed their warnings, state and local governments continue their ill-fated experiments with price controls in the rental market—to the detriment of both lessors and tenants.

### A.    Government price controls distort and harm markets.

At the heart of the American economic model is free choice.  That was so at the Founding, when the primary mode of economic freedom was found in either "hav[ing] land to labor," or "exact[ing] for [labor] such compensation as . . . to afford a comfortable subsistence."  Letter from Thomas Jefferson to John Adams (Oct. 28, 1813), *Founders Online*, Nat'l Archives, https://tinyurl.com/4m4wzm67.  Today, that liberty is further exercised by consumers of goods or services who patronize producers and service providers on the basis of market competition.  Those market participants all rely on price, "the central nervous system of the economy," to engage in free and rational commerce.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).

In every market, price conveys crucial information about product quality, scarcity, and demand.  For well-functioning markets, price represents the intersection of what those seeking a good or service (*e.g.*, renters) are willing to pay, as well as what suppliers (*e.g.*, lessors) are willing to accept in exchange for their goods, labor, and investment (*e.g.*, a leasehold).  When market participants have unfettered access to alternatives, "all elements of a bargain"—price as well as quality—are "favorably affected."  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

Price controls distort that process, to the detriment of all market participants.  An effective control lowers price below market levels; otherwise, no cap would be necessary.  Suppliers of a price-capped good or service see their revenues decrease and, consequently, the value of their property diminishes.  Some may attempt to recoup those losses by imposing charges that evade

4

the cap.  If those attempts succeed, the cap is rendered ineffective and the real price of the good or service remains unchanged.  But if unsuccessful, some suppliers will provide less of the price-capped good or service, others will exit the market altogether, and shortages will ensue.  Suppliers that choose to stay in the market have fewer incentives to invest in improvements or quality control.  Thus, even when imposed with the best of intentions, price controls have harmful and, indeed, counterproductive effects:  Instead of making goods more affordable, price caps make them scarcer.  *See, e.g.*, Hugh Rockoff, *Price Controls,* Libr. of Econ. & Liberty, https://tinyurl.com/msc5z38z (last visited May 8, 2026); Alec Stapp, *Price Controls Won't Fix What's Ailing the Restaurant Industry*, Progressive Pol'y Inst. 7-8 (Feb. 2021), https://tinyurl.com/9vkr9frf.

The negative effects of price controls are well-established in economic theory.  As one commentator has observed, "[t]wo words rarely appear in the same sentence:  economists and consensus.   But on the issue of price controls, they belong together," because "[t]he famously divided profession agrees that government-imposed price caps generally don't work and, in fact, only make matters worse."   Jeffrey H. Birnbaum, *Keep Prices Out of Control*, Fortune, June 25, 2001, at 36; *see also, e.g.*, Thomas Sowell, *Basic Economics: A Citizen's Guide to the Economy* 29 (2000) (explaining that economists are in "virtually unanimous agreement that declines in product quantity and quality are the usual effects of price controls").  This consensus reflects centuries-old wisdom:  In 1777, for example, John Witherspoon warned the Continental Congress that "it is beyond the power of despotic princes to regulate the price of goods."  Erik W. Matson, *The Recurrent Evils of Price Controls: John Witherspoon's 1778 Letter to George Washington*, 29 Indep. Rev. 303, 309 (2024).

In recent decades, numerous empirical studies have confirmed the basic intuition that

price controls inflict widespread harms on the economy.  *See, e.g.*, Robert T. Deacon & Jon Sonstelie, *The Welfare Costs of Rationing by Waiting*, 27 Econ. Inquiry 179, 179 (1989) (studying price controls on gasoline in the 1970s); Justin-Damien Guénette, *Price Controls: Good Intentions, Bad Outcomes* 3, (World Bank Grp., Working Paper No. 9212, Apr. 2020), https://tinyurl.com/d8a2dexu (discussing studies of price controls across different sectors and evidence showing that "price controls often undermine growth and development").   On this issue, then, practice has confirmed what theory has long hypothesized:  Far from serving the general welfare, price controls ultimately are harmful and distort rationally competitive markets.  *Cf. Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951) ("The heart of our national economic policy long has been faith in the value of competition.").

### B.    Rent-control measures like New York's Rent Stabilization Law have similar negative economic effects, harming lessors and renters alike.

These principles apply with full force to rent-control measures, a species of price control that inflicts injuries on both halves of the property-rental market (property owners and tenants), as well as the broader community.

Rent control decreases the value of owners' rental properties, and for some owners, it destroys the value of their leaseholds entirely.  Those harms repeatedly have been documented in empirical studies observing the effects of state and local rent-control measures.  *See, e.g.*, Brian Asquith, *Affordable Housing in Minneapolis & St. Paul: A Tale of Twin Cities*, W.E. Upjohn Inst. for Emp. Rsch., https://tinyurl.com/5hau4xfz (last visited May 8, 2026); Walter Block, *Preface to Rent Control: Myths & Realities*, at xiii (Fraser Inst. 1981) (explaining that "[e]conomists who have researched [the] effects" of price controls for rent "are virtually unanimous in their assessment" that such controls are bad policy).  The harms also are severe for tenants, who face lower rental inventory and decreased housing quality as a direct result of rent-control measures.

6

Moreover, the ripple effects from rent control cause harms beyond the property market by decreasing labor mobility and reducing consumers' ability to spend on other goods and services.

### 1. Rent control strips owners of revenue and decreases property values.

Rent control inflicts significant and direct economic harm on property owners. Some lessors own and operate rental properties as their livelihoods; in such cases, the properties can account for much of the owners' net worth. Imposing rent control undermines these owners' investment-backed expectations by severely reducing the income their properties were anticipated to generate absent artificial price caps. In turn, property values diminish, as prospective buyers recognize that they, too, will be subject to the same depressed income opportunity. That is particularly true for properties specifically designed for leasing, such as those in which separate apartments, with separate facilities, have been built. These properties demand significant expense before they can be converted to other uses. *See Hutton Park Gardens v. Town Council*, 350 A.2d 1, 14 n.9 (N.J. 1975) (emphasizing that the "supposed freedom of landlords to abandon the business is largely illusory" because converting a rental unit to a new use is "ordinarily economically prohibitive"); *see also* Anthony Downs, *Residential Rent Controls: An Evaluation* 23 (1988) (hereinafter "*Downs*") (discussing how rent control operates as a "capital tax" on property owners).

Research shows that the Rent Stabilization Law already has caused such harms. Economists at New York University recently analyzed data from the years immediately following the enactment of the Housing Stability and Tenant Protection Act ("HSTPA") in 2019, which amended the Rent Stabilization Law to eliminate vacancy adjustments and thereby impose the vacant-apartment rent controls at issue here. *See* 2019 N.Y. Laws ch. 36, pt. B, §§ 1-7 (codified at N.Y. Unconsol. Law § 8624). Following passage of the HSTPA, the "sales price per square foot of all properties fell," and sales dropped "the most for properties in which 26 to 75 percent of the apartments were rent-stabilized." NYU Furman Ctr., *Housing Stability and Tenant Protection*

*Act: An Initial Analysis of Short-Term Trends* 2 (July 2021), https://tinyurl.com/jwyxxmns.   The

loss in property value was stark:  The *Wall Street Journal* reported a 25% decline for rent-regulated

apartment buildings.  *See* Will Parker & Konrad Putzier, *Buyers Return After Rent-Control Slams*

*New York Apartment Values*, Wall St. J. (Feb. 4, 2020), https://tinyurl.com/4mzcp5m6.

The harms that the Rent Stabilization Law has inflicted on small-scale property owners like

Plaintiffs have been especially "severe[]."   Compl. ¶ 125.   As the Complaint alleges in detail,

"[s]ome of th[e] [affected] apartments" owned by Plaintiffs or their members "have been sitting

vacant for" years, because the "monthly rents" for these units "are capped as low as $200 or $300"—

***thousands*** of dollars less than they would command on the free market today.  *Id.* ¶¶ 130-31, 146-

47, 151-52, 219-22.  And "small-scale property owners" like Plaintiffs and their members "are less

able to absorb rising building costs when compared [to] larger owners"; among other things, "they

lack the ability to spread costs a[cross] many buildings or tenants; they enjoy less access to capital

that could allow renovations of units; and they are less able to endure long periods of monetary

losses." *Id.* ¶ 126.  Thus, "the inability to reset stabilized vacant units' rent to market rates makes it

particularly difficult for" these small-scale landlords "to survive as building owners."  *Id.* ¶ 127.

Indeed, "[m]any of [Plaintiff] SPONY's members are barely able to make ends meet on their

buildings" because of these vacant-unit price caps, and "[s]ome of SPONY's members are in

imminent danger of losing ownership of their buildings." *Id.* ¶¶ 132-33.

Scholarship confirms that the harms Plaintiffs and other New Yorkers have experienced are

not anomalous and cannot be explained by quirks in the local market—rent controls have had similar

negative effects across the country.  For example, a study of Berkeley, California's rent-control

measures and their impact on property values in the 1970s and 1980s determined that the inflation-

adjusted rental value of housing there decreased from 1970 to 1988, while the value of rental

8

properties in communities across the rest of Alameda County (which had no such measures) doubled. *See* Kenneth T. Rosen, *The Case for Preserving Costa-Hawkins: How Rent Control Reduces Property Values, Hurts Small Businesses and Limits State and Local Tax Revenue* 7 (Fisher Ctr. for Real Estate & Urb. Econ., Univ. of Cal., Berkeley Oct. 2018). Conversely, researchers at the Massachusetts Institute of Technology, who analyzed Cambridge, Massachusetts's reversal of rent control policies in the 1990s, observed "compelling evidence that the elimination of rent control raised the market values" of both "decontrolled" and "never-controlled properties." David H. Autor, Christopher J. Palmer & Parag A. Pathak, *Housing Market Spillovers: Evidence from the End of Rent Control in Cambridge, Massachusetts*, 122 J. Pol. Econ. 661, 667 (2014).

Time and again, rent-control measures have led to the same negative outcomes—badly diminishing the value of rental property and threatening the livelihood of small-scale property owners. As the Complaint's allegations confirm, the Rent Stabilization Law is no different.

### 2. Rent control harms tenants by decreasing housing availability, quality, and development, with negative spillover effects for the entire community.

Property owners are not the only ones who feel the negative effects of rent control. The harms extend to renters as well, and they ultimately affect the whole community.

To understand why, return to the Complaint's allegations. The Complaint explains that, as a direct result of the Rent Stabilization Law's price caps for vacant units, affected units languish unoccupied for years. *E.g.*, Compl. ¶¶ 129-30, 143-44, 149, 156, 184-85, 189, 216-17, 222, 263. The reason is that leasing these units at such depressed prices makes no economic sense—last year, owners of vacant units could raise their one-year rents by only 3% over that charged to a previous tenant, even if the unit has been vacant for nearly a decade. Mihir Zaveri, *Mamdani Promised to Freeze the Rent. Now the Fight Begins.*, N.Y. Times (Mar. 26, 2026). The costs to perform required

9

maintenance on these units far exceed the return from rents. *E.g.*, Compl. ¶¶ 159-61, 192-93, 195, 225-26, 228. And the units in the same buildings that remain available are left in poorer condition than they otherwise would be, as property owners are limited in how much they can invest in maintenance and upkeep. In the end, just like owners, renters lose out in this process—they must choose from a depleted housing inventory, and the options left to them are of significantly lower quality than what the free market offers.

These harms to renters have been felt across the New York City housing market. Studies of the region show that "rent controlled homes are associated with higher damage rates than non-rent controlled homes." Benjamin W. Schweitzer et al., *An Analysis of the Impact of Rent Control on New York City Housing*, 38 Computational Stat. 1643, 1643 (2023). And recent estimates suggest that owners have chosen to leave as many as ***50,000 apartments*** vacant, rather than accept the economically irrational bargain of collecting severely deflated rents in exchange for high maintenance and upkeep costs. *See* Adam Lehodey, *Why Are 50,000 New York City Apartments Vacant?*, City J. (Dec. 17, 2025), https://tinyurl.com/3duxc97b. Economists also have concluded that New York's Rent Stabilization Law has increased the rents for other tenants by as much as 25%. *See* Steven B. Caudill, *Estimating the Costs of Partial-Coverage Rent Controls: A Stochastic Frontier Approach*, 75 Rev. Econ. & Stat. 727, 731 (1993).

Again, these problems are not unique to the New York market—renters face the same negative effects in other rent-controlled cities. A survey of data for properties in the Boston area in the 1985-1998 timeframe found that "[r]ent control decrease[d] . . . unit maintenance." David P. Sims, *Out of control: What can we learn from the end of Massachusetts rent control?*, 61 J. Urb. Econ. 129, 150 (2007) (hereinafter "*Sims*"). Similar findings have been reported across many regions. *See* Choon-Geol Moon & Janet G. Stotsky, *The Effect of Rent Control on Housing Quality*

10

*Change: A Longitudinal Analysis*, 101 J. Pol. Econ. 1114 (1993) (reporting findings that rent control leads to lower housing quality); *Downs* at 20 (describing analyses in New York and Los Angeles that found rental properties under rent control were "on average, clearly in worse physical condition than decontrolled properties"); Konstantin A. Kholodilin, *Rent Control Effects through the Lens of Empirical Research: An Almost Complete Review of the Literature*, 63 J. Hous. Econ. 1, 6 (2024) (hereinafter "*Kholodilin*") (describing academic literature as "almost unanimous" regarding the conclusion that rent control "leads to a deterioration in the quality of those dwellings subject to regulations").

Studies from a number of different housing markets also show that rent control reduces the supply of available apartments. Reviewing Boston housing data of the 1990s, research indicated that rent control "induce[d] owners to remove their units from the rental market." *Sims* at 130. A study of San Francisco showed that, over the long run, rent control "shifted the city's housing supply toward less affordable types of housing," in turn "dr[iving] up citywide rents, damaging housing affordability for future renters," and "counteracting the stated claims" of such policies. Rebecca Diamond, Tim McQuade & Franklin Qian, *The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco*, 109 Am. Econ. Rev. 3365, 3366 (2019). Consistent with those results, analysts have found "that rent control is associated with a 10.4% reduction in the ***total*** number of [rental housing] units in a city," not just those subject to price caps. Christina Stacy et al., *Rent Control and the Supply of Affordable Housing*, 68 J. Hous. Econ. 1, 2 (2025) (emphasis added).

The ill effects of rent control therefore harm owners and tenants alike. But the harms do not stop with those stakeholders: Interference with the rental market has spillover effects for the wider economy. Lowering the value of rentable property "create[s] substantial negative

externalities on the nearby housing market," "fuels gentrification," and decreases a city's tax base. Rebecca Diamond, *What Does Economic Evidence Tell Us About the Effects of Rent Control?*, Brookings Inst. (Oct. 18, 2018), https://tinyurl.com/yzdwc5au.  It also "yield[s] unfavorable outcomes for the job market, as reduced residential mobility translates to less adaptable responses to shifts in the labor market"; businesses struggle to expand for lack of readily available labor. *Kholodilin* at 5.  And for consumers, as the supply of rentable housing decreases, the cost of housing increases—leaving less disposable income for all other expenses.  Thus, the ripple effects of rent control damage entire economies.

*        *        *

The evidence is clear—rent-control measures have caused wide-ranging and destabilizing harms to property owners, renters, and broader regional economies.  The severe injuries suffered by Plaintiffs are part of this pattern.

## II.    The New York Rent Stabilization law imposes an uncompensated taking.

These well-documented economic harms are not ancillary policy concerns.  Rather, they are central to Plaintiffs' case here, particularly their core as-applied takings claim.  The Fifth Amendment, as incorporated against the States by the Fourteenth Amendment, prohibits the taking of private property without just compensation.   The vacant-unit provisions of the Rent Stabilization law violate this prohibition.  Because the law renders Plaintiffs' vacant rental units economically unleasable, it effects a *per se* taking of those units.  And should this Court go beyond the *per se* analysis, the bottom line is the same:  The harms to property owners documented in the Complaint and confirmed by broader context show that the law amounts to a taking of Plaintiffs' property without just compensation.

12

A. **The Complaint states a claim that the New York Rent Stabilization Law is a *per se* taking of leasehold rights from Plaintiffs.**

Leaseholds are constitutionally protected property interests. *See Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 303 (1976) (observing that "[i]t has long been established" that "leasehold interest[s]" are protected by the Fifth Amendment). When the government "physically acquires private property for a public use"—whether by using "its power of eminent domain to formally condemn property," by "physically tak[ing] possession of property without acquiring title to it," or by "occup[ying] property" in some other way—"the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021). The Supreme Court repeatedly has applied this "clear and categorical" rule to deem physical invasions of property to be takings, whatever form those physical invasions may take. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 423-24, 434-35, 438 (1982) (law requiring landlords to allow cable companies to install equipment on their buildings was a *per se* taking); *Horne v. Dep't of Agric.*, 576 U.S. 350, 355, 357-362 (2015) (law requiring raisin growers to set aside a certain percentage of their harvest was a *per se* taking); *Cedar Point Nursery*, 594 U.S. at 147-49 (law requiring property owners to allow union officials on their premises was a *per se* taking).

But *per se* takings are not limited to literal infringements of the right to exclude. The Supreme Court has long recognized that, "where regulation denies all economically beneficial or productive use of land," *per se* or "categorical treatment [is] appropriate." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-16 (1992). That principle applies here: When a "property's highest use is to sit idle" as a result of government action, "a categorical taking [has] occurred." *DM Arbor Ct., Ltd. v. City of Houston*, 150 F.4th 418, 423, 426 (5th Cir. 2025). Plaintiffs have alleged that the Rent Stabilization Law's arbitrary vacant-unit price caps make those units impossible to rent

13

profitably, rendering the units useless space.  Compl. ¶¶ 129, 179-80, 210-11, 222, 249-50. Plaintiffs thereby are deprived of "all economically beneficial or productive use of" of this property. *Lucas*, 505 U.S. at 1015.  That is a *per se* taking.

The Takings Clause is not a bar on government regulation.  Rather, it dictates that when government regulates property in a particularly onerous way (by denying all economically beneficial or productive use of the property), it has a "clear and categorical obligation to provide the owner with just compensation."  *Cedar Point Nursery*, 594 U.S. at 147.  The Complaint plausibly alleges that the Rent Stabilization Law triggers that categorical obligation here.

**B.    The Complaint states a claim that the Rent Stabilization Law amounts to a regulatory taking even without *per se* analysis.**

Even if the Rent Stabilization Law's cap on prices for vacant units were not a *per se* taking, it still would fall afoul of the regulatory-takings doctrine.

The doctrine applies to claims that the government has taken property by unduly "restrict[ing] an owner's ability to use his own property."  *Id.* at 148.  Courts employ an "'ad hoc' factual inquiry," which trains on whether "a restriction on the use of property went 'too far,'" *Horne*, 576 U.S. at 360, thus requiring "complex factual assessments of the purposes and economic effects of government actions," *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992).  Relevant factors include "[t]he economic impact of the regulation on the claimant"; "the extent to which the regulation has interfered with distinct investment-backed expectations"; and "the character of the governmental action.'"  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

Under those guideposts, the vacant-unit provisions of the Rent Stabilization Law amount to a regulatory taking of Plaintiffs' property.  Plaintiffs have alleged that, as a direct result of the relevant regulations, vacant units in their buildings have been made economically irrational to rent, leaving them empty and unusable for years.  Compl. ¶¶ 129-30, 143-44, 149, 156, 184-85, 189,

14

216-17, 222, 263. As a result, their investment-backed expectations have been dramatically frustrated; indeed, their very livelihoods as small-scale landlords are in jeopardy. *Id.* ¶¶ 126-27, 132-33; *see supra* p. 8. Those harms are borne out by the broader data, which show that the relevant 2019 amendments to the Rent Stabilization law have slashed regulated property values by 25% and driven property owners to leave 50,000 units indefinitely empty. *See supra* pp. 8, 10.

The character of the regulation makes plain a taking has happened. This is not an example of even-handed regulation affecting all interested parties equally. As the Complaint explains: "Each apartment's regulated rent reflects its history of prior tenant turnover over the past five decades, a metric that bears no relationship to an incoming, unrelated tenant. As a result, essentially identical vacant apartments are subject to wildly disparate rental caps, for no material reason." Compl. ¶ 1; *see also id.* ¶¶ 40, 59-61, 64, 87, 146, 148, 151, 153-56. The Takings Clause embodies the bedrock principle that the government cannot "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The Rent Stabilization Law violates that prohibition, by forcing certain landlords to subsidize housing relief based solely on the vagaries of the rental history of vacant units in their buildings.

That alone would state a takings claim, but the problem with the Rent Stabilization Law goes deeper still. A basic regulatory-takings principle is that the "evident constitutional propriety" of a law affecting property rights "disappears … if the condition … utterly fails" to redress the problem it targets. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987); *accord Pennell v. City of San Jose*, 485 U.S. 1, 20 (1988) (Scalia, J., concurring in part and dissenting in part) (validity of "land-use regulation" depends on whether there is a "cause-and-effect relationship between the property use restricted by the regulation and the social evil that the regulation seeks

15

to remedy"). That is the case here. The Rent Stabilization Law has the unfortunate distinction of "utterly fail[ing]" to alleviate affordable-housing problems in New York. *Nollan*, 483 U.S. at 837. Instead, it has just made the problem worse by driving tens of thousands of units off the market and lowering the quality and value of available housing across the board. The end result is that landlords and renters have been harmed, and the broader economy is worse off too. Surely these poor results cannot justify the dramatic abrogation of property rights the Rent Stabilization Law has inflicted on Plaintiffs. By any measure, then, this law is an unconstitutional taking.

<b>CONCLUSION</b>

For these reasons and those given in Plaintiffs' opposition papers, the Court should deny the motions to dismiss.

Dated: May 8, 2026

Respectfully submitted.

*/s/ William E. Evans*
William E. Evans (5664594)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*WEvans@goodwinlaw.com*

*Counsel for* Amici Curiae *the Chamber of Commerce of the United States of America & The Business Council of New York State, Inc.*

16

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of New York by using the court's CM/ECF system on May 8, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

Dated: May 8, 2026

/s/ William E. Evans
William E. Evans (5664594)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
WEvans@goodwinlaw.com

Counsel for Amici Curiae the Chamber of Commerce of the United States of America & The Business Council of New York State, Inc.

17